## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and SMITH & WESSON INC.**<br><br>**Plaintiffs,**<br>**v.**<br><br>**GURBIR S. GREWAL,** *in his official capacity as Attorney General of the State of New Jersey* **and NEW JERSEY DIVISION OF CONSUMER AFFAIRS**<br><br>**Defendants.** | **CIVIL ACTION**<br><br>**CASE NO. _____**<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiffs Smith & Wesson Brands, Inc., Smith & Wesson Sales Company, and Smith & Wesson Inc. (collectively, "Smith & Wesson" or "Plaintiffs") hereby file this Complaint for Declaratory and Injunctive Relief against Defendants Gurbir S. Grewal, in his official capacity as Attorney General of the State of New Jersey (the "Attorney General"), and the New Jersey Division of Consumer Affairs.  In support of its claims, Smith & Wesson alleges as follows:

### INTRODUCTION AND BACKGROUND FACTUAL ALLEGATIONS

1.     The First Amendment to the U.S. Constitution guarantees the right to free speech no matter whether the government disagrees with that speech.  Benjamin Franklin articulated it this way: "Freedom of speech is a principal pillar of a free government . . . .  When this support is taken away, the constitution of a free society is dissolved."[1]  Indeed, governments throughout

---

[1] Benjamin Franklin, "On Freedom of Speech and the Press", Pa. Gazette (Nov. 17, 1737).

history have abused their power by punishing speech to suppress dissent and harm political opponents.

2.     Following in the abusive footsteps of these repressive regimes, the New Jersey Attorney General has taken a series of actions to suppress Smith & Wesson's speech, and with the intention of damaging Smith & Wesson both financially and reputationally.  The most recent such action is the issuance of an administrative subpoena (the "Subpoena") on October 13, 2020 that allegedly seeks evidence of consumer fraud relating to advertising – but in reality, it seeks to suppress and punish lawful speech regarding gun ownership in order to advance an anti-Second Amendment agenda that the Attorney General publicly committed to pursue.

3.     The Subpoena presents no legitimate inquiry into any purported fraud, and instead targets mere opinions and other protected statements allegedly made by Smith & Wesson, such as (1) whether Smith & Wesson's products are "safe," make a home safer, or enhance one's lifestyle; (2) whether an untrained consumer could successfully and effectively use a Smith & Wesson firearm for personal or home defense; and (3) whether private citizens should have the right to carry a concealed firearm.  The only fraud here is the Attorney General's abuse of his position to suppress a political viewpoint with which he disagrees.

4.     As the Supreme Court has recognized, "the enshrinement of constitutional rights takes certain policy choices off the table."[2]  Here, what must be off the table is the Attorney General's repeated abuse of power that violates the First, Second, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, as well as the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901 *et seq.* (the "PLCAA").

---

[2] *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

2

5.      Smith & Wesson is a good corporate citizen that is a leader on gun safety initiatives in the industry.   And Smith & Wesson has worked, and continues to work, with various government and law enforcement agencies to address issues relating to the illegal use of firearms. What the Attorney General seeks to do through his actions is impermissible as long as the guarantees of free speech and the right to bear arms remain in the Constitution.  The Attorney General and his anti-Second Amendment allies must seek the changes they want made through the will of the People, rather than by using a shadow pressure campaign of unlawful litigation and government regulatory action.

6.      Beyond the issuance of the Subpoena, the Attorney General, in coordination with anti-Second Amendment Activists (the "anti-Second Amendment Activists"), has also implemented a "name and shame" policy through which he presents to the public at large what he characterizes as a "connection" between "crime guns" and Smith & Wesson.  In reality, however, the Attorney General is simply using the power of the State to extra-legally brand Smith & Wesson as a bad actor in an obvious attempt to cause harm to Smith & Wesson's business and reputation.

7.      The intentional overreach of the facially invalid Subpoena and punitive intent of the Attorney General's "name and shame" initiative make no sense as an exercise of prosecutorial authority, but they make perfect sense when seen for what they really are – the latest chapter in efforts by anti-Second Amendment Activists, hostile to the private ownership of firearms, to impose, through coercion, a gun control agenda which they largely have been unable to impose through the federal or state legislative process or through the courts.

8.      In this new chapter, the anti-Second Amendment Activists have accepted that they cannot be successful through democratic means.   To overcome the inability to achieve their political objectives through the legislative process, they instead attempt to bypass the legislative

3

process and engage in abusive litigation, along with investigatory and other tactics, to create sufficient "pressure" to compel Smith & Wesson to "voluntarily" adopt "reforms" consistent with the activists' gun control agenda.

9.      The Attorney General and State of New Jersey have now publicly partnered with the anti-Second Amendment Activists in order to add the weight of the regulatory and enforcement powers of the State to the activists' existing "lawfare" campaign.

10.      The approach pursued here by the Attorney General and the anti-Second Amendment Activists draws on the tactics employed by the anti-gun movement in the 1980s and 1990s. Frustrated by their inability to achieve broad restrictions on the constitutional right to own and carry firearms through the legislative process, anti-Second Amendment Activists largely abandoned the democratic process and developed a new approach specifically designed to circumvent that democratic process and the protections afforded to all citizens through the Second Amendment.

11.      Back then, the activists sought to litigate manufacturers out of existence by launching overwhelming numbers of legal and regulatory actions to hold firearms businesses liable for the criminal misuse of their products by unrelated third parties. The regulatory and legal actions were designed to be so prohibitively expensive that the firearms industry would have no choice but to capitulate to the gun control demands of the anti-Second Amendment Activists. The outcome of the lawsuits largely was irrelevant as the mere costs of litigating would achieve their objectives.

12.      As here, the anti-Second Amendment Activists enlisted states and municipalities as partners in this scheme, placing the inexhaustible resources of the local governments behind this

effort.  For example, between 1998 and 2000, there were 19 lawsuits filed against firearms manufacturers and other members of the firearms industry by states and municipalities.

13.     Congress recognized that the abusive litigation and investigatory tactics of anti-Second Amendment Activists, which included various states and municipalities, were causing significant damage to the firearms industry.  As a result, in 2005 Congress introduced a bill that would become the PLCAA.

14.     Through the PLCAA, Congress expressly recognized and sought to put a stop to the strategy of litigating the firearms industry out of existence.  Senator Tom Coburn, a co-sponsor of the PLCAA, emphasized that "anti-gun activists" were looking "to constrict the right to bear arms" by "attack[ing] the arms industry financially through . . . frivolous lawsuits," which were "part of a stealth effort to limit gun ownership" in the United States.  Senator Coburn further recognized the obvious, that "huge costs . . . arise from simply *defending* [the] unjustified lawsuits[,]" and that the mere existence of the suits caused the manufacturers' insurance rates to "skyrocket," with "some manufacturers [even] being denied insurance" entirely and others "seeing their policies canceled[.]" 151 Cong. Rec. S9,062 (daily ed. July 27, 2005) (emphasis added).

15.     Congress was not merely concerned with lawsuits, but all manner of attacks on the firearms industry through the use of legal process including, as is the case here, the abuse of the investigative process by states and municipalities.  Congress found that permitting "[t]he liability actions commenced or contemplated by . . . States, municipalities, and private interest groups" would "expand civil liability in a manner never contemplated by the framers of the Constitution," and would "constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution." 15 U.S.C. § 7901(a)(7).

16.     The PLCAA is clear and unambiguous, and led to the courts dismissing a myriad of lawsuits because the anti-Second Amendment Activists could not establish, as they are now required to do, any nexus between the criminal use of firearms, and the lawful conduct of firearms industry.

17.     Only a few years after the passage of the PLCAA, the anti-Second Amendment Activists were dealt a second blow when the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Heller* struck down the District of Columbia's Firearms Control Regulations Act of 1975, which imposed the strict ban on firearms advocated by the anti-Second Amendment Activists.  In so doing, the Supreme Court affirmed the broad right to keep and bear arms.

18.     Frustrated by their inability to impose their gun control agenda as a result of the PLCAA and *Heller,* as well as resistance to their agenda in legislatures across the country, the anti-Second Amendment Activists continued to seek alternatives means to achieve their objectives.  However, an inability to work together around an agreed agenda minimized the effectiveness of their efforts.

19.     This changed significantly in 2013 with the formation of two new gun control groups with substantial financial backing and political and media contacts – Giffords Law Center to Prevent Gun Violence ("Giffords"), created by former U.S. Representative Gabrielle Giffords, and Everytown for Gun Safety ("Everytown"), founded by Michael Bloomberg, former New York City mayor and owner of Bloomberg, L.P.

20.     That same year, reports emerged of the formation of a new initiative, combining the resources of a number of major U.S. law firms with anti-Second Amendment activist

organizations like Giffords and the Brady Center to Prevent Gun Violence ("Brady").  In 2016, this initiative was launched as the Firearms Accountability Counsel Task Force ("FACT").[3]

21.    The FACT law firms committed to "unprecedented cooperation" among themselves in pursuing the gun control agenda.  Tellingly, FACT was charged with finding a way to resume the abusive litigation strategies – or, in their own language, "craft[ing] creative legal strategies" – designed to circumvent legislative and constitutional limitations which were previously employed by anti-Second Amendment Activists with great success prior to the enactment of the PLCAA.  As reported by the New York Times,

> Rather than fighting the political headwinds, the coalition is focusing on courts and state regulatory agencies, among the few places where they might still gain some traction. The coalition is drafting lawsuits and preparing regulatory complaints that could be announced as soon as next month, according to the Law Center to Prevent Gun Violence, one of the nonprofit advocacy groups that helped form the coalition, along with the Brady Center to Prevent Gun Violence and the Brennan Center for Justice, a legal think tank at New York University School of Law.

22.    At about this same time, other anti-Second Amendment Activists began a concerted effort to use shareholder resolutions to convince the shareholders of publicly-traded firearms companies to adopt benign-sounding "human rights" proposals, which obscured the fact that they sought to impose hundreds of billions of dollars in liability.  The human rights approach was a ruse

---

[3] *See* Jessica Silver-Greenberg and Ben Protess, "Gun Control Advocates Find a Deep-Pocketed Ally in Big Law," The New York Times, Dec. 7, 2016, *available at* https://www.nytimes.com/2016/12/07/business/dealbook/gun-control-big-law-firms.html.

designed to use "international human rights law as a counterweight to Americans' constitutional right to keep and bear arms . . . ."[4]

23.    As with the litigation strategy employed by FACT, the activists driving the human rights strategy sought to impose crippling liabilities on Smith & Wesson that would bankrupt the company.  For example, a proposal by the Interfaith Center on Corporate Responsibility ("ICCR") would have required Smith & Wesson to "prevent and mitigate actual and potential human rights impacts," and would have required the company to do so "regardless of legal framework" and "even if [Smith & Wesson] ha[s] not contributed to those" damages.  In this way, the anti-Second Amendment Activists have made the proxy process another tool in their attempt to harm firearms companies.

24.    The human rights strategy also is laid out in the Amnesty International ("Amnesty") report, "In the Line of Fire: Human Rights and the U.S. Gun Violence Crisis."  Not surprisingly, Amnesty is an advocate of using litigation, not to resolve disputes between parties, but rather as leverage in pursuit of its broader objectives.[5]  That is precisely what the anti-Second Amendment Activists have been implementing against Smith & Wesson – self-described "impact litigation" – where the "impact" is the intended destruction of Smith & Wesson and others engaged in the lawful manufacture, distribution and sale of firearms.

25.    Amnesty, Giffords, ICCR and others estimate the total amount of liability for these "impacts" to be in the tens of billions and hundreds of billions of dollars, sums that, if imposed on

---

[4] Lois Beckett, "'A human rights crisis':  US accused of failing to protect citizens from gun violence," *The Guardian* (Sept. 12, 2018), https://www.theguardian.com/us-news/2018/sep/12/us-gun-control-human-rights-amnesty-international.

[5] *See* https://www.amnesty.org/en/strategic-litigation/.

lawful manufacturers of firearms, would bankrupt Smith & Wesson and the entire private firearms industry.[6]

26.     At the same time ICCR was ramping up its board room attacks, members of FACT began ramping up their litigation efforts in support of their admitted gun control campaign.[7]  Smith & Wesson has specifically been targeted in this wave of litigation by members of the FACT coalition.[8]  Indeed, this litigation wave has not stopped at the border, as Brady has sought to advance its agenda by intervening in a lawsuit against Smith & Wesson in Toronto, Canada.

27.     The anti-Second Amendment Activists have not tried to hide their goals and objectives.  At a December 1, 2020 conference held at New York University, participants observed how consumer protection and false advertising theories were promising avenues for anti-gun initiatives, with one panelist, from the Attorney General's "Special Counsel for Firearms Safety Litigation" ("Firearms Counsel") of private law firms, specifically noting that theories such as these represented a "rich area" for future development.

28.     Harkening back to the coordinated litigation efforts of the public sector that led in part to the passage of the PLCAA, at the same NYU conference, Connecticut Attorney General

---

[6] *See* Amnesty International Report at 115-116 ($3 billion a year in direct costs and up to $222 billion a year in indirect costs); *Investor Statement on Gun Violence*, Interfaith Center on Corporate Responsibility, https://www.iccr.org/investor-statement-gun-violence (estimating costs for care and loss of $45 billion annually); *The Economic Cost of Gun Violence*, Giffords Law Center to Prevent Gun Violence, https://lawcenter.giffords.org/resources/the-economic-cost-of-gun-violence/ (costs of at least $229 billion a year).

[7] *See, e.g.*, *Goldstein v. Earnest, et al.*, Case No. 37-2020-16638 (Cal. Super. Ct. – San Diego Cnty.); *Brady Ctr. to Prevent Gun Violence v. City of Nelson (GA), et al.*, Case No. 2:13-CV-104 (U.S.D.C. N.D. Ga.); *Brady Campaign to End Gun Violence v. Brownback, et al.*, Case No. 2:14-CV-02327 (U.S.D.C. D. Kan.); *Philips, et al. v. Lucky Gunner, et al.*, Case No. 1:14-CV-2822 (Col. – Arapahoe Cnty.); *Chiapperini, et. al v. Gander Mountain Co. Inc., et al.*, Case No. 5717/2014 (N.Y. Supreme Ct. – Monroe Cnty.).

[8] *See Goldstein v. Earnest, et al.*, Case No. 37-2020-16638 (Cal. Super. Ct. – San Diego County).

William Tong commented on how state attorneys general were coordinating on pressing the gun control agenda.

29.     It is against this backdrop of coordinating with anti-Second Amendment Activists to search for new theories to litigate the firearms industry out of existence, that the Attorney General issued his Subpoena against Smith & Wesson here.  To this end, in addition to publicly partnering with anti-Second Amendment Activists, the Attorney General has also hired FACT counsel, Paul, Weiss, Rifkind, Wharton & Garrison, LLP as his own counsel specifically to pursue firearms manufacturers, further solidifying the anti-gun agenda as his own.

30.     The Attorney General's actions surrounding the issuance of the Subpoena and initiating the related investigation are forcing Smith & Wesson to expend substantial financial resources, and are threatening to cause irreparable damage with key stakeholders and necessary business partners, and create reputational harm.

31.     The Attorney General's campaign to silence, intimidate, and deter Smith & Wesson and other Second Amendment advocates, gun manufacturers, and gun owners from exercising their constitutional rights, his consignment of the State's prosecutorial authority to non-governmental partisans, and the targeting of protected, disfavored speech, violate numerous provisions of the U.S. Constitution, including the First, Second, Fourth, Fifth, and Fourteenth Amendments.

32.     By circumventing the legislature and the courts and, where possible, invading the board room, the anti-Second Amendment Activists disguise their true motives and avoid exposing their agenda to the robust political debate surrounding firearms in the United States.  Their allies then use the issues that they create, to falsely foster with shareholders, business partners and other stakeholders a perception of unmitigated risk.  Through these coordinated activities, in which the

Attorney General and State of New Jersey now are complicit, the activists have denied and continue to deny Smith & Wesson any meaningful access to the only fora that can stop these illegal actions and protect Smith & Wesson's rights.

## JURISDICTION AND VENUE

33.     Plaintiffs' claims alleging violations of the United States Constitution are brought under 42 U.S.C. § 1983, and therefore the Court has federal-question jurisdiction over them.  28 U.S.C. §1331.  The Court also has federal-question jurisdiction over Plaintiffs' claims alleging violations of the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901 *et seq.*

34.     Plaintiffs' claims alleging violations of New Jersey law share a common nucleus of operative facts with Plaintiffs' federal question claims, and therefore the Court has supplemental jurisdiction over them.  28 U.S.C. § 1367.

35.     There is an actual controversy in that the Attorney General of the State of New Jersey has served Smith & Wesson with an administrative Subpoena seeking overbroad and voluminous information relating to Plaintiffs' opinions regarding the Second Amendment of the U.S. Constitution and related issues, as allegedly articulated in Smith & Wesson's marketing and business materials.  The Subpoena violates Plaintiffs' First, Second, Fourth, Fifth, and Fourteenth Amendment rights under the U.S. Constitution, as well as the Second Amendment rights of gun buyers and bearers throughout the United States.  It also violates the Dormant Commerce Clause.

36.     The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.,* and the Court's inherent equitable powers. The controversy between the parties is within the jurisdiction of this Court and involves the rights and liabilities of Plaintiffs and third parties under the Constitution and the laws of the United States and can be resolved through a judgment of this Court.

37.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402 because Defendants are domiciled in New Jersey, and because a substantial part of the events or omissions giving rise to this action occurred in this district.

38.     This Court has personal jurisdiction over the Defendants because they are domiciled in New Jersey, and both Defendants have taken action, and will take action in New Jersey that harms Plaintiffs.

## PARTIES

39.     Plaintiff Smith & Wesson Brands, Inc. is the parent corporation of Smith & Wesson Sales Company and Smith & Wesson, Inc.  Smith & Wesson Brands, Inc. is a Nevada corporation, headquartered in Springfield, Massachusetts since 1852.  Smith & Wesson has, since its inception, invented and manufactured firearms that are noted for their innovative design, high quality, and reliability.

40.     Plaintiff Smith & Wesson Sales Company is a Delaware corporation, and is headquartered in Springfield, Massachusetts.

41.     Plaintiff Smith & Wesson Inc. is a Delaware corporation, and is headquartered in Springfield, Massachusetts.

42.     Defendant Gurbir Grewal is the New Jersey Attorney General and is responsible for all civil and criminal enforcement efforts at issue in this suit.  He is sued for declaratory and injunctive relief in his official capacity.  His address is Office of The Attorney General, Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, NJ 08625-0080.

43.     Defendant the Division of Consumer Affairs is a division of the New Jersey Office of the Attorney General.  It describes its mission as "protect[ing] the public from fraud, deceit, and misrepresentation in the sale of goods and services."

**FACTUAL ALLEGATIONS**

**I.     Smith & Wesson's Business and Its Advocacy for Second Amendment Rights**

44.     Smith & Wesson is an iconic brand, a leader in firearms manufacture and design, and a leader in the firearms industry.  It is a strong advocate of Second Amendment rights, which means that the anti-Second Amendment Activists view the company as a voice that must be silenced.

45.     Throughout its history, Smith & Wesson has been committed to advocating for the responsible exercise of the Second Amendment right to bear arms, which includes advocating for the safe use of firearms.  Smith & Wesson's safety programs focus on a variety of initiatives, including protecting children from gun accidents, preventing straw purchases, and safely securing firearms in the home.

46.     Smith & Wesson supports gun safety and responsible gun ownership initiatives, both directly and indirectly, including the company's own #GUNSMARTS program, as well as Project ChildSafe, Don't Lie for the Other Guy$^{TM}$, and Operation Secure Store®, sponsored by the National Shooting Sports Foundation ("NSSF"), which is the trade association for the firearms industry and which provides some of the most effective programs in the nation for promoting firearm safety.

47.     Smith & Wesson offers gun usage and storage safety tips and other gun safety videos, including as part of its #GUNSMARTS program, and through its membership in and support of the NSSF.  These videos and other media can be readily found on the company's website and social media sites, on the NSSF's website and social media sites, and on YouTube and other internet outlets.  Smith & Wesson's comprehensive support of gun safety is part of its broader

advocacy for the Second Amendment, which recognizes the need for training and the safe and responsible handling of firearms.

48.     Smith & Wesson also is an industry leader in its outspoken advocacy for Second Amendment rights and its support for prominent Second Amendment advocacy groups.

49.     Smith & Wesson's public pronouncements on Second Amendment rights are encapsulated in its February 2019 report to its shareholders.  In that report, Smith & Wesson adopted its "Principles for Responsible Engagement" ("Principles").[9]  These Principles state expressly that, "[a]s a manufacturer of firearms for the lawful use by citizens," Smith & Wesson "recognizes its responsibility to its shareholders, its employees, and its customers to defend the Second Amendment."

50.     The Principles reject the blind pursuit by anti-Second Amendment Activists of limitations on the private right of firearms ownership, committing instead to "support only those regulatory proposals that are consistent with the Second Amendment and that deliver demonstrable societal benefits."

51.     The Principles articulate the company's position that the Supreme Court's 2008 ruling in *District of Columbia v. Heller*, "confirming the broad rights of citizens to possess firearms"[10] is "settled law," a position directly at odds with the Attorney General's opposition to concealed carry rights.

52.     Finally, the Principles expressly articulate Smith & Wesson's commitment to "engag[ing] in advocacy through education, communication, and public affairs efforts on behalf

---

[9] Shareholder Requested Report on Product Safety Measures, at A-1.

[10] *Id.*

of its shareholders, employees, and customers" who oppose "the imposition of onerous and unnecessary regulations adversely impacting citizens' Second Amendment rights."[11]

53.     Smith & Wesson also has experienced firsthand the harm to its business that would be caused by an abandonment of its defense of the Second Amendment.  Specifically, a settlement in 2000 with the Clinton administration, whereby the company accepted certain gun control measures, almost bankrupted the company after an almost immediate decline in sales, due to market reaction from firearm owners and purchasers.[12]  Anti-Second Amendment Activists are aware of Smith & Wesson's history and seek to use that history as a basis for threatened litigation by those activists.

54.     The Attorney General knows, or should know, that his attempt to curb Smith & Wesson's speech will cause Smith & Wesson customers to abandon the brand and cause the company significant economic damages, by decreasing the company's sales and causing the company to expend unnecessary resources in fighting and responding to the Attorney General's baseless "fraud" investigation.

## II.     The Administrative Subpoena

55.     At issue in this case is the Subpoena served on Smith & Wesson by the Attorney General, on October 13, 2020.  The Subpoena is attached as Exhibit 1 to this Complaint.

56.     Through the Subpoena, purportedly acting pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-3 and 56:8-4, the Attorney General commands Smith & Wesson to produce a vast collection of documents on a number of topics, most of which are, at bottom,

---

[11] *Id.*

[12] *Id.* at 13.

opinions on either legal issues or matters of current public debate.  These statements of opinion should not be subject to review by State officials for "accuracy," and cannot form the basis of any investigation sounding in "fraud."

57.    For example, the Subpoena treats as fraudulent, any alleged position that guns enhance safety.  To the extent Smith & Wesson has ever advocated for such a position, it is an opinion held by many people, many of whom are customers of Smith & Wesson's business.  The search "do guns make you safer" in Google® returns 248 million results.  Some of those returns reflect the position that guns do not make one safer, while others present the exact opposite position.

58.    The Subpoena also demands that Smith & Wesson defend what appears to be a legal position on the Second Amendment – to wit, the Subpoena demands the company's position on "[w]hether Smith & Wesson [f]irearms can be legally carried and concealed by any [c]onsumer, [i]ncluding by New Jersey [c]onsumers, while in New Jersey[.]"  This purported legal position cannot constitute a statement sounding in fraud.

59.    The Subpoena also demands that Smith & Wesson produce information related to, and explain its opinion as to "[w]hether the concealed carry of a [f]iream enhances one's lifestyle[.]"  This is a  non-quantifiable, taste-and-opinion-based statement that also cannot sound in "fraud."

60.    The Attorney General challenges any opinion that "it is safer to confront a perceived threat by drawing a [f]irearm rather than seeking to move away from and avoid the source of the perceived threat[.]"  Again, a simple online search readily reveals that opinions regarding the personal protection, personal defense, and personal safety aspects of gun ownership vary greatly in the public square.

16

61.     Another subject of investigation by the Attorney General in the Subpoena is "[w]hether having a Smith & Wesson Firearm or other Firearm makes a home safer."  A survey of search results on this topic also reveals a difference of opinion in the public discourse.

62.     The same is true with respect to the inquiry in the Subpoena regarding "[w]hether novice, untrained [c]onsumers could successfully and effectively use a Smith & Wesson [f]irearm for personal or home defense."  This is a political statement by the Attorney General regarding the use of firearms by private persons, in the guise of a question.

63.     Similarly focused on political views and opinion is the Attorney General's inquiry as to whether Smith & Wesson's firearms are more reliable, effective or safe for use in personal or home defense or other activities.

64.     The remainder of the Subpoena constitutes an unconstitutional fishing expedition into virtually all of Smith & Wesson's purported advertisements and marketing materials, going back decades.  Moreover, as evidenced by the Attorney General's close coordination with anti-Second Amendment Activists, this fishing expedition is aimed at obtaining documents for use by those anti-Second Amendment Activists.  To wit, the Subpoena demands:

  a. "copies of all [a]dvertisements for [Smith & Wesson] [m]erchandise that are or were available or accessible in New Jersey [c]oncerning home safety, concealed carry, personal protection, personal defense, personal safety, or home defense benefits of a [f]iream[;] [and]

  b. [a]ll documents [c]oncerning any test, study, analysis, or evaluation considered or undertaken . . . which relates to, addresses, evaluates, proves, disproves, or substantiates any [c]laim made in th[ose a]dvertisements[.]"

17

65.     The Attorney General warns Smith & Wesson in the Subpoena that "[f]ailure to comply with this Subpoena may render [Smith & Wesson] liable for contempt of Court and such other penalties as provided by law."

### III.    The Attorney General's Expressed Hostility to the Second Amendment and to the Courts' Constitutional Oversight of His Agenda

66.     On January 16, 2018, the New Jersey Senate confirmed Defendant Grewal as Attorney General of the State of New Jersey.

67.     Since his confirmation, the Attorney General has been clear, through both his conduct and a series of inflammatory and biased statements, about his plan to use the power of his office to coerce firearms companies to adopt his policy preferences with respect to the Second Amendment.  To that end, he publicly boasted at a March 12, 2019 press conference with anti-Second Amendment Activists that he intended to "turn up the heat" on gun manufacturers.

68.     Despite cloaking his agenda in the rhetoric of "gun violence," the Attorney General's singular focus has been limited to interfering with constitutionally protected activity and to reduce gun ownership by law-abiding citizens.  For example, the Attorney General has been a fierce opponent of "open carry" and "concealed carry" policies, taking sides in the public gun debate by asserting that "[p]ublic carrying of firearms is dangerous to our residents and to law enforcement."

69.     Further, the Attorney General has used the vast resources of the State to bring meritless claims, for the purpose of using the burden and cost of a defense as leverage to force his opinions on others.

70.     The Attorney General's hostility to opposing views extends even to the courts.  He unabashedly stated that "the evidence is clear that when more people carry guns in public, public

18

confrontations get more dangerous, not only for the public, but also for our law enforcement officers," and that the "[c]ourts have no basis to overrule these careful public safety determinations made by states[.]"

71.     Under the Attorney General's view of the world, Smith & Wesson should have no recourse to the courts to challenge his "public safety determinations." The Attorney General's view necessarily means that the Subpoena represents, in his mind, not an investigatory tool but rather his attempt to eliminate the debate around the issue of "public safety" and unilaterally impose his political views.

72.     The Attorney General's statements and actions demonstrate that his goal is to employ his prosecutorial authority to impose his own views regarding a contentious political issue, notwithstanding any constitutional or other legal safeguards.

## IV.   The Attorney General's Alliance and Coordination with anti-Second Amendment Organizations

### A.    The Attorney General Signs on to the anti-Second Amendment Activists' Agenda and Transfers His Prosecutorial Authority to Law Firms for the Purpose of Going After Gun Manufacturers.

73.     The Attorney General has partnered with anti-Second Amendment Activists, such as Giffords and Brady, as well as Do Not Stand Idly By, which are explicit in their desire to restrict firearms ownership and carry rights, and to dictate to the firearms industry what types of firearms may be manufactured and how they may be sold.

74.     In May 2018, the co-founders of Giffords appeared with New Jersey Governor Phil Murphy to announce an "unprecedented public-private effort on gun-safety litigation" in New Jersey which would "combin[e] the *investigative and enforcement powers of the State* with the expertise of the nation's leading gun litigation coalition." (emphasis added).

75.     A Giffords press release explained that the "partners in [the] FACT litigation coalition w[ould] *work closely with New Jersey*" in this "unprecedented" campaign to "bring[] unparalleled legal resources to the . . . fight," and that "[l]everaging these resources *and Attorney General Grewal's leadership* will . . . enable . . . action against" what Giffords described as the "rogue elements" of the gun industry.  (emphasis added).

76.     In a telling "coincidence," only a couple of months earlier, in March 2018, the anti-Second Amendment Activists developed and issued the ICCR's Investor Statement on Gun Violence, and the Principles for a Responsible Civilian Firearms Industry, which were signed on to by various state pension fund officials, in November 2018.

77.     Just three short months after the May 2018 press conference, the Attorney General made good on his commitment to Giffords to use "the investigative and enforcement powers of the State" to advance the anti-gun agenda.  In August of 2018, the Attorney General issued a Request for Qualifications ("RFQ") for "Special Counsel for Firearms Safety Litigation," or "Firearms Counsel."  The RFQ sought qualifications from law firms with, "at a minimum," "[s]ubstantial experience in litigation pertaining to reducing or seeking damages for the impacts of firearm violence or similar *public safety impact litigation* claims[.]"[13]  The effect is that only law firms that already support the anti-Second Amendment Activists' lawfare campaign against the firearms industry need apply.

78.     Per the RFQ, the Attorney General made it clear that he would delegate the immense prosecutorial power of the State to his Firearms Counsel:

---

[13] Office of the Attorney General, State of New Jersey, Request for Qualifications for Special Counsel for Firearms Safety Litigation, Aug. 16, 2018, at 3, *available at* https://www.nj.gov/oag/law/pdf/rfqs/Firearms-Safey-Litigation.pdf (emphasis added).

> The firm(s) selected as [Firearms] Counsel will be required to handle all aspects of providing representation to the Attorney General in his role as Chief Law Enforcement Officer, the New Jersey State Police, the New Jersey Division of Criminal Justice, the Commissioner of Health as the State official responsible for public health, or other State officials or agencies impacted by gun safety issues in litigation seeking to remedy and reduce gun violence impacts in the State of New Jersey.[14]

79.     The RFQ further states that "[i]f legal action is approved by the Attorney General, the firm(s) may be retained to prepare, commence, and manage litigation *on behalf of the Attorney General*, the New Jersey State Police, the New Jersey Division of Criminal Justice, the Commissioner of Health or other State officials or agencies[.]"[15]

80.     Although the RFQ claims that this work would be performed under the supervision and control of the Attorney General, that generalized language is contradicted by specific provisions of the RFQ.  Notably, the scope of the Firearms Counsel's role and authority to use the prosecutorial power of the State under the RFQ appears to be almost unfettered.  The RFQ provides that "[p]reparation may include significant pre-filing evaluative and investigative work" and that "[l]itigation will include: drafting pleadings, motions, briefs and all other papers to be filed in court; *conducting and responding to discovery*; attending all pre-trial, trial and post-trial court appearances; [and] conducting settlement negotiations and handling appeals."[16]

81.     In addition to handing over the keys to the prosecutorial powers of the State, the RFQ also provides that Firearms Counsel will be compensated on a contingency basis.  Firearms Counsel receives compensation only if they prosecute cases, and even then, only in proportion to

---

[14] *Id*.

[15] *Id*. (emphasis added).

[16] *Id*. at 4 (emphasis added).

the amount recovered – thus effectively imposing a bounty system for private law firms executing State prosecutions against other private parties.

82.    The Attorney General's incentivization of private entities to execute State prosecutions runs afoul of the bedrock principle of the neutral and impartial administration of justice to which the Attorney General, like all attorneys-general, must adhere, effectively creating "bounty hunters" at the disposal of the Attorney General's office.  No New Jersey law provides any meaningful limitations on this abuse of power or, alternatively, grants the targets of such efforts any due process protection.

**B.    The Attorney General Retains Counsel Representing Anti-Second Amendment Activists as his Firearms Safety Counsel.**

83.    Delivering on the State's promise to "combin[e] the investigative and enforcement powers of the State with the expertise of the nation's leading gun litigation coalition," the Attorney General has appointed to his Firearms Safety Counsel a law firm which is a member of FACT. That law firm plainly proclaims that it aims "to help promote gun control."

84.    In addition, the FACT law firm serving as New Jersey's Firearms Counsel has committed to "unprecedented cooperation" with other FACT law firms in pursuing the gun control agenda.  One of those other FACT law firms is counsel of record in another case recently filed against Smith & Wesson, in which the Plaintiffs assert claims ringing similar in tone to the information requested by the Attorney General in the Subpoena.[17]

85.    By retaining this FACT law firm as Firearms Safety Counsel, the Attorney General has knowingly ceded his investigatory and prosecutorial responsibility to a law firm that publicly supports an agenda hostile to gun manufacturers.  In short, the Attorney General is placing his

---

[17] *See Goldstein v. Earnest, et al*., Case No. 37-2020-16638 (Cal. Super. Ct. – San Diego County).

Firearms Safety Counsel in a position where they can use the machinery of the state to press their stated gun control objectives in favor of their clients Giffords and Brady. That situation presents an unacceptable risk that information could be used to advance the litigation objectives of the anti-Second Amendment activists that the FACT law firms represent, inadvertently or otherwise.

86.     In so doing, the Attorney General has created an unacceptable risk, if not the desired result, that the immense investigatory and prosecutorial powers of the State will be used to infringe on Smith & Wesson's constitutionally protected rights and target its protected speech, all within the context of an investigation that improperly seeks volumes of information relating to Smith & Wesson's opinion and its positions on matters of public debate.

## V.     The Attorney General Implements an Arbitrary and Irrational Program, the Sole Purpose of Which is to Damage Smith & Wesson, the Firearms Industry, and Its Supporters.

87.     The Attorney General also has implemented an irrational, "name and shame" program that serves no purpose beyond harming Smith & Wesson and advancing the efforts of the anti-Second Amendment Activists.

88.     At a March 12, 2019 press conference with Governor Murphy and anti-Second Amendment Activists, the Attorney General announced that he had "signed on" with the anti-firearms agenda of Do Not Stand Idly By, a group whose self-professed method is to "identify the players with the most power to make a difference [and] work creatively, persistently, and flexibly to get them to respond[.]"

89.     In signing on to this agenda, the Attorney General announced what he referred as the "next step" in his campaign against the firearms industry, which is "to show the link between specific companies and guns recovered from crime scenes in New Jersey." The purported objective of this "next step" is to "compel" gun manufacturers to work with the State, in an effort

to reduce gun violence, by "*naming and shaming* gun manufacturers and holding them accountable for [the] illegal guns that flood [New Jersey] streets." (emphasis added).

90.      But the "name and shame" policy's inherently flawed methodology produces no actionable information and contributes nothing to its purported ultimate objective of compelling gun manufacturers to work with the State.  Upon information and belief, the Attorney General knows this to be the case.

**A.      The "Name and Shame" Policy Does Not Serve its Stated Purposes.**

91.      The cornerstone of the "name and shame" initiative lies in the Attorney General issuing monthly "NJGUNStat" reports that identify the number and location of firearms "recovered" statewide, the caliber of these firearms, and—*sometimes*—the manufacturer.  The reports are so flawed that the only purpose for publishing them, is to improperly label manufacturers as bad actors – a result that reflects the Attorney General's lack of prosecutorial neutrality.

92.      The Attorney General claims that the reports are designed to compel manufacturers to work with the State to stop weapons from ending up in the hands of dangerous criminals, with the inference that firearms manufacturers will not work with the State otherwise.  This is a false premise.

93.      Smith & Wesson works to develop and implement programs to promote compliance with firearms laws, the legal sale of firearms, and firearms safety at the federal, state, and local levels.  As part of these efforts, the company collaborates with federal, state and local agencies, including prosecutors and law enforcement entities.  In fact, Smith & Wesson is required by law to respond within 24 hours to requests to help trace firearms used in crimes.  In short, the Attorney General has never raised any concern with Smith & Wesson regarding its cooperation

with his office or with other government agencies in New Jersey, and there is no legitimate question that can be raised regarding Smith & Wesson's commitment to cooperate with prosecutors and the law enforcement community.

94.     Nor do the reports shed any light on the Attorney General's claimed connection between guns found at crime scenes and possible manufacturer culpability.  Completely absent from the reports is any information regarding who possessed the firearm or how it was obtained, making it impossible to determine if a manufacturer had theoretical culpability, if any, in the appearance of a firearm at a crime scene.  That is a critically important omission because the available data, in fact, shows that manufacturers have no such culpability because, for example, the overwhelming number of "crime guns" are obtained illegally.  The Attorney General either knows this to be the case or should know it to be the case.

95.     Even the definition of "crime gun" demonstrates that the reports, at best, are designed to target manufacturers.  "Crime guns recovered," as defined by the Attorney General, include firearms having nothing to do with crimes, such as abandoned or discarded guns, and guns lawfully used in self-defense.  Moreover, because New Jersey treats even the lawful transport of a firearm pursuant to the Federal Firearms Owners Protection Act ("FOPA"), 18 U.S.C. § 926A, as a chargeable criminal offense, a firearm merely in the possession of a lawful owner who has committed no crime other than transporting her firearm through New Jersey is considered a "crime gun."

96.     The State of New Jersey even admits that the data in its reports are flawed, and yet makes no attempts to resolve those known flaws.  A tiny print disclaimer states that "[t]his chart [Weapons Breakdown by Manufacturer] reflects the information provided to the New Jersey State Police through NJTrace, a statewide program that relies on local police departments to input data

on guns used in the commission of a crime. This chart does not rely on any reports from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). *The information is preliminary and subject to further analysis*."[18]  No such further analysis ever appears in subsequent reports.

97.     It would be a simple matter for the Governor or the Attorney General to resolve these deficiencies.  They could mandate reporting of brands in all cases of recovered guns along with such critical information needed to serve the Attorney General's claimed end.  After all, both the brand name of a firearm and its serial number are stamped on all firearms.  No public evidence exists that the Attorney General has even made the attempt to have this information collected.

98.     The flawed data do serve one purpose – in the Attorney General's words, to "turn up the heat" on manufacturers where there is no basis for prosecutorial action.  Not coincidentally, the Attorney General's reports place Smith & Wesson prominently at the "top" of a list of "bad" gun manufacturers who need to be "h[e]ld . . . accountable."  The Attorney General's naming of Smith & Wesson as a bad actor, for nothing more than engaging in the entirely lawful activity of manufacturing and selling firearms, necessarily means he already has judged the issue, abandoned any semblance of prosecutorial neutrality, and replaced it with his own bias and political beliefs.

99.     In short, the nature and structure of the reports, combined with a demonstrated hostility to lawful and constitutionally protected firearms manufacture, make it difficult to reach any conclusion other than that the reports have little to do with public safety and everything to do with an attempt to harm firearms companies, such as the manufacturer at the top of the Attorney General's list, Smith & Wesson.

---

[18] *See* September 2020 NJ GUNStat Report, *available at* https://www.nj.gov/oag/njsp/njgunstat/pdf/Sept-2020-GUNSTAT-Report.pdf (emphasis added).

### VI.     The Subpoena Violates Constitutional Rights and Is Causing Harm to Smith & Wesson and Its Customers.

100.    The harm to Smith & Wesson from the Attorney General's abuse of his prosecutorial authority, in particular by issuing the Subpoena and initiating an investigatory process against Smith & Wesson that goes hand-in-glove with the Subpoena, is real and immediate, even without any attempt to enforce the Subpoena in court.

101.    For any business to survive, it must rely on relationships with a host of key stakeholders and critical business partners, including those in banking, insurance, transportation, product distribution and retail sales, among many others.

102.    Anti-Second Amendment Activists have worked in a persistent and coordinated fashion to create an image of threatened reputational and litigation risk to Smith & Wesson that would harm these relationships and impede or cut off these services, unless Smith & Wesson changes its political views and legal business practices.

103.    For example, the ICCR, working through its affiliates, has been the driving force in getting shareholder proposals on the ballot at Smith & Wesson's annual meeting of stockholders, alleging that the failure to voluntarily adopt the gun control agenda will cause debilitating financial and reputational risk (or in the anti-Second Amendment Activists' words, cost Smith & Wesson its "social license to operate").

104.    The ICCR's board room efforts then are "proven" by the ICCR's allies through their admittedly "creative" litigation, which is designed for this purpose (its "impact"), where the nominal parties are merely tools of the anti-Second Amendment Activists.

105.    In this strategic and planned manner, the anti-Second Amendment Activists have engaged in a self-fulfilling prophecy, creating the very concerns they seek to use as a lever, all in

an effort to circumvent the Second Amendment protections of Smith & Wesson and private citizens. The perceived risk and public approbation resulting from these attacks on the firearms industry and Smith & Wesson are having their desired impact of depriving the industry of the support of services critical to its day-to-day operation, and threatening its long-term survival.

106. One need only be a casual observer of news headlines to know that a myriad of industries, from investment houses, banks, and insurers, to retail vendors all have expressed concerns regarding these alleged risks, created and propagated by anti-Second Amendment Activists. The result has been that they either have ceased providing necessary business services critical to firearms manufacturers' ordinary course business operations or have conditioned the provision of these services in ways that create added burdens.

107. It is only through this lens of coordinated action that the Attorney General's facially invalid Subpoena makes sense. By issuing the Subpoena to Smith & Wesson, backed by the full prosecutorial authority of his office, as well as the near-limitless resources of the State of New Jersey, his anti-Second Amendment Activist partners and his Firearms Counsel, the Attorney General is merely making good on the promise announced at the May 2018 press conference with the co-founders of Giffords and the Governor of New Jersey to "combine the investigative and enforcement powers of the State with the expertise of the nation's leading gun litigation coalition" and "turn up the heat" on firearms manufacturers.

108. Beyond the improper litigation tactics and abuse of prosecutorial authority is the facially invalid Subpoena itself, which forces Smith & Wesson to divert financial and personnel resources from its ordinary course operations and expend those resources to preserve its First Amendment-protected speech and Second Amendment-protected activity. These expenditures are, and will continue to be, substantial.

28

109.    The harm does not end there.  The very statute on which the Attorney General has predicated his Subpoena, the New Jersey Consumer Fraud Act, expressly confers a private right of action.  Thus, again, by providing a litigation roadmap to private litigants, like the anti-Second Amendment Activists to whom he has pledged his support, the Attorney General is making good on his threat to harm firearms manufacturers, including Smith & Wesson.

110.    Forcing Smith & Wesson to expend its limited resources, and divert the time and attention of its board of directors, senior executives and other personnel from running its business, in order to fight the spurious Subpoena, threatens the precise reputational and financial risks fabricated by the Attorney General's anti-Second Amendment Activist partners and causes Smith & Wesson real and immediate harm.  The facial invalidity of the Subpoena compels a singular conclusion that this harm to Smith & Wesson's business is not merely an incidental effect, but rather the Subpoena's singular purpose.

## VII.    The Subpoena and the Attorney General's Conduct Violate Smith & Wesson's Rights.

111.    The Attorney General's public statements, conduct and actions in issuing the Subpoena and initiating the related investigation, combined with the attendant threat of related criminal and civil sanctions, unlawfully punish Smith & Wesson for constitutionally protected speech.  The Attorney General's demonstrated prejudice against firearms manufacturers makes it clear that the Subpoena and related investigation are an attempt to suppress Smith & Wesson's speech and Second Amendment advocacy efforts; to retaliate against and harass Smith & Wesson for its speech and its lawful business as a gun manufacturer, seller and distributor; and to infringe upon the Second Amendment rights of both Smith & Wesson and the residents, not only of New

Jersey, but of all fifty states in the United States of America, who are the beneficiaries of Smith & Wesson's products and advocacy.

112.     Additionally, because the Attorney General's public statements, conduct and actions in issuing the Subpoena and initiating the related investigation implicate nationwide political statements made by Smith & Wesson, they have a nationwide impact on the company. Smith & Wesson will be subject to varying and arbitrary standards for what constitutes "fraud" in a given jurisdiction.  Protected speech is protected speech under the Constitution; labeling it as "fraud," because one disagrees with it, does not strip away that protection.  Nor is there any compelling interest for the State of New Jersey to do so.

113.     Specifically, Smith & Wesson will have to tailor its political and commercial conduct out of concern that the aforementioned varying and arbitrary standards for what constitutes "fraud" in New Jersey, as defined by the Attorney General, will result in prosecution and harassment by the Attorney General, and others who share his political views of Smith & Wesson's business, Second Amendment advocacy and protected speech.  In regulating nonactionable national political and commercial speech, the Attorney General is regulating interstate commerce, which the State of New Jersey cannot do under the Dormant Commerce Clause.

114.     In part because they are attempts to regulate protected speech, and not reasonably related to any valid investigation of fraud, the Attorney General's actions in issuing the Subpoena and initiating the related investigation deprive Smith & Wesson of constitutionally protected interests—including time, financial expenditures, and other resources—without due process of law.

115.     Additionally, the Attorney General's public statements, conduct and actions in issuing the Subpoena and initiating the related investigation assist the anti-Second Amendment

Activists' goal of creating the risk of debilitating financial and reputational harm for Smith & Wesson, and forcing Smith & Wesson to expend significant financial resources in defending against legal proceedings at the expense of ordinary course business operations.

116.    Finally, the Attorney General's demonstrated prejudice deprives Smith & Wesson of its substantive due process right to an unbiased prosecutor.  The Attorney General's political agenda, and the means and mechanisms he has put into place to drive that political agenda, are clearly motivating his actions in issuing the Subpoena and initiating the related investigation, neither of which are aimed at legitimate prosecutorial objectives, or prosecuting unlawful activity.

117.    The due process requirement of a neutral prosecution bars the Attorney General from injecting his personal interests – in this case, his partisan, political views regarding the Second Amendment – into any government enforcement effort.  When viewed in the light of the Attorney General's prior inflammatory statements regarding gun manufacturers and his views on Second Amendment rights, as well as his improper motive to undermine Second Amendment rights, it is clear that the Subpoena and investigation are designed to harm Smith & Wesson, both financially and in the court of public opinion.

118.    The Attorney General's ends-driven, biased prosecution of Smith & Wesson, the result of which is pre-ordained, only serves to project impropriety and undermine public confidence in his investigation and his office.  The principle of a neutral prosecutor, a bedrock of our system of justice, is designed precisely to avoid such harms.

## CLAIMS FOR RELIEF

### Count I – Violation of Smith & Wesson's First and Fourteenth Amendment Rights
### (Unlawful Viewpoint Discrimination and Restriction of Political Speech)

119.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.    The focus of the Attorney General's Subpoena is on one side of a political policy debate regarding opinions and legal issues, and the Subpoena was issued in an effort to silence, intimidate, and deter Smith & Wesson and others possessing a particular viewpoint from participating in that debate.  The Subpoena itself violates, and any effort to enforce the Subpoena would further violate, the rights provided to Smith & Wesson by the First Amendment of the United States Constitution, made applicable to the State of New Jersey by the Fourteenth Amendment.

121.    The Attorney General's Subpoena is an impermissible viewpoint-based restriction on protected speech, and it burdens Smith & Wesson's political speech.  The Attorney General issued the Subpoena based on his disagreement with Smith & Wesson's opinions and advocacy on behalf of Second Amendment issues, and based on Smith & Wesson's status as a manufacturer, distributor and seller of firearms.

122.    Even if the Subpoena had not been issued for that illegal purpose, it would still violate the First Amendment because it burdens Smith & Wesson's political speech without being substantially related to any compelling governmental interest.  The Subpoena cannot survive strict scrutiny review.

**Count II – Violation of Smith & Wesson's First and Fourteenth Amendment Rights
(Unlawful Restriction of Protected Commercial Speech)**

123.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    Defendants' Subpoena was issued in an effort to silence, intimidate, and deter Smith & Wesson's ability to speak in the commercial marketplace.  The Subpoena itself contravenes, and any effort to enforce the Subpoena would further contravene, the rights provided to Smith & Wesson by the First Amendment of the United States Constitution, made applicable to the State of New Jersey by the Fourteenth Amendment.

125.    The Attorney General's Subpoena is an impermissible restriction on Smith & Wesson's commercial speech, and it burdens Smith & Wesson's commercial speech.

126.    Defendants cannot survive the heightened scrutiny review attendant to Smith & Wesson's commercial speech because Smith & Wesson's speech pertains to lawful commercial transactions and, being grounded in opinion, cannot be misleading.

**Count III – Violation of Smith & Wesson's Second and Fourteenth Amendment Rights**

127.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.    The Subpoena violates Smith & Wesson's rights under the Second Amendment of the United States Constitution, as made applicable to the State of New Jersey by the Fourteenth Amendment.

129.    Specifically, (1) the Subpoena inhibits Smith & Wesson's ability to engage in the lawful manufacture, distribution, and sale of firearms to consumers; and (2) issuance of the

33

Subpoena was motivated by an intent to infringe upon Smith & Wesson's Second Amendment rights and chill its exercise of those rights.

**Count IV – Violation of Citizens' Second and Fourteenth Amendment Rights**

130.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 129 of this Complaint as if fully set forth herein.

131.    The Subpoena violates citizens' rights to bear arms under the Second Amendment, as made applicable to the State by the Fourteenth Amendment, by interfering with Smith & Wesson's ability to manufacture, distribute, and sell firearms, which by extension impedes and places an undue burden on citizens' ability to exercise their right to own and bear arms.

132.    Smith & Wesson has standing to bring this constitutional claim on behalf of third parties because it is an interested party.  Because the Subpoena was issued to Smith & Wesson, citizens have no means to seek judicial recourse as to the Subpoena and its effects.

133.    The Subpoena and related investigation are motivated by the Attorney General's desire to prevent New Jersey residents from exercising their Second Amendment rights, and to chill citizens' exercise of those rights, by harassing and intimidating Plaintiffs.

**Count V – Violation of Equal Protection Rights, Fourteenth Amendment to the U.S. Constitution**

134.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.    The Subpoena and related investigation violate the Fourteenth Amendment's Equal Protection Clause because Smith & Wesson is being treated differently than similarly situated entities.  More specifically, non-firearm manufacturer businesses that sell consumer products are not being targeted by these types of sweeping and overreaching administrative subpoenas and

coordinated campaigns to inhibit and prohibit their lawful business activities or to chill the desires of their customers to purchase their products.

136.    Defendants have selectively targeted Smith & Wesson for improper reasons, because the Attorney General's ideological beliefs and political agenda, as evidenced by his ongoing campaign against lawful firearm ownership and proponents of the Second Amendment, lies squarely at odds with Smith & Wesson's own political viewpoints.

### Count VI –Violation of Due Process Rights, Fifth and Fourteenth Amendments to the U.S. Constitution

137.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138.    The Subpoena and related investigation violate Smith & Wesson's substantive due process rights to a neutral, disinterested prosecutor under the due process clause of the Fifth Amendment to the United States Constitution, as made applicable to states by the Fourteenth Amendment.

139.    The Attorney General has made his opinions clearly known through public statements, his actions and policies, and his propounding of the "NJGUNSTATS" reports, which are fundamentally and methodologically flawed as set forth above.

140.    The proceedings are further tainted by the Attorney General's hiring of "Firearms Counsel" as well as the existence of the contingency fee arrangement.  The Subpoena is merely the tip of a spear aimed at Smith & Wesson by a coalition of the State of New Jersey, law firms, and third-party groups, all aimed at "taking matters into their own hands" to bring down Smith & Wesson and other firearms manufacturers.

141.    Moreover, the Attorney General's lack of impartiality is further demonstrated, standing alone, by his issuance of the Subpoena under the New Jersey Consumer Fraud Act, in that the opinions and political viewpoints targeted by the Subpoena cannot constitute fraud.

142.    Rather, the Attorney General's statements and conduct, as set forth above, demonstrate that the Subpoena is not about "fraud", and that he has targeted Smith & Wesson based on a bias against gun manufacturers.  The Attorney General, who is clearly biased with regard to Second Amendment issues, is prosecuting Smith & Wesson for its views on those issues.

**Count VII – Violation of Smith & Wesson's Fourth and Fourteenth Amendment Rights**

143.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.    The Attorney General's Subpoena contravenes the rights provided to Smith & Wesson by the Fourth Amendment's proscription of unreasonable searches and seizures, made applicable to the states by the Fourteenth Amendment.

145.    The Subpoena is an unreasonable search and seizure because it is vastly overbroad, seeks information related to opinion or the basis of a legal position, demands information about lawful conduct that is protected under the First, Second, and Fourteenth Amendments, is not reasonably related to any legitimate investigative purpose, and is overly burdensome.

**Count VIII – Preemption, Protection of Lawful Commerce in Arms Act**

146.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 145 of this Complaint as if fully set forth herein.

147.    The Subpoena and related investigation are preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA").

148.    The PLCAA requires a court to dismiss any "civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, *resulting from the criminal or unlawful misuse of a [firearm]* by the person or a third party[,]" 15 U.S.C. § 7902(5)(A) (emphasis added).

149.    The Attorney General's decision to conduct this investigation and issue this Subpoena was motivated by, and "result[s] from", the "criminal [and] unlawful misuse of [firearms] by . . . third part[ies]" throughout the State of New Jersey and elsewhere.

150.    Although the PLCAA's preemption/dismissal provision does not apply to "an[y] action in which a manufacturer or seller of a [firearm] knowingly violated a state or federal statute applicable to the sale or marketing of the product, [where] the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. § 7903(5)(A)(iii), Smith & Wesson has not "knowingly violated" the New Jersey Consumer Protection Act, and—even if it did—any violation would not "[be] a proximate cause of the harm for which relief is sought."

### Count IX – Violation of the Dormant Commerce Clause

151.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 150 of this Complaint as if fully set forth herein.

152.    The Subpoena and related investigation violate the Dormant Commerce Clause.

153.    Article I, Section 8 of the United States Constitution grants Congress the exclusive authority to regulate interstate commerce and thus prohibits the states from imposing an undue burden on interstate commerce and from regulating conduct occurring wholly beyond their borders.

154.    Smith & Wesson's advertising and marketing campaigns are not specifically focused on the State of New Jersey, but rather a broader market throughout the United States.

155.    By seeking to regulate Smith & Wesson's advertisements in New Jersey, the Attorney General in reality seeks to regulate speech and business conduct that occurs almost entirely outside New Jersey.  The Attorney General's actions necessarily and unduly burden Smith & Wesson's ability to advertise and speak throughout the United States.

156.    Because the State and the Attorney General seek to regulate and burden out-of-state speech, or attendant lawful commerce through the Subpoena, the State improperly encroaches on Congress's exclusive authority to regulate interstate commerce and violates the Dormant Commerce Clause.

## Count X – Abuse of Process

157.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158.    The Attorney General committed an abuse of process under common law by (1) issuing the Subpoena to Smith & Wesson without having a good faith basis for conducting an investigation; and (2) having an ulterior motive for issuing and serving the Subpoena – an intent to prevent Smith & Wesson from exercising its right to express views with which the Attorney General disagrees.

159.    The Attorney General's actions have caused, and threaten to cause, injury to Smith & Wesson's business and reputation, and have violated Smith & Wesson's First, Second, Fourth, Fifth, and Fourteenth Amendment constitutional rights.

**Count XI – Injunctive Relief Prohibiting Defendants from Enforcing the Subpoena.**

160.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.     This Court has the authority to provide injunctive relief in order to ensure that public officers and officials act within the bounds of their lawful powers.

162.     Smith & Wesson seeks an injunction as to Defendants preventing them from enforcing the Subpoena.

163.     Smith & Wesson has a substantial likelihood of success on the merits.

164.     Smith & Wesson will suffer irreparable injury if an injunction is not granted.

165.     An injunction will not substantially injure other interested parties, in that there can be no injury to Defendants for not being able to prosecute or investigate Smith & Wesson for lawful activity, nor is there any harm to Defendants arising from a brief delay to await a ruling on the merits of this matter.

166.     The public interest would be furthered by the injunction because constitutional rights are at stake, and because the public has an interest in preserving the principle of prosecutorial neutrality.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

167.     Enjoin any proceedings in the state courts of New Jersey to enforce the Subpoena;

168.     Enjoin Defendants from enforcing the Subpoena;

169.     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate Smith & Wesson's rights under the First, Second, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

170.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate New Jersey citizens' rights under the Second Amendment to the United States Constitution;

171.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation are preempted by the Protection of Lawful Commerce in Arms Act;

172.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate the Dormant Commerce Clause and the Supremacy Clause of the United States Constitution;

173.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation constitute an abuse of process, in violation of New Jersey common law;

174.    Award Plaintiffs such costs and reasonable attorney's fees to which it might be entitled by law; and

175.    Award such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  December 15, 2020

*/s/ Christopher M. Strongosky*
Christopher M. Strongosky
DLA Piper LLP (US)
51 John F. Kennedy Parkway
Suite 120
Short Hills, New Jersey 07078-2704
Tel: 973-520-2550
christopher.strongosky@dlapiper.com


Joseph A. Turzi (*pro hac vice* forthcoming)
Edward S. Scheideman (*pro hac vice*
        forthcoming)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Tel:  (202) 799-4000
joe.turzi@dlapiper.com
edward.scheideman@dlapiper.com

*Attorneys for Plaintiffs*
*Smith & Wesson Brands, Inc.*
*Smith & Wesson Sales Company*
*Smith & Wesson Inc.*

# Exhibit 1

REGISTERED AGENT SOLUTIONS INC

**Registered Agent Solutions, Inc.**
*Corporate Mailing Address*
1701 Directors Blvd.
Suite 300
Austin, TX 78744

Phone: (888) 705-RASi (7274)

# SERVICE OF PROCESS RECEIPT

10/14/2020

Tina Rettura
**SMITH & WESSON SALES COMPANY**
Legal Department
2100 Roosevelt Avenue
Springfield, MA 01104 USA

**NOTICE OF CONFIDENTIALITY**

This notice and the information it contains are intended to be a confidential communication only to the individual and/or entity to whom it is addressed. If you have received this notice in error, immediately call our SOP Department at (888) 705-7274.

**RE: SMITH & WESSON SALES COMPANY**

This receipt is to inform you that Registered Agent Solutions, Inc. has received a Service of Process on behalf of the above-referenced entity as your registered agent and is hereby forwarding the attached document(s) for your immediate review. A summary of the service is shown below; however, it is important that you review the attached document(s) in their entirety for complete and detailed information.
For additional information and instruction, contact the document issuer: DEPUTY ATTORNEY GENERAL

**SERVICE INFORMATION**

Service Date: 10/14/2020
Service Time: 8:00AM EDT
Service Method: ATTORNEY GENERAL REP.

**RASi REFERENCE INFORMATION**

Service No.: 0151940
RASi Office: New Jersey
Rec. Int. Id.: JLW

**CASE INFORMATION**

Case Number: N/A
File Date: 10/13/2020
Jurisdiction: NEW JERSEY DIVISION OF CONSUMER AFFAIRS
Case Title: RE: DOCUMENTS REGARDING ADVERTISEMENTS FOR MERCHANDISE

**ANSWER / APPEARANCE INFORMATION**

11/13/2020 *(Be sure to review the document(s) for any required response dates)*

**AGENCY / PLAINTIFF INFORMATION**

Firm/Issuing Agent: DEPUTY ATTORNEY GENERAL
Attorney/Contact: CHANEL VAN DYKE
Location: New Jersey
Telephone No.: N/A

**DOCUMENT(S) RECEIVED & ATTACHED**

Subpoena
Affidavit / Certification

**ADDITIONAL NOTES**

**Questions or Comments...** Should you have any questions or need additional assistance, please contact the SOP Department at (888) 705-7274.

You have been notified of this Service of Process by Insta-SOP Delivery, a secure email transmission. The transmitted documents have also been uploaded to your Corpliance account. RASi offers additional methods of notification including Telephone Notification and FedEx Delivery. If you would like to update your account's notification preferences, please log into your Corpliance account at www.rasi.com.

*Thank you for your continued business!*



**GURBIR S. GREWAL**
**ATTORNEY GENERAL OF NEW JERSEY**
**Division of Law**
**124 Halsey Street - 5th Floor**
**P.O. Box 45029**
**Newark, New Jersey 07101**
**Attorney for New Jersey Division of Consumer Affairs**

**By:    Chanel Van Dyke**
**Deputy Attorney General**
**Chanel.VanDyke@law.njoag.gov**


### ADMINISTRATIVE ACTION
### SUBPOENA DUCES TECUM

**THE STATE OF NEW JERSEY to:**       **Smith & Wesson Sales Co., Inc.**
**A/K/A American Outdoor Brands Sales Co.**
**A/K/A Smith & Wesson Corp.**
**2100 Roosevelt Avenue**
**Springfield, Massachusetts 01104**

**c/o    Registered Agent Solutions, Inc.**
**208 West State Street**
**Trenton, NJ 08608**

YOU ARE HEREBY COMMANDED to produce to the New Jersey Division of Consumer

Affairs, Office of Consumer Protection ("Division") through Chanel Van Dyke, Deputy Attorney

General, at 124 Halsey Street, 5th Floor, Newark, NJ, 07101, on or before **November 13, 2020**, at

10:00 A.M., the following:

The Documents in the attached Schedule A; and

Your completed Certification of Compliance.

You may produce the Documents and information identified in the attached Schedule A on

or before the return date in electronic form, in a format compliant with Exhibit A, to Chanel Van

Dyke,    Deputy    Attorney    General,    who    may    be    contacted    by    email    at

1

Chanel.VanDyke@law.njoag.gov. In the alternative, You may produce the Documents and information identified in the attached Schedule A on or before the return date at the address listed above by Certified Mail, Return Receipt Requested, addressed to the attention of Chanel Van Dyke, Deputy Attorney General. You may, at Your option and expense, provide certified, true copies in lieu of the original Documents identified in the attached Schedule by completing and returning the Certification attached hereto.

Failure to comply with this Subpoena may render You liable for contempt of Court and such other penalties as provided by law. This Subpoena is issued pursuant to the authority of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226, specifically N.J.S.A. 56:8-3 and 56:8-4.

Date:   10/13/20

 /s/ Chanel Van Dyke
Chanel Van Dyke
Deputy Attorney General

2

**PROOF OF SERVICE**

I, _____, being of full age, certify that on _____,

2020, at approximately, _____, I served the within Subpoena on

_____ at _____, by exhibiting the

Subpoena to _____ and leaving a true copy thereof with said individual.

I certify that the foregoing statements made by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

Dated: _____, 2020          _____

1

## CERTIFICATION OF COMPLIANCE

I, _____, certify as follows:

1.   I am employed by Smith & Wesson Sales Co., Inc. in the position of
     _____;

2.   Smith & Wesson Sales Co., Inc.'s productions and responses to the Subpoena of the
     Attorney General of the State of New Jersey, dated October 13, 2020 (the "Subpoena")
     were prepared and assembled under my personal supervision;

3.   I made or caused to be made a diligent, complete, and comprehensive search for all
     Documents and information requested by the Subpoena, in full accordance with the
     instructions and definitions set forth in the Subpoena;

4.   Smith & Wesson Sales Co., Inc.'s production and responses to the Subpoena are complete
     and correct to the best of my knowledge and belief;

5.   No Documents or information responsive to the Subpoena have been withheld from Smith
     & Wesson Sales Co., Inc.'s production and responses, other than responsive Documents or
     information withheld on the basis of a legal privilege or doctrine;

6.   All responsive Documents or information withheld on the basis of a legal privilege or
     doctrine have been identified on a privilege log composed and produced in accordance with
     the instructions in the Subpoena;

7.   The Documents contained in Smith & Wesson Sales Co., Inc.'s productions and responses
     to the Subpoena are authentic, genuine, and what they purport to be;

8.   Attached is a true and accurate record of all Persons who prepared and assembled any
     productions and responses to the Subpoena, all Persons under whose personal supervision
     the preparation and assembly of productions and responses to the Subpoena occurred, and
     all Persons able competently to testify:  (a) that such productions and responses are
     complete and correct to the best of such Person's knowledge and belief; and (b) that any
     Documents produced are authentic, genuine, and what they purport to be; and

9.   Attached is a true and accurate statement of those requests under the Subpoena as to which
     no responsive Documents were located in the course of the aforementioned search.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:_____

_____
Name (signature)

_____
Name (print)

_____
Title or Position

2

## INSTRUCTIONS AND DEFINITIONS

### A.   INSTRUCTIONS

1.      The Subpoena requests that follow are continuing in nature, and thus, You have a continuing obligation to timely serve supplemental responses if You locate or obtain additional, more complete, or new information or Documents after Your response is due.

2.      This Subpoena is directed to Smith & Wesson, as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, divisions, subsidiaries, affiliates, successors, assigns, or any other Person(s) acting or purporting to act on its behalf.

3.      Unless otherwise specifically stated, the period of time encompassed by this Subpoena shall be from **October 13, 2010**, up to and Including the date of Your response to the Subpoena.

4.      No Subpoena request(s) should be construed to limit the scope of any other Subpoena request(s), or of any Definition set forth below.  No subpart of any Subpoena request should be construed to limit the scope of any other subpart of such Subpoena request.

5.      Unless otherwise specifically stated, capitalized terms are defined as set forth in the Definitions below.

6.      You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate, or otherwise diminish Your aforementioned preservation obligations.  Nor shall You act, in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under law.  No agreement purporting to modify, limit, or otherwise vary Your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating, or otherwise diminishing such aforementioned preservation obligations, nor shall You act in reliance upon any such agreement, unless a Deputy Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

7.      The Subpoena calls for all responsive Documents or information in Your possession, custody, or control.  This Includes Documents or information possessed or held by any of Your officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, divisions, affiliates, subsidiaries, successors, assigns, or any Persons from whom You could request Documents or information.  If Documents or information responsive to a request in this Subpoena are in Your control, but not in Your possession or custody, You shall promptly Identify the Person with possession or custody.

8.      If there are no Documents responsive to any particular Subpoena request, You shall so certify in writing in the Certification of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

9.      When a Subpoena request requires both privileged and non-privileged Documents, the non-privileged Documents must be produced to the fullest extent possible without thereby disclosing the privileged Documents.  When a response Includes Documents that have been redacted or otherwise altered on the basis of privilege, any redaction or alteration must be clearly visible on the Document.

10.     If a Subpoena request requires the production of Documents the form and/or content of which has changed over the relevant period, You must identify the period of time during which each such Document was used and/or otherwise was in effect.

11.     Unless otherwise specifically indicated, each and every Document produced shall be Bates-stamped or Bates-labeled or otherwise consecutively numbered, without disrupting or altering the form, sequence, organization, or other order or layout in which such Documents were maintained before production, and the Person making such production shall Identify the corresponding Subpoena request number(s) to which each Document or group of Documents responds.

12.     Electronically Stored Information should be produced in the format specified in the attached Exhibit A.

13.     Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization, or other order or layout in which it was maintained before production, Including production of any Document or other material indicating filing or other organization.  Such production shall Include any file folder, file jacket, cover, or similar organizational material, as well as any folder bearing any title or legend that contains no Document.  Likewise, all Documents that are physically attached to each other in Your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

14.     For each Document withheld from production on the ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, You shall insert one or more placeholder page(s) in the production bearing the same Bates number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

15.     If one or more Documents or any portions thereof requested herein are withheld under a claim of privilege or otherwise, identify each Document or portion thereof as to which the objection is made, together with the following information:

    a.      The Bates-stamp, Bates-label, or other consecutive numbering of the Document or portion thereof as to which the objection is made;

4

    b.      Each author or maker of the Document;

    c.      Each addressee or recipient of the Document or Person to whom its contents were disclosed or explained;

    d.      The date thereof;

    e.      The title or description of the general nature of the subject matter of the Document and the number of pages;

    f.      The present location of the Document;

    g.      Each Person who has possession, custody, or control of the Document;

    h.      The legal ground for withholding or redacting the Document; and

    i.      If the legal ground is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

16.     In the event that any Document which would have been responsive to this Subpoena was formerly in Your possession, custody, or control but is no longer available, no longer exists, or has been destroyed or discarded, Identify that Document and also Include:

    a.      A detailed description of the nature of such Document and its contents;

    b.      The Identity of the Person(s) who prepared such Document and its contents;

    c.      The Identity of the Person(s) who have seen or had possession of such Document;

    d.      The date(s) on which such Document was prepared, transmitted, or received;

    e.      The date(s) on which such Document became unavailable;

    f.      The reason why such Document is unavailable, Including whether it was misplaced, destroyed, discarded, or transferred;

    g.      For each such Document destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and/or performing such destruction or transfer; and

    h.      The Identity of all Persons with knowledge of any portion of the contents of the Document.

18.     A copy of the Certification of Compliance provided herewith shall be completed and executed by all natural Persons supervising or participating in compliance with this Subpoena, and You shall submit such executed Certification(s) of Compliance with Your response to this Subpoena.

19.     In a schedule attached to the Certification of Compliance provided herewith, You shall Identify the natural Person(s) who prepared or assembled any productions or responses to this Subpoena.  You shall further Identify the natural Person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred.  You shall further Identify all other natural Person(s) able competently to testify:  (a) that such productions and responses are complete and correct to the best of such Person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be.

20.     You shall produce a copy of all written or otherwise recorded instructions prepared by You concerning the steps taken to respond to this Subpoena.  For any unrecorded instructions given, You shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

21.     No agreement purporting to modify, limit, or otherwise vary this Subpoena shall be valid or binding, and You shall not act in reliance upon any such agreement, unless a Deputy Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

## B.     **DEFINITIONS**

1.     "Advertisement" shall be defined in accordance with N.J.S.A. 56:8-1(a) and/or N.J.A.C. 13:45A-9.1, and Includes the Smith & Wesson Website, mailings, brochures, catalogs, periodicals, activity on Social Media, sponsored content, promotional materials, podcast content, and activity on the internet.  This definition applies to other forms of the word "Advertisement," Including "Advertise(s)" and "Advertising."

2.     "All" means each and every.

3.     "Any" includes "all" and vice versa.

4.     "Claim(s)" means All statements, representations, implications, messages, or suggestions made by Any Advertisement, commercial, endorsement, or other Communication.

5.     "Communication(s)" means any conversation, discussion, letter, email, text message, Social Media message or post, memorandum, meeting, note, picture, post, blog, or any other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means, and shall Include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.  Except where otherwise stated, a request for "Communications" means a request for All such Communications.

6.     "Compensation" means a payment in monies, digital currency, or other items for a provision of Firearms, or other goods, services, or Merchandise.

7.      "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing, or constituting.

8.      "Consumer(s)" refers to any Person who is offered Merchandise for Sale.

9.      "Custodian" means any Person that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled a Document.

10.     "Document(s)" Includes All writings, word processing documents, records saved as a .pdf, spreadsheets, charts, presentations, graphics/drawings, images, emails and any attachments, instant messages, text messages, phone records, websites, audio files, and any other Electronically Stored Information.  Documents Include originals and non-identical duplicates.  If a printout of an electronic record is a non-identical copy of the electronic version (for example, because the printout has a signature, handwritten notation, other mark, or attachment not included in the computer Document), both the electronic version in which the Document was created and the non-identical copy Document must be produced.

11.     "Electronically Stored Information" means any Document or information stored or maintained in electronic format.

12.     "Firearm(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(f).

13.     "Handgun(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(k).

14.     "Identify," "Identity," or "Identification" as applied to a Person, means to give, to the extent known, the Person's: (a) full legal name, any aliases, or d/b/a, former, or other names; (b) any parent, subsidiary, officers, employees, or agents thereof; (c) present or last known mailing and physical address(es), email address(es), and any telephone number(s); and (d) when referring to a natural Person, the present or last known place of employment.

15.     "Include" and "Including" shall be construed as broadly as possible and shall mean "without limitation."

16.     "Merchandise" shall be defined in accordance with N.J.S.A. 56:8-1(c) and/or N.J.A.C. 13:45A-9.1, and shall Include Firearms.

17.     "New Jersey" refers to the State of New Jersey.

18.     "New Jersey Consumer(s)" refers to Consumers who reside in New Jersey, maintain a New Jersey IP address, and/or maintain a New Jersey shipping address.

19.     "Person(s)" shall be defined in accordance with N.J.S.A. 56:8-1(d).

20.     "Policies" shall Include any procedures, practices, and/or established courses of action, whether written or oral.

21.     "Retail Dealer(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(l).

22.     "Sale(s)" shall be defined in accordance with N.J.S.A. 56:8-1(e).

23.     "Smith & Wesson" means Smith & Wesson Sales Co., Inc., a/k/a American Outdoor Brands Sales Co., a/k/a Smith & Wesson Corp. and any of their predecessors, successors, assigns, present or former parents, subsidiaries, or affiliates, whether direct or indirect; and all owners, directors, officers, shareholders, founders, partners, managers, employees, agents, servants, contractors, consultants, representatives, and attorneys of the foregoing, or any other Persons associated with or acting on behalf of the foregoing, or acting on behalf of any predecessors, successors, assigns, parents, subsidiaries, or affiliates of the foregoing.

24.     "Smith & Wesson Website" means the websites located at https://www.smith-wesson.com/ and https://www.aob.com/, as well as any other website owned or controlled by Smith & Wesson through which it Advertises Merchandise.

25.     "Social Media" means any websites and applications that enable users to create and store content or to participate in social networking, Including Facebook, Instagram, Snapchat, TikTok, Twitter, Pinterest, and YouTube.

26.     "You" and "Your" mean Smith & Wesson.

27.     The use of the singular form of any word used herein shall include the plural and vice versa.  The use of any tense of any verb includes all other tenses of the verb.

28.     As used herein, the conjunctions "and" and "or" shall be interpreted conjunctively and shall not be interpreted disjunctively to exclude any information or Documents otherwise within the scope of this Subpoena.  References to the singular include the plural and references to the plural include the singular.

## SCHEDULE A
## DOCUMENT REQUESTS

1.  True, accurate, and complete copies of all Advertisements for Your Merchandise that are or were available or accessible in New Jersey Concerning home safety, concealed carry, personal protection, personal defense, personal safety, or home defense benefits of a Firearm, including a Smith & Wesson Firearm.

2.  True, accurate, and complete copies of all versions and drafts of each Advertisement produced in response to Request No. 1 above.

3.  All Documents Concerning any test, study, analysis, or evaluation considered or undertaken, whether by You, on Your behalf, or by a third party, which relates to, addresses, evaluates, proves, disproves, or substantiates any Claim made in the Advertisements produced in response to Request Nos. 1 or 2, Including Documents Concerning safety, risks, or performance of the Firearms depicted in such Advertisements.

4.  All Documents Concerning the following topics:

    a.  Whether Smith & Wesson Firearms can be legally carried and concealed by any Consumer, Including by New Jersey Consumers, while in New Jersey;

    b.  Whether the concealed carry of a Firearm enhances one's lifestyle;

    c.  Whether it is safer to confront a perceived threat by drawing a Firearm rather than seeking to move away from and avoid the source of the perceived threat;

    d.  Whether having a Smith & Wesson Firearm or other Firearm makes a home safer;

    e.  Whether Smith & Wesson Firearms are designed to be more safe, reliable, accurate, or effective than Firearms made by other Firearm manufacturers for use in personal or home defense or other activities; and

    f.  Whether novice, untrained Consumers could successfully and effectively use a Smith & Wesson Firearm for personal or home defense.

5.  All Documents, Including Policies, reports, and findings, Concerning any efforts by You to determine whether Your Advertisement of Merchandise complies with New Jersey law. If the Documents have changed over time, identify the time period during which each Document produced was used by or on behalf of You.

6.  All Documents Concerning the public or personal health, safety, or other risks of:  (a) keeping a Firearm in the home, (b) carrying a Firearm in public in New Jersey or elsewhere; or (c) drawing a Firearm in response to a perceived threat.  Such Documents Include any studies, reports, news articles, surveys, or Communications, whether created by You, on Your behalf, or by a third party, Including Documents Concerning best practices for mitigating any such risks.

9

7.      True and correct copies of Your organizational charts for each division (and each department therein) which were responsible for the creation, development, or approval of the Advertisements produced in response to Request Nos. 1 or 2, or the Advertising, marketing, promotion, or Sale of any Firearm depicted in such Advertisements.

8.      All Documents, Including contracts, agreements, and Communications between You and any Advertising agency or any other Person employed or retained to assist You, or which did assist You, in creating, developing, approving, maintaining, marketing, or distributing any of the Advertisements produced in response to Request Nos. 1 or 2, Concerning such Advertisements, Including all Compensation provided by You for any such services.

9.      All Documents Concerning All models of Firearms manufactured by You that were sold to New Jersey Consumers, and the total Compensation received by You for the Sale of Firearms manufactured by You that were sold to New Jersey Consumers.

10.     All Documents, Including contracts and agreements, Concerning any arrangements with any Person, Including Retail Dealers, to sell Your Firearms or other Merchandise in New Jersey.

11.     All Documents reflecting contracts, agreements, or arrangements with any Person, Including Retail Dealers, to use Your Trademark, Advertise Your Merchandise, or otherwise make statements about Your Merchandise or Firearms to Consumers, Including New Jersey Consumers.

12.     All Documents Concerning:

        a.      any agreement or authorization provided by Smith & Wesson to permit New Jersey Retail Dealers to include the Smith & Wesson logo or trademark, Smith & Wesson Advertisements, or links to the Smith & Wesson Website on their websites or in other Advertising or Communications;

        b.      any coordination, assistance, training, or approval provided by Smith & Wesson to Persons in New Jersey, Including Retail Dealers, Concerning the Advertisement, marketing, promotion, and/or Sale of Smith & Wesson Firearms;

        d.      any training or promotional materials (Including product displays and customer events) provided by Smith & Wesson to Persons in New Jersey, Including Retail Dealers, Concerning the Advertisement, marketing, and/or Sale of Smith & Wesson Firearms.

13.     Documents Concerning Smith & Wesson's sponsorship, presence, or participation in any Firearm shows, exhibitions, or competitions held in New Jersey.

14.     All contracts and agreements between You and any third parties Concerning the development, approval, and/or broadcast in whole or in part in New Jersey of the Advertisements produced in response to Request Nos. 1 or 2, Including all Compensation provided by You for any such services.

10

15.     Documents Concerning any Communications by You or on Your behalf with any television network, cable television, digital media, Social Media, radio, or other commercial platform relating to the Advertisements available to or accessible by New Jersey Consumers which relate to the Advertisements produced in response to Request Nos. 1 or 2, Including drafts of such Documents.

16.     Documents Concerning marketing strategies related to the Advertisements produced in response to Request Nos. 1 or 2, Including any efforts to distribute or display the Advertisements on the internet, any algorithms used for the Advertisements' distribution or dissemination, and any research used to Identify and/or target the Persons or demographics that the Advertisements would reach.

17.     Documents Concerning any integrated marketing strategy using different Advertising venues to reach intended audiences and market Your Firearms in the United States, Including New Jersey.