UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE

| | |
|---|---|
| SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and SMITH & WESSON INC. | Hon. Kevin McNulty, U.S.D.J. Hon. Edward S. Kiel, U.S.M.J. |
| Plaintiffs, | |
| v. | Docket No. 2:20-cv-19047 |
| | **CIVIL ACTION** |
| GURBIR S. GREWAL, in his official capacity as Attorney General of the State of New Jersey and NEW JERSEY DIVISION OF CONSUMER AFFAIRS | **(ELECTRONICALLY FILED)** Motion Return Date:  May 17, 2021 |
| Defendants. | |

BRIEF ON BEHALF OF DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1) and 12(b)(6)

**GURBIR S. GREWAL**
ATTORNEY GENERAL OF NEW
JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
*Attorney for Defendants Gurbir S. Grewal
and New Jersey Division of Consumer
Affairs*

Stephanie J. Cohen
Assistant Attorney General
 Of Counsel and On the Brief

Robert J. McGuire
Justine M. Longa
Michael T. Moran
Kai W. Marshall-Otto
John T. Passante
Tim Sheehan
Deputy Attorneys General
 On the Brief

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ...........................................................................1

PROCEDURAL HISTORY AND STATEMENT OF FACTS .............................4

    A.    *The New Jersey Consumer Fraud Act* ...................................................4

    B.    *The Subpoena* ........................................................................................7

    C.    *Procedural History* ...............................................................................9

STANDARDS OF REVIEW ...............................................................................10

ARGUMENT .......................................................................................................10

    I.    THIS COURT SHOULD ABSTAIN FROM INTERFERING WITH THE ONGOING STATE ENFORCEMENT PROCEEDING ....................................................10

        A.    *The Subpoena Enforcement Action Qualifies For* Younger *Abstention* ................................................12

        1.    *The Subpoena Enforcement Action Constitutes An Ongoing Civil Enforcement Proceeding* ...............................12

        2.    *The Subpoena Enforcement Action Likewise Involves Orders In Furtherance Of State Court Judicial Function* .................................................15

    II.    THIS COURT SHOULD DISMISS UNDER RULE 12(b)(6)........................................................................21

        A.    *The CFA Subpoena Does Not Violate The Second Amendment Or PLCAA Simply Because Plaintiffs Manufacture Firearms* .........................................21

1.    *Plaintiffs' Second Amendment Claim Fails* ...........................21

2.    *Plaintiffs' PLCAA Claim Fails*................................................27

B.    *The CFA Subpoena Does Not Violate The First, Fourth, Or Fourteenth Amendments* .......................................29

1.    *Constitutional Principles Foreclose These Claims*.................30

2.    *The Allegations Do Not Support Plaintiffs' Claims* ...............34

C.    *The CFA Subpoena Does Not Violate The Commerce Clause*......................................................................................38

III.    THE CLAIMS AGAINST DCA AND COMMON LAW CLAIMS   ARE   INDEPENDENTLY   BARRED   BY SOVEREIGN IMMUNITY ..............................................................39

CONCLUSION ................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACRA Turf Club, LLC v. Zanzuccki*,
748 F.3d 127 (3d Cir. 2014)......................................................................11, 12

*Arbitron Inc. v. Cuomo*,
No. 08-8497, 2008 WL 4735227 (S.D.N.Y. Oct. 27, 2008) ............................18

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986).......................................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................10

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018).......................................................................24, 25

*Backpage.com v. Hawley*,
No. 17-1951, 2017 WL 5726868 (E.D. Mo. Nov. 28, 2017) ...................*passim*

*Bowers v. NCAA*,
475 F.3d 524 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007)......................39

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).........................................................................10

*Chao v. Cmty. Tr. Co.*,
474 F.3d 75 (3d Cir. 2007)..............................................................................33

*Cox v. Sears Roebuck & Co.*,
647 A.2d 454 (N.J. 1994)..................................................................................4

*District of Columbia v. Heller*,
554 U.S. 570 (2008)........................................................................................24

*Emp'l Div. v. Smith*,
494 U.S. 872 (1990)........................................................................................23

*Exxon Mobil Corp. v. Schneiderman*,
316 F. Supp. 3d 679 (S.D.N.Y. 2018) ........................................................*passim*

*Fairfield Cmty. Clean Up Crew Inc v. Hale*,
  735 F. App'x 602 (11th Cir. 2018) ...................................................................18

*Goldstein v. Galvin*,
  719 F.3d 16 (1st Cir. 2013) .............................................................................37

*Greco v. Grewal*,
  No. 19-19145, 2020 WL 7334194 (D.N.J. Dec. 11, 2020) ........................12, 17

*Hicks v. Miranda*,
  422 U.S. 332 (1975)........................................................................................18

*Hill v. Borough of Kutztown*,
  455 F.3d 225 (3d Cir. 2006).............................................................................32

*Holland v. Rosen*,
  895 F.3d 272 (3d Cir. 2018).............................................................................26

*Holloway v. Atty. Gen.*,
  948 F.3d 164 (3d Cir. 2020).............................................................................24

*Interactive Media Entm't & Gaming Ass'n v. Att'y Gen.*,
  580 F.3d 113 (3d Cir. 2009).............................................................................25

*J. & W. Seligman Co. v. Spitzer*,
  No. 05-7781, 2007 WL 2822208 (S.D.N.Y. Sept. 27, 2007) ...........................20

*Juidice v. Vail*,
  430 U.S. 327 (1977)...................................................................................16, 17

*King v. Christie*,
  981 F. Supp. 2d 296 (D.N.J. 2013)...................................................................40

*Lemelledo v. Beneficial Mgmt. Corp. of Am.*,
  696 A.2d 546 (N.J. 1997)...................................................................................4

*Lupin Pharms. v. Richards*,
  No. 15-1281, 2015 WL 4068818 (D. Md. July 2, 2015)......................16, 17, 19

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
  538 U.S. 600 (2003)...................................................................................25, 30

*Malhan v. Sec'y U.S. Dep't of State*,
938 F.3d 453 (3d Cir. 2019)............................................................................10

*In re Matter Under Investigation*,
15 So.3d 972 (La. 2009)..................................................................................33

*Meshinsky v. Nichols Yacht Sales*,
541 A.2d 1063 (N.J. 1988)................................................................................5

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982)..................................................................................12, 17

*In re Middlesex Power Equip. & Marine, Inc.*,
292 F.3d 61 (1st Cir. 2002) ............................................................................18

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
938 F.3d 424 (3d Cir. 2019)............................................................................31

*Newark Cab Ass'n v. City of Newark*,
901 F.3d 146 (3d Cir. 2018)......................................................................31, 32

*NYLife Distrib. v. Adherence Grp.*,
72 F.3d 371 (3d Cir. 1995)..............................................................................18

*Okla. Press Pub. Co. v. Walling*,
327 U.S. 186 (1946)........................................................................................33

*PDX N. Inc. v. Comm'r N.J. Dep't of Labor & Workforce Dev.*,
978 F.3d 871 (3d Cir. 2020)..............................................................11, 12, 17

*Pena v. Lindley*,
898 F.3d 969 (9th Cir. 2018)..........................................................................23

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)..........................................................................................40

*Philips v. Cty of Allegheny*,
515 F.3d 224 (3d Cir. 2008)............................................................................10

*Pitt News v. Fisher*,
215 F.3d 354 (3d Cir. 2000)............................................................................26

*Prescott v. Slide Fire Solutions, LP*,
   410 F. Supp. 3d 1123 (D. Nev. 2019).................................................................29

*Pryor v. NCAA*,
   288 F.2d 548 (3d. Cir. 2002)..............................................................................10

*Raygor v. Regents of the Univ. of Minn.*,
   534 U.S. 533 (2002)............................................................................................40

*Rearick v. Wiedemer*,
   No. 11-624, 2012 WL 3231096 (M.D. Pa. Aug. 6, 2012)..................................22

*Rhett v. Evans*,
   576 F. App'x 85 (3d Cir. 2014)...........................................................................39

*Sambrano v. Savage Arms*,
   338 P.3d 103 (N.M. Ct. App. 2014) ...................................................................28

*SEC v. McGoff*,
   647 F.2d 185 (D.C. Cir. 1981) ...........................................................................30

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
   648 F.2d 118 (3d Cir. 1981)................................................................................37

*Shea v. Office of Thrift Supervision*,
   934 F.2d 41 (3d Cir. 1991)..................................................................................19

*Smith & Wesson Corp. v. City of Gary*,
   875 N.E.2d 422 (Ind. Ct. App. 2007) .................................................................29

*Soto v. Bushmaster Firearms Int'l, LLC*,
   202 A.3d 262 (Conn.) *cert. denied sub nom. Remington Arms Co.,*
   *LLC v. Soto*, 140 S. Ct. 513 (2019) .............................................................28, 29

*Sprint Commc'ns, Inc. v. Jacobs*,
   571 U.S. 69 (2013)...................................................................................*passim*

*Stroman Realty v. Martinez*,
   505 F.3d 658 (7th Cir. 2007)..............................................................................20

*In re Subpoena Duces Tecum*,
   228 F.3d 341 (4th Cir. 2000)........................................................................33, 34

*Temple of the Lost Sheep v. Abrams*,
    761 F. Supp. 237 (E.D.N.Y. 1989) ................................................................19

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019) ................................................................................38

*United States v. Fattah*,
    858 F.3d 801 (3d Cir. 2017) ........................................................................30

*United States v. Lanier*,
    520 U.S. 259 (1997) ....................................................................................32

*United States v. Mazzarella*,
    614 F.3d 85 (3d Cir. 2010) ........................................................21, 22, 24

*United States v. Norwood*,
    420 F.3d 888 (8th Cir. 2005) ......................................................................33

*United States v. Salerno*,
    481 U.S. 739 (1987) ....................................................................................32

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ....................................................................................30

*Wearly v. Federal Trade Comm'n*,
    616 F.2d 662 (3d Cir. 1980) ........................................................................19

*Wharton v. Danberg*,
    854 F.3d 234 (3d Cir. 2017) ........................................................................32

*Ex Parte Young*,
    209 U.S. 123 (1908) ....................................................................................39

*Younger v. Harris*,
    401 U.S. 37 (1971) ..............................................................................*passim*

*Zimmer v. N.J. Div. of Child Prot. & Permanency*,
    No. 15-2524, 2016 WL 234844 (D.N.J. Jan 20, 2016) ...............................22

**Statutes**

15 U.S.C. § 7901(b)(1) ........................................................................................27

15 U.S.C. § 7901(b)(1), *et seq.*..........................................................21, 27, 28, 29

15 U.S.C. § 7903(5)(A) .................................................................................. 27

N.J. Stat. Ann. § 2C:21-7(e) ......................................................................... 15

N.J. Stat. Ann. § 56:8-2 ............................................................................ 6, 25

N.J. Stat. Ann. § 56:8-3 .............................................................................. 4, 5

N.J. Stat. Ann. §§ 56:8-4, ...................................................................... 4, 5, 13

N.J. Stat. Ann. § 56:8-6 ......................................................................... 5, 13, 14

N.J. Stat. Ann. § 56:8-6, *et seq.* ................................................................. 16

N.J. Stat. Ann. §§ 56:8-8 ................................................................................ 5

## Other Authorities

U.S. Const. *amend.* I ................................................................................. 1, 34

U.S. Const. *amend.* II ............................................................................ *passim*

U.S. Const. *amend.* IV ................................................................................. 34

U.S. Const. *amend.* XI ............................................................................ 39, 40

U.S. Const. *amend.* XIV ...................................................................... 29, 31, 34

## **PRELIMINARY STATEMENT**

This Court should dismiss the instant Complaint for one overarching reason: it attempts to turn a garden-variety state consumer-fraud investigation into a federal constitutional case. In October 2020, the New Jersey Division of Consumer Affairs ("DCA" or "Division") sent an investigatory subpoena to a company that markets and sells its products in the State, seeking to determine whether its advertisements and marketing available to New Jersey customers violated the New Jersey Consumer Fraud Act ("CFA" or "Act"). That sort of subpoena is routine; the Division is the state agency charged with investigating and sanctioning illegal sales practices in New Jersey, work it has performed for decades. Like similar state consumer agencies all across the country, the Division regularly initiates investigations and enforcement actions to protect consumers from unlawful business practices involving a range of goods and services—including (in recent months alone) mortgage-loan modifications, used cars, student-loan servicing, COVID-19 tests, and prescription opioids. And when an entity refuses to produce documents relating to whether its advertisements misled New Jersey consumers, the Division files an action in the New Jersey Superior Court to enforce its subpoena, just as it did here.

The only thing unusual about this consumer fraud investigation is that Smith & Wesson Brands, Inc. and affiliated companies (collectively "Smith & Wesson" or "Plaintiffs") rushed into federal court, claiming that the subpoena contravenes a

smorgasbord of federal constitutional provisions. In Plaintiffs' telling, any decision by DCA to inquire into whether their advertisements mislead consumers would violate the First Amendment, Second Amendment, Fourth Amendment, Equal Protection Clause, Due Process Clause, and Dormant Commerce Clause, and a federal statute. Said another way, rather than comply with the subpoena or attempt to engage in any good-faith effort to narrow its scope, Plaintiffs decided they would be best served by using this Court as a sword against a lawful state investigation into their potentially misleading advertising practices. But there are two problems with pursuing these constitutional claims in federal court: the Complaint does not belong in federal court, and Plaintiffs' constitutional claims lack merit.

There is a good reason why this Court is not in the business of evaluating state disputes over consumer protection subpoenas—such arguments belong instead in state court. As the federal courts have recognized time and again, any time a State initiates a qualifying civil enforcement proceeding in state court, that court is the best forum for evaluating the related legal claims and defenses. That abstention doctrine, known as *Younger* abstention, applies squarely to this dispute. *See Younger v. Harris*, 401 U.S. 37 (1971). There is an ongoing subpoena enforcement action in New Jersey court; it implicates important state interests in investigating fraudulent practices and obtaining responses to subpoenas; and the Superior Court is an adequate available forum to consider all the First Amendment, Second Amendment,

Fourth Amendment, Equal Protection Clause, Due Process Clause, Dormant Commerce Clause, and preemption issues raised here, along with state law claims. To allow this case to proceed would thus disrespect the important role state courts play—including in evaluating federal claims. And it would allow for and incentivize forum shopping, which risks turning this Court into an all-too-frequent forum for state subpoena disputes.

But wherever these issues are heard, Plaintiffs cannot prevail. The State's decision to issue a subpoena to Smith & Wesson to determine whether its advertisements mislead consumers does not offend the United States Constitution; this commonplace exercise of the police power to protect residents from fraud does not inhibit lawful speech, anyone's right to bear arms, equal protection of the laws, or anything else. And while Smith & Wesson tries to get around the weaknesses in its theories by claiming the Attorney General has impermissibly singled it out for unfair treatment, the facts pleaded fall far short of plausibly alleging that Smith & Wesson was targeted because of the product it sells. There is nothing remarkable about the underlying investigation; instead, what singles out this action is *Plaintiffs'* efforts to pull this Court into a quotidian subpoena dispute.

The ongoing proceedings in New Jersey Superior Court offer Plaintiffs a full and fair opportunity to make their arguments—as tenuous as they may be. That court, rather than this one, should assess (and ultimately reject) them.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

A.    *The New Jersey Consumer Fraud Act*

The CFA protects vulnerable consumers from fraudulent and unconscionable practices, often by enormous corporate entities that wield extraordinary power. The Legislature passed the CFA in 1960 to allow the New Jersey Attorney General ("Attorney General") "to combat the increasingly widespread practice of defrauding the consumer." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 460 (N.J. 1994); *see also Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997) (noting the CFA grants the Attorney General various powers to accomplish its goals). The Act empowers the Attorney General to investigate potential violations of the Act and promulgate rules that have the force of law. N.J. Stat. Ann. § 56:8-3, -4. Just a decade later, in 1971, the Legislature amended the CFA to transform it into "one of the strongest consumer protection laws in the nation" by broadly making unlawful every "unconscionable commercial practice[]" and expanding the Attorney General's enforcement powers. Governor's Press Release for Assembly Bill No. 2402, at 1 (Apr. 19, 1971).

The CFA accords the Attorney General and DCA extensive powers to combat fraud against consumers. In its original form, the CFA "was exclusively enforced by the Attorney General, who was provided with broad powers to investigate, subpoena records, and seek injunctions prohibiting fraudulent conduct and orders of restitution

4

to make whole any person damaged by conduct violating the Act." *Meshinsky v. Nichols Yacht Sales*, 541 A.2d 1063, 1067 (N.J. 1988) (citing N.J. Stat. Ann. §§ 56:8-3, -5, -8). In 1967, the Attorney General's powers and duties under the CFA were delegated to an Office of Consumer Protection, which has since been incorporated into the Division. *See id.* § 52:17B-5.7; § 52:17B-120. Now, the CFA authorizes the Attorney General and the Division to investigate potential consumer fraud, promulgate rules that have the force of law, issue cease-and-desist orders, and impose penalties for violations of such orders. N.J. Stat. Ann. §§ 56:8-3, -4, -18. Still other CFA provisions reinforce the Attorney General's broad authority. *See, e.g.*, *id.* § 56:8-6 (setting forth Attorney General's powers when person fails to obey subpoena); § 56:8-13 (authorizing imposition of civil penalties); § 56:8-15 (authorizing restitution of moneys or property); § 56:8-16 (stating Attorney General may provide for remission of penalty conditioned on "prompt compliance with the requirements" he sets forth); § 56:8-17 (establishing that upon failure to pay penalty or restore money or property, Attorney General may "issue certificate to Clerk of Superior Court that such person is indebted to the State for the payment of such penalty and moneys or property ordered restored" and that such entry has same effect as docketed judgment).

The CFA's substantive scope is equally sweeping. Unlike other state statutes that are limited to specific industries or businesses, the CFA protects against nearly

all consumer fraud in the marketing and sale of products. *See id.* § 56:8-2 (establishing the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation … in connection with the sale or advertisement of any merchandise or real estate … is declared to be an unlawful practice"); *id.* § 56:8-1 (defining merchandise to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale").

The Division's recent consumer fraud enforcement actions bear out the broad scope of the Act. In the past six months alone, the Attorney General and Division have successfully settled a wide range of actions, including (1) a $3 Million settlement with an auto manufacturer pertaining to alleged failure to disclose danger related to airbags,[1] (2) settlement with major bank regarding alleged predatory subprime auto lending practices,[2] (3) settlement with used car dealers concerning alleged misrepresentation of the condition of vehicles,[3] (4) a $16 million settlement pertaining to the marketing of opioids that caused countless deaths in the State,[4] and

---

[1] New Jersey Division of Consumer Affairs, Press Release dated January 5, 2021, available at:  https://www.njconsumeraffairs.gov/News/Pages/08252020.aspx

[2] New Jersey Division of Consumer Affairs, Press Release dated December 8, 2020, available at:  https://www.njconsumeraffairs.gov/News/Pages/05192020.aspx

[3] New Jersey Division of Consumer Affairs, Press Release dated October 22, 2020, available at: https://www.njconsumeraffairs.gov/News/Pages/10222020.aspx

[4] New Jersey Division of Consumer Affairs, Press Release dated September 21, 2020, available at: https://www.njconsumeraffairs.gov/News/Pages/02042021B.aspx

(5) a settlement relating to the sale of unlawful firearm magazines while concealing the product's illegal nature.[5] In short, the CFA reaches across practices and industries, and the State's long history of consumer fraud enforcement confirms its broad scope.

### B.    *The Subpoena*

On or about October 13, 2020, the Division served an administrative subpoena on Plaintiffs (the "Subpoena"). ECF No. 1, Compl., ¶ 55, Ex. 1. The Subpoena asked Smith & Wesson for seventeen (17) particularized categories of documents directly relevant to the question of whether the company has engaged in consumer fraud in violation of the CFA. *See* ECF No. 1, Compl., Ex. 1, Schedule A.

The Subpoena seeks documents pertaining to Plaintiffs' advertising and marketing available to New Jersey consumers. For example, the Subpoena demands advertisements pertaining to the safety and defense benefits of owning a firearm, and related marketing strategies, communications, and contracts. *Id.*, ¶¶ 1-2, 7-8, 14-16. The Subpoena also requests documents evaluating the veracity of the claims made in said advertisements and marketing available to state consumers, and documents demonstrating any efforts by Plaintiffs to determine whether its advertising practices

---

[5] New Jersey Division of Consumer Affairs, Press Release dated September 10, 2020, available at: https://www.njconsumeraffairs.gov/News/Pages/09102020.aspx; New Jersey Division of Consumer Affairs, Press Release dated January 11, 2021, available at: https://www.njconsumeraffairs.gov/News/Pages/01112021.aspx

comport with New Jersey law. *Id.*, ¶¶ 3, 5. It demands "[a]ll Documents Concerning any test, study, analysis, or evaluation considered or undertaken, whether by You, on Your behalf, or by a third party, which relates to, addresses, evaluates, proves, disproves, or substantiates any Claim made" in the responsive advertisements. *Id.*, ¶ 3. It seeks "[a]ll Documents, Including Policies, reports, and findings, Concerning any efforts by You to determine whether Your Advertisement of Merchandise complies with New Jersey law." *Id.*, ¶ 5. And it requests documentation pertaining to Smith & Wesson's sales of firearms in the State. *Id.*, ¶¶ 9-12.

Potential CFA violations are often investigated by securing and analyzing advertising, marketing and sales documentation and data. This is exactly the type of information demanded in the Subpoena. Moreover, the Subpoena is tailored to specific types of marketing and advertisements, including (1) "[w]hether Smith & Wesson Firearms can be legally carried and concealed by any Consumer, including New Jersey Consumers, while in New Jersey," *id.*, ¶ 4(a); (2) "[w]hether it is safer to confront a perceived threat by drawing a firearm rather than seek to move away from and avoid the source of the perceived threat," *id.*, ¶ 4(c); and (3) "[w]hether novice, untrained Consumers could successfully and effectively use a Smith & Wesson Firearm for personal or home defense," *id.*, ¶ 4(f).

C.    *Procedural History*

Although Smith & Wesson requested and received a thirty-day extension to respond to the Subpoena, on the day after the extension expired, December 15, 2020, Plaintiffs filed this suit in federal court instead. ECF No. 1, Compl. The Complaint, in essence, is premised on the proposition that New Jersey's top consumer fraud official is not entitled to any information about how Smith & Wesson advertises and sells products in this State and whether it has evidence or other materials belying the claims it makes to consumers. Plaintiffs raise a plethora of constitutional challenges to the Division's Subpoena, including claims based on the First Amendment, Second Amendment, Fourth Amendment, Equal Protection Clause, Due Process Clause, Dormant Commerce Clause, and a federal statute.

The instant suit is not the only case involving the Subpoena. On February 12, 2021, following Plaintiffs' failure to respond, the Attorney General and the Division commenced a subpoena enforcement action in New Jersey Superior Court. *See* Feb. 22, 2021 Declaration of Robert J. McGuire ("McGuire Decl."), Ex. A. The action seeks to hold Plaintiffs in contempt for non-compliance with the Subpoena and direct the production of the subpoenaed documents. *See id.*, at 7.

Defendants now move to dismiss Plaintiffs' Complaint in its entirety.

## STANDARDS OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(1) challenges the federal court's subject matter jurisdiction. The plaintiff bears the burden of persuasion. *See Heges v. United* States, 404 F.3d 744, 750 (3d Cir. 2005). In considering a 12(b)(1) motion, a "court may not presume the truthfulness of plaintiff's allegations, but rather must 'evaluat[e] for itself the merits of [the] jurisdictional claims.'" *Id.*

Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint fails to state a claim on which relief can be granted. In deciding the motion, courts may consider documents "referred to in the plaintiff's complaint [that] are central to the claim." *Pryor v. NCAA*, 288 F.2d 548, 560 (3d. Cir. 2002). Although courts must accept as true factual allegations, *Philips v. Cty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), they do not "credit a complaint's 'bald assertions' or 'legal conclusions.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997). Instead, a court looks to see whether the pleadings and legal conclusions "are supported by factual allegations," and whether, if true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

### I.   THIS COURT SHOULD ABSTAIN FROM INTERFERING WITH THE ONGOING STATE ENFORCEMENT PROCEEDING.

This Court should abstain from adjudicating Plaintiffs' challenge to this state consumer protection subpoena. Although the federal courts typically decide any case

over which they have jurisdiction, the Supreme Court has for decades recognized a "far-from-novel" exception to that rule, known colloquially as *Younger* abstention, which "requires federal courts to abstain from deciding cases that would interfere with certain ongoing state proceedings." *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 462 (3d Cir. 2019). At its core, this doctrine instructs that federal courts should refrain from taking action in cases where the federal plaintiff has adequate redress available in state enforcement proceedings. As the Third Circuit explained, *Younger* abstention serves an important "dual-purpose": (1) "to promote comity, 'a proper respect for state functions,' by restricting federal courts from interfering with ongoing state judicial proceedings and (2) to restrain equity jurisdiction from operating when state courts provide adequate legal remedies for constitutional claims and there is no risk of irreparable harm." *PDX N. Inc. v. Comm'r N.J. Dep't of Labor & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)).

There are two steps involved in any *Younger* analysis. First, a court must seek to determine whether the underlying state proceeding is the type to which abstention applies. As the Third Circuit laid out most recently in *PDX*, abstention is appropriate if that state proceeding fits within any of the following three categories: "(1) criminal prosecutions, (2) civil enforcement proceedings, and (3) 'civil proceedings involving orders in furtherance of the state courts' judicial function.'" *Id.* (quoting *ACRA Turf*

11

*Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014)). Second, if one or more categories is satisfied, this Court will also ask "(1) whether there are ongoing judicial proceedings; (2) whether those proceedings implicate important state interests; and (3) whether there is an adequate opportunity in the state proceeding to raise constitutional challenges." *Id.* (quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). That analysis resolves this case—there is a proceeding that fits within *Younger*'s categories, and it satisfies the "*Middlesex* factors." Smith & Wesson will have its day in court, but this is the wrong court.

    A.    *The Subpoena Enforcement Action Qualifies For* Younger *Abstention*.

As a threshold matter, the subpoena enforcement action in Superior Court is a qualifying civil enforcement proceeding and/or a civil proceeding involving orders in furtherance of the state courts' judicial function.

    1.    *The Subpoena Enforcement Action Constitutes An Ongoing Civil Enforcement Proceeding*.

This Court must abstain under *Younger* because the subpoena enforcement action in state court is a qualifying civil enforcement proceeding. As the Supreme Court has noted, *Younger* most frequently, though not exclusively, applies to a civil enforcement proceeding if the suit is "akin to a criminal prosecution" in "important respects." *Sprint*, 571 U.S. at 79-80. Federal courts ask "whether (1) the action was commenced by the state in its sovereign capacity, (2) the proceeding was initiated to sanction the plaintiff for some wrongful act; and (3) there are other similarities to

criminal actions, such as a preliminary investigation that culminated with the filing of formal charges." *PDX*, 978 F.3d at 883 (quoting *ACRA Turf*, 748 F.3d at 138); *Greco v. Grewal*, No. 19-19145, 2020 WL 7334194, at *7 (D.N.J. Dec. 11, 2020) (noting "these factors are not a mandatory checklist for quasi-criminal proceedings; instead, a court determining a state proceeding's quasi criminal character weighs the factors above; no single factor is dispositive"). A holistic assessment leads only to one conclusion—*Younger* applies to this civil enforcement proceeding.

First, the subpoena enforcement action was commenced by the State in its sovereign capacity. *See Sprint*, 571 U.S. at 79 (noting "[i]n cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the [state] action"). Indeed, the sole plaintiffs in the state court subpoena enforcement action are the Attorney General and the DCA Acting Director. McGuire Decl., Ex. A, at ¶¶ 7-8. And of course, the subpoena itself was also from a state actor—the Division— exercising the statutory authority of the Attorney General. ECF No. 1, Compl., Ex. 1. That is also what state law demands: the Attorney General alone (and through him the Division) has authority to "issue subpoenas to any person" under the CFA, N.J. Stat. Ann. § 56:8-4, and they alone have the authority to "apply to the Superior Court and obtain an order" that requires compliance with the subpoena's demands, *id.* § 56:8-6. As another court noted when evaluating the applicability of *Younger* to consumer-fraud subpoena enforcement, this is textbook initiation by a state actor.

13

*See, e.g.*, *Backpage.com v. Hawley*, No. 17-1951, 2017 WL 5726868, at *8 (E.D. Mo. Nov. 28, 2017).

Second, the proceeding is initiated to sanction the plaintiff for some wrongful act. *Sprint*, 571 U.S. at 79. The CFA makes clear that the ongoing state court action satisfies this in two different ways. For one, the CFA establishes that failure to obey a subpoena issued by the Attorney General is a wrongful act, and that enforcement actions exist not just to get compliance but to impose sanctions. Indeed, the Attorney General may apply for a court order "[a]djudging such person in contempt of court"; "vacating, annulling, or suspending [its] corporate charter"; and "restraining the sale or advertisement of any merchandise by such persons" who refuse to obey. N.J. Stat. Ann. § 56:8-6. For another, the Attorney General's overall authority under the CFA likewise empowers him to issue subpoenas and to engage in investigations that allow the Attorney General, in appropriate cases, to hold unscrupulous businesses accountable for their wrongful acts of consumer fraud. *See id.* § 56:8-13 (providing violators are "liable to a penalty of not more than $10,000 for the first offense and not more than $20,000 for the second"). A subpoena enforcement action is a key step in that enforcement process.

This "state-court action clearly involves an investigation with the potential to culminate in the filing of a formal complaint or charges." *Backpage.com*, 2017 WL 5726868, at *8; *see also Sprint*, 571 U.S. at 80 (explaining that "[i]nvestigations are

14

commonly involved, often culminating in the filing of a formal complaint or charges," but not requiring filing of final charges). *Backpage.com* involved facts quite similar to the case at bar. There, another state Attorney General issued civil investigative demands (CIDs) under his Merchandising Practices Act; the recipient sued in federal court, asserting a series of constitutional grounds, in response. 2017 WL 5726868, at *5-6. The Attorney General then moved to enforce his CID in the appropriate state court, leading the federal court to abstain on *Younger* grounds. As the court laid out, such facts map on easily to *Younger*: there is an ongoing investigation by a state actor (as evidenced by the subpoena), it *already* led to the filing of a formal Complaint for the noncompliance with the subpoena, and it has the potential to lead to other formal complaints for statutory violations in the future. *Id.* at *7. These points are even stronger in New Jersey, where there is a criminal analogue to the civil provisions being enforced in this case. *See* N.J. Stat. Ann. § 2C:21-7(e) (criminal deceptive business practice to make "a false or misleading statement in any advertisement addressed to the public . . . promoting the purchase or sale of property or services."). The teachings of *Backpage.com* fit this case hand-in-glove.

      2.    *The Subpoena Enforcement Action Likewise Involves Orders In Furtherance Of State Court Judicial Function*.

Additionally or alternatively, this Court should find the subpoena enforcement action in New Jersey Superior Court involves "certain orders uniquely in furtherance

15

of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78. Once again, the decision in *Backpage.com* is instructive. In that case, the Missouri Attorney General argued his motion to enforce a consumer-fraud subpoena qualified "because it implicates a state court's ability to enforce subpoenas under state law." 2017 WL 5726868, at *7. In particular, the court laid out, in such cases "comity and federalism require[] abstention because the contempt power"—by which the state subpoena was to be enforced—" lies at the core of the administration of a State's judicial system and such interference with the contempt process unduly interferes with the legitimate activities of the State." *Id.* (citations omitted); *see also id.* (emphasizing that, under state law, noncompliance with the Attorney General's investigative demand could lead to enforcement and sanctions). Those principles apply here: consistent with the statutory scheme laid out in N.J. Stat. Ann. § 56:8-6, *et. seq.*, the Attorney General seeks to hold Plaintiffs in contempt for their noncompliance and to direct the production of the subpoenaed documents. *See* McGuire Decl., Ex. A, at 7.

Precedent supports those first principles. As another court recently explained when confronted with nearly identical facts, the progenitor of this third category of *Younger* cases is *Juidice v. Vail*, 430 U.S. 327 (1977), in which "the Supreme Court found that abstention under *Younger* was appropriate in a federal class action suit brought by individuals who had been found in contempt by state court judges for

disobeying subpoenas" on the basis that "'federal-court interference with the State's contempt process is an offense to the State's interest … likely to be every bit as great as it would be were [it] a criminal proceeding.'" *Lupin Pharms. v. Richards*, No. 15-1281, 2015 WL 4068818, at *4 (D. Md. July 2, 2015) (quoting *Juidice*, 430 U.S. at 335). Although that case involved the failure to respond to a subpoena in a civil suit between private parties, and *Lupin* (like this case) involved the refusal to comply with an administrative subpoena, this reflects a "distinction without a difference." *Id.* After all, the court went on, the former is issued by a private attorney backed by the power of state courts, while CFA subpoenas "are issued by the Attorney General, but … can only be enforced after involving a state court." *Id.* Because the State and its courts have critical interests in ensuring subpoena compliance, the State's motion in state court to enforce a subpoena "requires [it] to abstain under the third category of the *Younger* Doctrine" just as in *Juidice*. *Id.* Abstention is proper here.

      B.    *The* Middlesex *Factors Are Satisfied, Triggering* Younger *Abstention*.

Because the Division's subpoena enforcement action falls into one or more of the qualifying categories, the next question is whether the case meets the *Middlesex* factors. At this second and final step, the Court asks if there are ongoing judicial proceedings that implicate important state interests and offer an adequate

opportunity for Plaintiffs to raise their arguments. The subpoena enforcement action in the New Jersey Superior Court meets that test.[6]

That the Superior Court subpoena enforcement action was filed after Plaintiffs filed their federal Complaint makes no difference, as courts (including the Supreme Court) have found that *Younger* remains applicable "where state … proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975); *Arbitron Inc. v. Cuomo*, No. 08-8497, 2008 WL 4735227, at *3-4 (S.D.N.Y. Oct. 27, 2008) (abstaining where no proceedings on merits occurred in federal suit prior to filing of Attorney General's state-court action). That makes sense: the contrary "first-to-file" rule would permit, and even incentivize, the very forum shopping that abstention is designed to prevent—encouraging entities who receive warning letters or subpoenas to rush to this Court to eventually avoid *Younger*. *See generally NYLife Distrib. v. Adherence Grp.*, 72 F.3d 371, 383 (3d Cir. 1995) (instructing district court in abstention case "to ensure … forum shopping or gamesmanship is not rewarded"); *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 69 (1st Cir. 2002) (referring to "courts' shared interest in the avoidance of forum shopping").

---

[6] Because there is no doubt Plaintiffs can raise their federal claims in New Jersey's state courts, *see PDX*, 978 F.3d at 882; *Greco*, 2020 WL 7334194, at *7, this motion focuses on the other two factors.

That test is dispositive here, where Plaintiffs filed this action just one day after its deadline to respond to the subpoena expired and where no federal proceedings of substance had occurred by the time the State filed its subpoena enforcement action in state court. *See Fairfield Cmty. Clean Up Crew Inc v. Hale*, 735 F. App'x 602, 605 (11th Cir. 2018) (noting case where "district court had not held any hearings and [defendants] had not filed any substantive pleadings" by time state court action was initiated "is precisely the type of timeline that" can trigger *Younger*). Indeed, other courts have confronted this situation—where a subpoena recipient rushes to federal court and the State then moves to enforce in state court—and have applied *Younger* abstention. *See Dreamland*, 2008 WL 4369270, at *10 (holding that "because the Motion to Compel came after the federal Complaint was filed but before any other proceedings in federal court, the *Younger* abstention doctrine applies in full force. Therefore there is an ongoing proceeding for purposes of the abstention doctrine."); *Lupin*, 2015 WL 4068818, at *5 (recognizing that, while Attorney General did not file state action until after filing of preliminary injunction motion in federal court, "the Court has not made any substantive rulings to date" so "there is no basis for this Court to refuse to abstain"); *Temple of the Lost Sheep v. Abrams*, 761 F. Supp. 237, 242 (E.D.N.Y. 1989) (same). The state court proceeding here is "ongoing."[7]

---

[7] Notably, this Court need not even define the precise contours of how much federal court proceeding is "too much" here because Plaintiffs' suit was not even valid at its

Because there is an ongoing proceeding, the final question is whether a state court action to compel responses to a consumer protection subpoena implicates important state interests. It does so for two reasons: it involves consumer protection and it involves subpoena compliance. Regarding the former, the "state has an important interest in enforcing its consumer protection statutes and protecting the public from deceptive business practices." *Backpage.com*, 2017 WL 5726868, at \*8; *see also id.* ("Because the state-court action here involves the state's efforts to enforce the state's consumer-protection laws, it satisfies the important state interests requirement."); *J. & W. Seligman Co. v. Spitzer*, No. 05-7781, 2007 WL 2822208, at \*6 (S.D.N.Y. Sept. 27, 2007) (agreeing "investigating and preventing fraudulent conduct" is "important state interest"); *Stroman Realty v. Martinez*, 505 F.3d 658, 663-64 (7th Cir. 2007) (noting state interest in protecting against "fraudulent, dishonest and incompetent" business practices). That is especially true in New Jersey, where the Legislature took pains "to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public" in adopting the

---

inception. Indeed, in the Third Circuit, a challenge to an administrative subpoena—absent any sort of subpoena enforcement action by the issuer—is unripe and thus not fit for review by any Article III court. *See, e.g.*, *Wearly v. Federal Trade Comm'n*, 616 F.2d 662, 665 (3d Cir. 1980); *Shea v. Office of Thrift Supervision*, 934 F.2d 41, 45 (3d Cir. 1991). It cannot be that a party can file an unripe, jurisdictionally-improper federal suit before a subpoena enforcement action is initiated to defeat the otherwise-plain application of *Younger* once that action is initiated. To note that such a regime allows for gamesmanship would, if anything, be an understatement.

CFA. *Kugler*, 279 A.2d at 648. And as to the latter, states have an interest in "enforcing subpoenas issued pursuant to state law" to protect "the integrity of its subpoena and contempt process." *J. & W. Seligman*, 2007 WL 2822208, at *6; *see also Dreamland*, 2008 WL 4369270, at *10 (confirming state "interest in enforcing its own laws and investigating their violation cannot seriously be disputed"). It follows that "the enforcement of subpoenas issued pursuant to state law in furtherance of a fraud investigation [] represent an important and legitimate state interest." *J. & W. Seligman*, 2007 WL 2822208, at *6.

## II.    THIS COURT SHOULD DISMISS UNDER RULE 12(b)(6).

Investigating whether marketing and advertisements mislead consumers does not violate the Second Amendment, Protection of Lawful Commerce in Arms Act (PLCAA), First Amendment, Fourth Amendment, Equal Protection Clause, Due Process Clause, or Dormant Commerce Clause. The Complaint must be dismissed.

### A.    *The CFA Subpoena Does Not Violate The Second Amendment Or PLCAA Simply Because Plaintiffs Manufacture Firearms.*

Plaintiffs' claims under the Second Amendment and PLCAA are meritless. A company is not shielded from consumer-fraud liability or investigations solely on the basis that it happens to sell firearms.

#### 1.    *Plaintiffs' Second Amendment Claim Fails.*

The Second Amendment does not support the proposition that manufacturers of firearms are shielded from investigations into otherwise unlawful behavior, such

21

as fraudulent advertising. Plaintiffs' Second Amendment claims must be dismissed because the Subpoena—used to gather information about a potential violation of a law of general applicability—is not a restriction on gun ownership, and it does not "impose a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Mazzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see also id.* (explaining that if the law "does not" impose such a burden, the Second Amendment "inquiry is complete" and challenge must fail). Moreover, while Plaintiffs seek to assert the Second Amendment rights of their customers, customers are not served by allowing a company to hide whether it made misrepresentations to them.

An informational subpoena to a firearms manufacturer to produce information about its advertising claims imposes no "burden on conduct" relating to the "the right to possess firearms for defense of hearth and home." *Id.* at 88. For one, no Third Circuit precedent suggests that governmental action can burden Second Amendment rights when it *does not* impinge on any individual's possession or use of any firearm. More than that, the cases say just the opposite—that Second Amendment rights are not burdened when a government entity makes an informational inquiry of someone who possess firearms. *See Zimmer v. N.J. Div. of Child Prot. & Permanency*, No. 15-2524, 2016 WL 234844, at *12 (D.N.J. Jan 20, 2016) (holding that child protective services worker's inquiry into "Plaintiffs' gun ownership and gun safety practices, or inspecting Plaintiffs' firearms and gun safe, did not burden Plaintiffs'

22

rights to possess and carry firearms"); *Rearick v. Wiedemer,* No. 11-624, 2012 WL 3231096, at *3 (M.D. Pa. Aug. 6, 2012) (concluding that state employer's "mere questioning [an employee] about her gun permit does not rise to the level of a Second Amendment violation"). If informational requests of individual gun owners about use of firearms does not burden Second Amendment rights, an information subpoena to a gun manufacturer about their advertising of firearms cannot either.

Moreover, the CFA, which is a facially neutral law that has nothing to do with the possession or use of firearms, does not burden constitutional rights just because it also applies to businesses that sell products used in the exercise of those rights. Take, for example, the Supreme Court's upholding of regulations based on public safety even when the business being regulated sells products that individuals use to exercise First Amendment rights. *See, e.g., Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (upholding suspension of adult bookstore's ability to operate when investigation determined prostitution was occurring on premises and posed a threat to public health, a violation of a generally neutral law); *Emp'l Div. v. Smith*, 494 U.S. 872, 878 (1990) (rejecting First Amendment challenge to state law banning religious use of peyote because the law was neutrally applied).

In the same manner here, such "rules of general applicability"—including the generally applicable CFA and the subpoena authority it accords DCA—"do not violate the Second Amendment just because they place conditions on commercial

sales, including sales of handguns used for self-defense." *Pena v. Lindley*, 898 F.3d 969, 1008 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part). And although compliance with consumer fraud statutes can theoretically "affect the willingness of consumers to purchase the goods," such statutes "do[] not, for that reason, violate the Second Amendment—no more than taxes collected on the sales of religious materials restrict Free Exercise rights under the First Amendment." *Id.* These principles comport with both "constitutional tradition and common sense." *Emp'l Div.*, 494 U.S. at 885. Put simply, it cannot be that states lose their power to investigate fraudulent behavior when the subject happens to be a publisher, a manufacturer of birth control, a criminal defense law firm, or in this case a firearms manufacturer. After all, customers of firearms—like of any other product—have an interest in receiving advertisements free of fraud.

Even if the Subpoena somehow does "burden" Second Amendment rights, it is nevertheless permissible. Only regulations "that severely burden the core Second Amendment right to self-defense in the home are subject to strict scrutiny," and lesser burdens are subject to intermediate scrutiny. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018). Because a CFA subpoena does not burden that right—it places no limits on possession or use of firearms for self-defense in the home—intermediate scrutiny would apply. *Id.* Indeed, the Third Circuit has applied intermediate scrutiny to even more direct burdens on firearm

24

possession. *See Marzzarella*, 614 F.3d at 97; *Holloway v. Atty. Gen.*, 948 F.3d 164, 172 (3d Cir. 2020). The only questions are thus whether the State has an "important interest" in the CFA, and whether there exists "a reasonable fit between that asserted interest and the challenged law." *N.J. Rifle*, 910 F.3d at 119.

That analysis is easily resolved in this case. The Supreme Court has already recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626-27, n.26 (2008). Here, the issuance of the Subpoena, prompted by concerns over Plaintiffs' potentially misleading advertising claims, advances the State's "important interest" in protecting the public from false and deceptive advertising. *See* N.J. Stat. Ann. § 56:8-2. Courts have repeatedly recognized the governmental interest in "vigorously enforc[ing] antifraud laws." *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 623-24 (2003). There is a "reasonable fit" between that State interest and the Subpoena because the Subpoena "does not burden more conduct than is reasonably necessary." *N.J. Rifle*, 910 F.3d at 119. To comply, Plaintiffs merely need to answer questions and produce documents; they do not need to relinquish or stop selling firearms. The instant subpoena does not violate the Second Amendment.

To sidestep the weakness in its Second Amendment claim, Smith & Wesson tries to assert constitutional claims on behalf of its customers. Compl., Count IV.

That claim must be dismissed for lack of standing. To establish third-party standing, "(1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a close relationship; and (3) the third party must face some obstacles that prevent it from pursuing its own claims." *Interactive Media Entm't & Gaming Ass'n v. Att'y Gen.*, 580 F.3d 113, 118 (3d Cir. 2009). Plaintiffs fail every prong.

First, as explained above, Plaintiffs cannot demonstrate a cognizable Second Amendment injury from a Subpoena that seeks information regarding their advertising practices, and the Subpoena's impact on its operations are purely conjectural. Second, Plaintiffs cannot rely on a hypothetical future customer to establish third-party standing. In *Holland v. Rosen*, 895 F.3d 272, 287 (3d Cir. 2018), the court held that a bail bonds business could not assert third-party standing on behalf of "potential … criminal defendant customers" to challenge state bail laws. As in *Holland*, "the hypothetical relationship" between Plaintiffs and potential future customers who allegedly want to buy Smith & Wesson firearms but may not be able to is "not a close one; indeed, 'they have no relationship at all." *Id.* And in this case, the relationship is especially attenuated: it is unclear how compliance with the DCA Subpoena would in any way impact Smith & Wesson's ability to sell firearms, and even if it did, customers have interests in receiving advertising *without* fraudulent statements—making Smith & Wesson a particularly unsuitable representative of their interests. Third and finally, Plaintiffs can make no showing that any future

26

individual customers face obstacles from pursuing their own claims. *See Holland*, 895 F.3d at 288 (rejecting argument indigent defendants cannot bring claims vindicating their constitutional rights); *Pitt News v. Fisher*, 215 F.3d 354, 362–63 (3d Cir. 2000) (newspaper cannot assert standing on behalf of advertisers or readers that have no "impediment to bringing their own suit to challenge the statute" in question). Plaintiffs cannot establish third-party standing.

2.    *Plaintiffs' PLCAA Claim Fails*.

In enacting PLCAA, Congress sought to protect federally-licensed firearms manufacturers and sellers from certain forms of civil liability—but made clear other civil matters could still go forward. The statute thus expressly protects such firearms manufacturers and sellers from liability "for the harm *solely* caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1) (emphasis added). To effectuate that regime, PLCAA provides that "[a] qualified civil liability action may not be brought in any Federal or State court," *id.* § 7902(a), and it defines a "qualified civil liability action" as "a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the *criminal or unlawful misuse* of a qualified product by the person or a third

27

party. 15 U.S.C. § 7903(5)(A) (emphasis added). The statutory definition excludes "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought"— meaning such lawsuits can still go forward. *Id.* § 7903(5)(A)(iii). This is commonly referred to as the "predicate exception." Two flaws prove fatal to Plaintiffs' PLCAA claim—this CFA investigation does not qualify as a "qualified civil liability action" in the first place, and it also fits into PLCAA's so-called predicate exception.

As to the former, the Division's Subpoena—which merely seeks documents and information relating to Plaintiffs' advertising practices—has nothing to do with any particular person's *misuse* of firearms, and PLCAA's bar therefore cannot apply to it. *See Sambrano v. Savage Arms*, 338 P.3d 103, 106 (N.M. Ct. App. 2014) ("We note that the PLCAA expresses the necessary connection between a plaintiff's damages and a third party's criminal or unlawful misuse of a firearm twice in its provisions using different terminology.... [T]o be a qualified civil liability action, the harm or damages must result from the third party's criminal or unlawful misuse of a firearm."). Rather than turn on a third party's use of the product, the investigation— and any related action—would instead turn on representations made *by* the manufacturer *to* customers, and whether they were misleading. PLCAA does not apply.

28

Moreover, "[t]here is no doubt that statutes that govern the advertising and marketing of firearms potentially qualify as predicate statutes" expressly exempted from PLCAA. *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 303 (Conn.) *cert. denied sub nom. Remington Arms Co., LLC v. Soto*, 140 S. Ct. 513 (2019). As courts across the country have explained, Congress did not abrogate the Attorney General's authority to prosecute consumer fraud taking place within New Jersey's borders. *See id.* at 272 (permitting Connecticut Unfair Trade Practices Act claim against manufacturers because PLCAA did not divest state legislature and courts' authority "to protect the people of Connecticut from the pernicious practices alleged in the present case"); *Prescott v. Slide Fire Solutions, LP*, 410 F. Supp. 3d 1123, 1139 (D. Nev. 2019) (permitting Nevada Deceptive Trade Practices Act claim for allegedly false statement that October 2017 Las Vegas concert shooter's rifles were equipped with ATF-approved "bump stocks"); *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 434 (Ind. Ct. App. 2007) (finding claim against Smith & Wesson under Indiana's public nuisance statute not barred by PLCAA). By the terms of its express exception, then, PLCAA does not preempt consumer fraud cases and it does not preempt subpoenas issued to investigate potential fraud.

    B.    *The CFA Subpoena Does Not Violate The First, Fourth, Or Fourteenth Amendments.*

Plaintiffs' assertion that the underlying Subpoena violates other constitutional rights is meritless. For one, black letter First, Fourth, and Fourteenth Amendment

doctrines foreclose their claims. For another, while Plaintiffs seek to get around these shortcomings by baldly claiming the Attorney General acted with unlawful purpose, there are no plausible allegations of impropriety to allow this case to proceed.

1.   *Constitutional Principles Foreclose These Claims.*

Plaintiffs' Complaint finds no support in well-established principles relating to claims under the First Amendment, Fourth Amendment, Equal Protection Clause, and Due Process Clause. These Counts must thus be dismissed.

Begin with the First Amendment. Although Plaintiffs claim that the Subpoena has interfered with its free political and commercial speech, the Subpoena does not implicate the First Amendment at all for two independently sufficient reasons. First, an administrative subpoena does not "regulate" speech; it only seeks the production of documents through a process prescribed by law. *See SEC v. McGoff*, 647 F.2d 185, 187 (D.C. Cir. 1981) (administrative subpoenas "do not directly regulate the content, time, place, or manner of expression, nor do they directly regulate political associations"). Second, the Subpoena seeks information regarding potentially fraudulent statements, deceptions, and misrepresentations, which are not protected by the First Amendment. *See Madigan*, 538 U.S. at 612 ("the First Amendment does not shield fraud"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *United States v. Fattah*, 858 F.3d 801, 816-17 (3d Cir.

30

2017) (holding that misleading or fraudulent speech is not protected by the First Amendment). The Subpoena states it "is issued pursuant to the authority of the New Jersey CFA," ECF No. 1, Ex. 1 at 3, and the requests are aimed at materials germane to determining whether Plaintiffs' conduct violated the CFA. *See, e.g.,* Schedule A, ¶¶ 1-3 ("Advertisements" and factual bases for representations made therein); ¶¶ 5, 11-12, 14-17.[8] The State is not denying or restricting Plaintiffs' access to any particular forum based on their views, *see Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436, 439 (3d Cir. 2019) (explaining this is a predicate to viewpoint discrimination claim), but simply investigating whether and when consumer fraud may have occurred.

The Fourteenth Amendment Due Process and Equal Protection claims fare no better. The standards applicable to both claims are enormously difficult for Smith & Wesson to meet. Because the CFA and the Subpoena do not contravene fundamental constitutional rights or implicate any suspect classifications, *see* Part II.A.1 (refuting

---

[8] Plaintiffs claim that the Attorney General is inquiring into their political position on firearm safety laws, but they are mistaken. It would obviously not be fraudulent for Smith & Wesson to express its views as to whether New Jersey *should* enact or refrain from enacting certain laws, and whether or not those laws would be constitutional. But the subpoena inquires only about Plaintiffs' representations regarding what New Jersey law *actually is*, ECF No. 1, Compl., Ex. 1, Schedule A, ¶¶ 4(a), 5, which is a permissible subject of CFA investigation. An example helps clarify: a retailer who tells a customer he believes large capacity magazine laws should be found invalid under the Second Amendment expresses an opinion, but a vendor who tells a New Jersey customer his 100-round magazine *is* lawful in New Jersey and so induces a customer to buy it on that basis has engaged in fraud.

Second Amendment claim), this Court can only find an equal protection violation if there is no "reasonably conceivable state of facts that could provide a rational basis" for the State to have acted as it did, *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018), and this Court can find a substantive due process violation only if the State has "engag[ed] in conduct that 'shocks the conscience' . . . or interferes with rights 'implicit in the concept of ordered liberty,'" *United States v. Salerno*, 481 U.S. 739, 746 (1987). Plaintiffs cannot meet either bar. Most obviously, Plaintiffs have not even alleged *any* similarly-situated entities who have included potentially false information in advertisements but who have not been investigated by the Attorney General—a necessary (though not sufficient) step to plausibly alleging its claims. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). And, of course, because state officials retain substantial enforcement discretion, Plaintiffs would also have to show—and have not alleged—a lack of *any* plausible policy reason" to explain why they received a subpoena and the other, allegedly comparable entity did not. *Newark Cab*, 901 F.3d at 156.[9]

---

[9] The Due Process claims fail for an additional reason. Under the "more-specific-provision" rule, when "a constitutional claim is covered by a specific constitutional provision," then it "must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Wharton v. Danberg*, 854 F.3d 234, 246 (3d Cir. 2017) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). As explained in this motion, those other specific claims fail.

The Fourth Amendment claims are weaker still. After all, in the context of a subpoena, "no officer or other person attempts to enter the premises … nor does any person attempt to search or seize their person or their records without their assent, other than pursuant to orders of a court authorized by law and made after adequate opportunity to present objections." *In re Matter Under Investigation*, 15 So.3d 972, 986 (La. 2009) (citing *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 202 (1946)). Said another way, "this opportunity for objection and judicial intervention, in fact, differentiates a subpoena duces tecum from a search or seizure. Persons from whom documents are subpoenaed are not required to submit to the subpoena's demand if it is in any way unreasonable or overreaches its authority." *Id.* This, of course, provides yet more evidence that *Younger* abstention is appropriate—to allow Plaintiffs to litigate the scope of this subpoena in the subpoena enforcement action.

In any event, because this case involves an administrative subpoena, a federal court's analysis is deferential, and Plaintiffs' Fourth Amendment claim falls short. In issuing a subpoena, the State does not need probable cause, and a subpoena is valid so long as it lies "within the authority of the [requesting] agency," is "not ... too indefinite," and is "reasonably relevant to the authorized inquiry." *Chao v. Cmty. Tr. Co.*, 474 F.3d 75, 79 (3d Cir. 2007); *In re Subpoena Duces Tecum*, 228 F.3d 341, 348-49 (4th Cir. 2000) (same). As applied here, the Division has the authority to investigate consumer fraud, and its requests—for representations to consumers, and

the material either supporting or undermining those representations—fits that power. *See supra* at 6, 10. And while Plaintiffs allege that the State has requested a wide array of documents, "broadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant." *United States v. Norwood*, 420 F.3d 888, 896 (8th Cir. 2005). In any event, "as a condition to maintaining the argument that an investigative subpoena is overly broad and oppressive, [Smith & Wesson] would have to be able to point to reasonable efforts on his behalf to reach accommodation with the government," which it has not alleged in this case. *In re Subpoena Duces Tecum*, 228 F.3d at 351. This claim cannot go forward.

### 2.  *The Allegations Do Not Support Plaintiffs' Claims*.

To get around the shortcomings in their legal theories, Plaintiffs offer a single insufficient argument—that the instant Subpoena was served not for the purpose of determining whether Plaintiffs violated the CFA, but instead in furtherance of some improper motive. *See Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 705 (S.D.N.Y. 2018) (finding "allegations of an improper motive are essential" to subpoena recipient claims arising from First, Fourth, and Fourteenth Amendments). But the bald conclusions of improper motive lack supportive plausible allegations and are thus no basis to allow this case to proceed.

This is not the first time that a large company has attempted to evade consumer investigation for consumer fraud on such a basis. In *Exxon Mobil Corp. v. Schneiderman*, Exxon likewise challenged subpoenas issued by two Attorneys General by claiming that the state officers' real purpose was to punish and deter the company's views on climate change. *See id.* at 686. Exxon relied on arguments similar to those asserted by Smith & Wesson here—*i.e.*, that officials "acted not based on a good faith belief that Exxon may have violated state laws, but to retaliate against Exxon for, or to deter Exxon from, speech that is protected by the First Amendment." *Id.* at 704. In support, Exxon cited statements by the two Attorneys General about climate change, accused them of "deriding" Exxon's statements about the causes of climate change, and claimed outside activists influenced the decision to issue subpoenas. *Id*. at 706.

The court flatly rejected those arguments, reasoning that Exxon had not done anywhere near enough to plausibly allege that the Attorneys General were "pursuing an investigation even though [they] do[] not believe that Exxon may have committed fraud"—the staggeringly high bar Exxon needed to meet. *Id.* at 707; *see also id.* at 712 ("[W]hether viewed separately or in the aggregate, Exxon's allegations fall well short of plausibly alleging that the [Attorneys General] are motivated by an improper purpose."). The court recognized Exxon's Complaint could "not allege any direct evidence of an improper motive" and found the "circumstantial evidence put forth"

35

sorely lacking. *Id.* at 712. First, the court addressed allegations regarding these state officials' views on climate change, rejecting the "false equivalence between [their] belief that climate change is a settled issue" and any "inference" that investigating an oil company's potential fraud was "retaliat[ion] for" political speech. *Id.* at 707; *see also id.* ("The fact that [an official] believes climate change is real … does not mean the [official] does not also have reason to believe that Exxon may have committed fraud."). Second, the court also rebuffed Exxon's insistence that activists' attacks on Exxon established improper motive, finding Exxon did not "plausibly allege" either that "the activists have an improper purpose" or that meetings between activists and officials showed "the [officials] share the activists' improper purpose." *Id.* at 708; *see id.* at 712 (finding "the circumstantial evidence … fails to tie the AGs to any improper motive, if it exists, harbored by activists"). These failures were fatal.

That analysis squarely forecloses Plaintiffs' claims, where the allegations of improper motive are even weaker. The Complaint primarily cites instances in which the Attorney General expressed a desire to reduce gun violence, opposed policies he believes are inconsistent with public safety and law enforcement safety, and stated his aim to "turn up the heat" on gun manufacturers in *another* context to urge them to take greater steps to reduce gun violence. *See* Compl., ¶¶ 67, 68. Notably, unlike the allegations at issue in *Exxon*, none of the comments targeted Smith & Wesson in particular, meaning they are even *less* probative of improper motive. But the basic

36

flaw is the same: even if true, the allegations do not plausibly show the Division or Attorney General lack valid "reason to believe that [Plaintiffs] may have committed fraud" any more than public comments about the opioid crisis undermine consumer fraud actions against the companies and others who fueled its rise. Public officials frequently comment on topics of public importance, but that is not carte blanche for companies to engage in fraud if they sell related products. *See Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out on matters of public concern.").

The effort to tie this investigation to the allegedly improper motive of certain activists—another feature of *Exxon*—is no more successful. See Compl., at ¶¶ 19-32. As an initial matter, Plaintiffs fail to plausibly show that the activists who may welcome this investigation have an improper motive: that such activists seek to reduce gun violence "fall[s] short of an inference" that they also "do not believe that there is a reasonable basis to investigate [this company] for fraud." 316 F. Supp. 3d at 709. (And logically, it is quite possible to hold both views.) But more important, they fail to establish that the Attorney General shares such allegedly improper motives just because he is sympathetic to their broader public safety goals. There is no contention that an outside advocate could or did make the decision to issue the

37

Subpoena,[10] and mere meetings with or requests by advocates hardly substantiates claims of an improper public purpose. *See, e.g.*, *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 130 (3d Cir. 1981) ("That the SEC commenced these proceedings as a result of the importuning of Senator Weicker or CF&I, even with malice on their part, is not a sufficient basis to deny enforcement of the subpoena"); *Exxon*, 316 F. Supp. 3d at 709 ("[E]ven if the climate activists did encourage the AGs to investigate Exxon … another logical leap is required to infer [that the AGs] agreed to do so without having a good faith belief that their investigations of Exxon were justified.").

Just as in *Exxon*, the entire theory of this case—that the Constitution has been violated by dint of an Attorney General's improper motive—lacks requisite plausible allegations to proceed. The Attorney General's work to protect the public from gun violence is not an excuse for Plaintiffs to get out of a fraud investigation.

## C.   *The CFA Subpoena Does Not Violate The Commerce Clause.*

Plaintiffs' final claim that the Division has run afoul of the Dormant Commerce Clause is meritless. The Dormant Commerce Clause exists to prevent

---

[10] Smith & Wesson tries to get around this shortcoming by emphasizing that New Jersey issued a Request for Qualifications for Special Counsel for Firearms Safety Litigation. But Plaintiffs' selective quoting in the Complaint overlooks the limited role of any Special Counsel. Although Plaintiffs quote snippets to emphasize the authority granted to outside counsel, the materials are clear that investigative and litigation decisions are overseen directly by the lawyers in the Attorney General's Office. RFP § 1.1. This Court can consider these materials because they are quoted in the Complaint.

each State from unduly restricting interstate commerce in favor of its local economic interests, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019), and to bar the States from reaching out "extra-territorially" beyond its borders to regulate those transactions with an insufficient connection to the State and its residents. Plaintiffs do not attempt to include any allegations as to the former; Plaintiffs do not allege that non-resident businesses are treated differently from in-state businesses under the CFA or relevant subpoena practice. And while Plaintiffs *do* suggest New Jersey has reached beyond its borders (since Plaintiffs are not incorporated there), the subpoena applies specifically to misrepresentation to *New Jersey* residents. *See ECF No. 1, Compl., Ex. 1 at 9*, ¶1. The enforcement of—and investigation under—a fraud statute that regulates in-state businesses and protects a State's residents, including from the conduct of companies based out of state, is a textbook example of permissible state action. *See, e.g., Exxon*, 316 F. Supp. 3d at 712-13.

## III.   THE CLAIMS AGAINST DCA AND COMMON LAW CLAIMS ARE INDEPENDENTLY BARRED BY SOVEREIGN IMMUNITY.

Two subsets of Plaintiffs' claims contravene sovereign immunity. First, the Eleventh Amendment immunizes States, as well as entities that are "arms of the State," from suit in federal court. *Bowers v. NCAA*, 475 F.3d 524, 545 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007). Here, all of the claims against DCA itself should

be dismissed because DCA is an arm of the State and thus immune from claims in federal court. *See Rhett v. Evans*, 576 F. App'x 85, 88 (3d Cir. 2014).

Second, although the Eleventh Amendment permits suit against the Attorney General in his official capacity for claims seeking prospective injunctive relief for violations of federal law, *Ex Parte Young*, 209 U.S. 123, 162-63 (1908), the abuse of process claim (Count X) in this suit is pled as an ordinary tort "under common law." *See* Compl., ¶ 158. It thus falls within the category of pendent state law claims that the Eleventh Amendment forbids. *See Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540-41 (2002); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013).

## CONCLUSION

This Court should dismiss the Complaint in its entirety.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/Robert J. McGuire
Robert J. McGuire
Deputy Attorney General
robert.mcguire@njoag.gov
(609) 376-2787

Dated:  February 22, 2021

40