## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and SMITH & WESSON INC.**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**GURBIR S. GREWAL,** *in his official capacity as Attorney General of the State of New Jersey* **and NEW JERSEY DIVISION OF CONSUMER AFFAIRS**<br><br>        **Defendants.** | **CIVIL ACTION**<br><br>**CASE NO. 2:20-CV-19047-KM-ESK**<br><br><br>**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiffs Smith & Wesson Brands, Inc., Smith & Wesson Sales Company, and Smith & Wesson Inc. (collectively, "Smith & Wesson" or "Plaintiffs") hereby file this Amended Complaint for Declaratory and Injunctive Relief against Defendants Gurbir S. Grewal, in his official capacity as Attorney General of the State of New Jersey (the "Attorney General"), and the New Jersey Division of Consumer Affairs. In support of its claims, Smith & Wesson alleges as follows:

### INTRODUCTION AND BACKGROUND FACTUAL ALLEGATIONS

1.      The First Amendment to the U.S. Constitution guarantees the right to free speech no matter whether the government disagrees with that speech. Benjamin Franklin articulated it this way: "Freedom of speech is a principal pillar of a free government . . . . When this support is taken away, the constitution of a free society is dissolved."[1] Indeed, governments throughout history have abused their power by punishing speech to suppress dissent and harm political opponents.

---

[1] Benjamin Franklin, "On Freedom of Speech and the Press", Pa. Gazette (Nov. 17, 1737).

2.     Following in the abusive footsteps of these repressive regimes, the New Jersey Attorney General has taken a series of actions to suppress Smith & Wesson's speech, with the intention of damaging Smith & Wesson both financially and reputationally.  The Attorney General targeted Smith & Wesson specifically with the issuance of an administrative subpoena (the "Subpoena") on October 13, 2020 that allegedly seeks evidence of consumer fraud relating to advertising – but in reality, it seeks to suppress and punish lawful speech regarding gun ownership and other issues related to the Second Amendment in order to advance an anti-Second Amendment agenda that the Attorney General publicly committed to pursue.  *See* Ex. 1.

3.     The Subpoena presents no legitimate inquiry into any purported fraud, and instead targets mere opinions and other protected statements allegedly made by Smith & Wesson, such as (1) whether Smith & Wesson's products are "safe," make a home safer, or enhance one's lifestyle; (2) whether an untrained consumer could successfully and effectively use a Smith & Wesson firearm for personal or home defense; and (3) whether private citizens should have the right to carry a concealed firearm.  Such statements do not sound in "fraud."  The Subpoena's focus on these and other non-fraudulent statements demonstrates the Attorney General's abuse of his position to suppress a political viewpoint with which he disagrees.

4.     Smith & Wesson tendered written objections to the Subpoena on December 14, 2020, the date when the Attorney General agreed that written responses would be due.  On December 15, 2020, Smith & Wesson filed its initial complaint (the "Initial Complaint") in this action, challenging the constitutionality of the Subpoena based on a pattern of conduct engaged in by the Attorney General constituting clear viewpoint discrimination and other conduct violating Smith & Wesson's First Amendment rights, as well as conduct violating other constitutional rights, including those protected by the Second, Fourth, Fifth, and Fourteenth Amendments.  The Initial

2

Complaint also included claims for preemption under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901 *et seq.* (the "PLCAA"), and a violation of the Dormant Commerce Clause.

5.      The Attorney General's response to the Initial Complaint was originally due on or before January 8, 2021; however, Defendants requested until February 22, 2021 to respond to that filing.   Smith & Wesson agreed.

6.      Prior to the response date, and almost two months to the day after filing the Initial Complaint, the Attorney General struck in retaliation for Smith & Wesson's exercise of its First Amendment-protected right to petition to this Court for redress.  *See Grewal v. Smith & Wesson Sales Co., Inc.*, Dkt. No. ESX-C-000025-21 (N.J. Super. Ct.).  Specifically, on February 12, 2021, the Attorney General filed both a Complaint before the Superior Court of New Jersey, *see* Ex. 2, and concurrent request for an Order to Show Cause, *see* Ex, 3, requesting the Superior Court to hear the matter "in a summary manner," *id.* at 2, and seeking, among other things, the draconian relief of "[r]estraining [Smith & Wesson] from engaging in the advertisement, offering for sale, or sale of any merchandise until it fully responds to the Subpoena," as well as a finding of contempt, Ex. 2 at 7, notwithstanding the fact that Smith & Wesson both objected to the Subpoena and responded to the Subpoena by asserting its constitutionally protected rights before this Court.

7.      Indeed, the Attorney General is seeking such a draconian remedy as a means of continuing to advance his unconstitutional suppression and oppression of Smith & Wesson's rights, as now manifested in his retaliation against Smith & Wesson's decision to enforce its rights before this Court in an entirely lawful and appropriate way.  Importantly, per the New Jersey Supreme Court, such summary relief through an immediate finding of contempt is not even available under New Jersey law.  *See Silverman v. Berkson*, 141 N.J. 412, 426–27 (N.J. 1995).

8.      The extraordinary relief requested by the Attorney General, as well as the timing of his state court action, make clear that he seeks to deprive Smith & Wesson of its right to raise constitutional and other challenges to the Subpoena by compelling compliance in a summary and expedited manner and seeking to have an injunction imposed against protected speech.   The Attorney General's response is to offer a Hobson's choice designed to punish Smith & Wesson's protected challenge – either relinquish all objections to the Subpoena or cease all advertising and sales.  Such a response to a legitimate constitutional challenge has no rational basis.  No new or imminent harm is identified by the Attorney General, nor does the Attorney General even suggest why that summary adjudication pursuant to an Order to Show Cause suddenly is necessary.

9.       Put differently, the Attorney General's state court action has transformed his original request for information allegedly in support of an "investigation" about *potentially* misleading advertising, into an emergency motion to prevent the purported *imminent* harm caused by Smith & Wesson's advertising (as compared to the advertising of all other firearms manufacturers, distributors, and retailers).  Yet the only circumstance that has changed since the Attorney General served the Subpoena which explains this acute and unmistakable escalation in approach is Smith & Wesson's request to enforce its rights before this Court.

10.     Moreover, in addition to asking the State Court to ban Smith & Wesson's protected speech (which the Attorney General broadly characterizes as "advertising") and commerce, the Attorney General admits, on the very first page of his Memorandum of Law in Support of Order to Show Cause, *see* Ex. 4 at 1, that the result of his alleged "investigation" is preordained.  To wit, he asserts that by merely filing its action before this Court, Smith & Wesson "claims that it is above the law—that it can deceive consumers and potential consumers of its products without consequence . . . ." *Id.*

4

11.     Quite obviously, the Attorney General has *already* concluded that Smith & Wesson has violated the law without the need for an "investigation," and his words show what Smith & Wesson alleges in the Initial Complaint– that he is suppressing, and further intends to suppress, Smith & Wesson's speech merely because he disagrees with the viewpoints contained in that speech.

12.     Of course, having already concluded that Smith & Wesson has "deceive[d]," and continues to "deceive consumers and potential consumers of its products" underscores the pretextual nature of the Attorney General's "investigation" and Subpoena, in that they are simply to further the goal of restricting speech with which he disagrees.

13.     Smith & Wesson has merely taken lawful and entirely appropriate steps to vindicate its constitutional rights and have the merits of the dispute adjudicated before this Court.

14.     As the Supreme Court has recognized, "the enshrinement of constitutional rights takes certain policy choices off the table."[2]  Here, what must be off the table is the Attorney General's repeated abuse of power that violates the First, Second, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, as well as the PLCAA.  What also must be off the table is the Attorney General's attempt to "strong arm" Smith & Wesson, through retaliatory action, into relinquishing its well-founded constitutional objections to that abuse of power, as well as preempting this court from adjudicating the claims before it.

15.     Smith & Wesson is a good corporate citizen that is a leader on gun safety initiatives in the industry.  And Smith & Wesson has worked, and continues to work, with various government and law enforcement agencies to address issues relating to the illegal use of firearms. What the Attorney General seeks to do through his actions is impermissible as long as the

---

[2] *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

guarantees of free speech and the right to bear arms remain in the Constitution. The Attorney General and his anti-Second Amendment allies must seek the changes they want made through the will of the People, rather than by using a shadow pressure campaign of unlawful litigation and government regulatory action.

16.     Beyond the issuance of the Subpoena, the Attorney General, in coordination with anti-Second Amendment Activists (the "anti-Second Amendment Activists"), has also implemented a "name and shame" policy through which he presents to the public at large what he characterizes as a "connection" between "crime guns" and Smith & Wesson. In reality, however, the Attorney General is simply using the power of the State to extra-legally brand Smith & Wesson as a bad actor in an obvious attempt to cause harm to Smith & Wesson's business and reputation.

17.     The intentional overreach of the facially invalid Subpoena and punitive intent of the Attorney General's "name and shame" initiative make no sense as an exercise of prosecutorial authority, but they make perfect sense when seen for what they really are – the latest chapter in efforts by anti-Second Amendment Activists, hostile to the private ownership of firearms, to impose, through coercion, a gun control agenda which they largely have been unable to impose through the federal or state legislative process or through the courts.

18.     In this new chapter, the anti-Second Amendment Activists have accepted that they cannot be successful through democratic means. To overcome the inability to achieve their political objectives through the legislative process, they instead attempt to bypass the legislative process and engage in abusive litigation, along with investigatory and other tactics, to create sufficient "pressure" to compel Smith & Wesson to "voluntarily" adopt "reforms" consistent with the activists' gun control agenda.

19.     The Attorney General and State of New Jersey have now publicly partnered with the anti-Second Amendment Activists in order to add the weight of the regulatory and enforcement powers of the State to the activists' existing "lawfare" campaign.

20.     The approach pursued here by the Attorney General and the anti-Second Amendment Activists draws on the tactics employed by the anti-gun movement in the 1980s and 1990s.  Frustrated by their inability to achieve broad restrictions on the constitutional right to own and carry firearms through the legislative process, anti-Second Amendment Activists largely abandoned the democratic process and developed a new approach specifically designed to circumvent that democratic process and the protections afforded to all citizens through the Second Amendment.

21.     Back then, the activists sought to litigate manufacturers out of existence by launching overwhelming numbers of legal and regulatory actions to hold firearms businesses liable for the criminal misuse of their products by unrelated third parties.  The regulatory and legal actions were designed to be so prohibitively expensive that the firearms industry would have no choice but to capitulate to the gun control demands of the anti-Second Amendment Activists.  The outcome of the lawsuits largely was irrelevant as the mere costs of litigating would achieve their objectives.

22.     As here, the anti-Second Amendment Activists enlisted states and municipalities as partners in this scheme, placing the inexhaustible resources of the local governments behind this effort.  For example, between 1998 and 2000, there were 19 lawsuits filed against firearms manufacturers and other members of the firearms industry by states and municipalities.

23.     Congress recognized that the abusive litigation and investigatory tactics of anti-Second Amendment Activists, which included various states and municipalities, were causing

significant damage to the firearms industry.  As a result, in 2005 Congress introduced a bill that would become the PLCAA.

24.     Through the PLCAA, Congress expressly recognized and sought to put a stop to the strategy of litigating the firearms industry out of existence.  Senator Tom Coburn, a co-sponsor of the PLCAA, emphasized that "anti-gun activists" were looking "to constrict the right to bear arms" by "attack[ing] the arms industry financially through . . . frivolous lawsuits," which were "part of a stealth effort to limit gun ownership" in the United States.  Senator Coburn further recognized the obvious, that "huge costs . . . arise from simply *defending* [the] unjustified lawsuits[,]" and that the mere existence of the suits caused the manufacturers' insurance rates to "skyrocket," with "some manufacturers [even] being denied insurance" entirely and others "seeing their policies canceled[.]" 151 Cong. Rec. S9,062 (daily ed. July 27, 2005) (emphasis added).

25.     Congress was not merely concerned with lawsuits, but all manner of attacks on the firearms industry through the use of legal process including, as is the case here, the abuse of the investigative process by states and municipalities.  Congress found that permitting "[t]he liability actions commenced or contemplated by . . . States, municipalities, and private interest groups" would "expand civil liability in a manner never contemplated by the framers of the Constitution," and would "constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution." 15 U.S.C. § 7901(a)(7).

26.     The PLCAA is clear and unambiguous, and led to the courts dismissing a myriad of lawsuits because the anti-Second Amendment Activists could not establish, as they are now required to do, any nexus between the criminal use of firearms, and the lawful conduct of firearms industry.

27.     Only a few years after the passage of the PLCAA, the anti-Second Amendment Activists were dealt a second blow when the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Heller* struck down the District of Columbia's Firearms Control Regulations Act of 1975, which imposed the strict ban on firearms advocated by the anti-Second Amendment Activists.  In so doing, the Supreme Court affirmed the broad right to keep and bear arms.

28.     Frustrated by their inability to impose their gun control agenda as a result of the PLCAA and *Heller,* as well as resistance to their agenda in legislatures across the country, the anti-Second Amendment Activists continued to seek alternatives means to achieve their objectives.  However, an inability to work together around an agreed agenda minimized the effectiveness of their efforts.

29.     This changed significantly in 2013 with the formation of two new gun control groups with substantial financial backing and political and media contacts – Giffords Law Center to Prevent Gun Violence ("Giffords"), created by former U.S. Representative Gabrielle Giffords, and Everytown for Gun Safety ("Everytown"), founded by Michael Bloomberg, former New York City mayor and owner of Bloomberg, L.P.

30.     That same year, reports emerged of the formation of a new initiative, combining the resources of a number of major U.S. law firms with anti-Second Amendment activist organizations like Giffords and the Brady Center to Prevent Gun Violence ("Brady").  In 2016, this initiative was launched as the Firearms Accountability Counsel Task Force ("FACT").[3]

---

[3] *See* Jessica Silver-Greenberg and Ben Protess, "Gun Control Advocates Find a Deep-Pocketed Ally in Big Law," The New York Times, Dec. 7, 2016, *available at* https://www.nytimes.com/2016/12/07/business/dealbook/gun-control-big-law-firms.html.

31.   The FACT law firms committed to "unprecedented cooperation" among themselves in pursuing the gun control agenda.  Tellingly, FACT was charged with finding a way to resume the abusive litigation strategies – or, in their own language, "craft[ing] creative legal strategies" – designed to circumvent legislative and constitutional limitations, which strategies were previously employed by anti-Second Amendment Activists with great success prior to the enactment of the PLCAA.  As reported by the New York Times,

> Rather than fighting the political headwinds, the coalition is focusing on courts and state regulatory agencies, among the few places where they might still gain some traction. The coalition is drafting lawsuits and preparing regulatory complaints that could be announced as soon as next month, according to the Law Center to Prevent Gun Violence, one of the nonprofit advocacy groups that helped form the coalition, along with the Brady Center to Prevent Gun Violence and the Brennan Center for Justice, a legal think tank at New York University School of Law.

32.   At about this same time, other anti-Second Amendment Activists began a concerted effort to use shareholder resolutions to convince the shareholders of publicly-traded firearms companies to adopt benign-sounding "human rights" proposals, which obscured the fact that they sought to impose hundreds of billions of dollars in liability.  The human rights approach was a ruse designed to use "international human rights law as a counterweight to Americans' constitutional right to keep and bear arms . . . ."[4]

33.   As with the litigation strategy employed by FACT, the activists driving the human rights strategy sought to impose crippling liabilities on Smith & Wesson that would bankrupt the company.  For example, a proposal by the Interfaith Center on Corporate Responsibility ("ICCR") would have required Smith & Wesson to "prevent and mitigate actual and potential human rights

---

[4] Lois Beckett, "'A human rights crisis': US accused of failing to protect citizens from gun violence," *The Guardian* (Sept. 12, 2018), *available at* https://www.theguardian.com/us-news/2018/sep/12/us-gun-control-human-rights-amnesty-international.

impacts," and would have required the company to do so "regardless of legal framework" and "even if [Smith & Wesson] ha[s] not contributed to those" damages.  In this way, the anti-Second Amendment Activists have made the proxy process another tool in their attempt to harm firearms companies.

34.     The human rights strategy also is laid out in the Amnesty International ("Amnesty") report, "In the Line of Fire: Human Rights and the U.S. Gun Violence Crisis."  Not surprisingly, Amnesty is an advocate of using litigation, not to resolve disputes between parties, but rather as leverage in pursuit of its broader objectives.[5]  That is precisely what the anti-Second Amendment Activists have been implementing against Smith & Wesson – self-described "impact litigation" – where the "impact" is the intended destruction of Smith & Wesson and others engaged in the lawful manufacture, distribution, and sale of firearms.

35.     Amnesty, Giffords, ICCR, and others estimate the total amount of liability for these "impacts" to be in the tens of billions and hundreds of billions of dollars, sums that, if imposed on lawful manufacturers of firearms, would bankrupt Smith & Wesson and the entire private firearms industry.[6]

---

[5]    *See* Amnesty International, Strategic Litigation, *available at* https://www.amnesty.org/en/strategic-litigation/.

[6] *See* Amnesty International Report at 115-116 ($3 billion a year in direct costs and up to $222 billion a year in indirect costs); *Investor Statement on Gun Violence*, Interfaith Center on Corporate Responsibility, *available at* https://www.iccr.org/investor-statement-gun-violence (estimating costs for care and loss of $45 billion annually); *The Economic Cost of Gun Violence*, Giffords Law Center to Prevent Gun Violence, *available at* https://lawcenter.giffords.org/resources/the-economic-cost-of-gun-violence/ (costs of at least $229 billion a year).

36.     At the same time ICCR was ramping up its board room attacks, members of FACT began ramping up their litigation efforts in support of their admitted gun control campaign.[7]  Smith & Wesson has specifically been targeted in this wave of litigation by members of the FACT coalition.[8]  Indeed, this litigation wave has not stopped at the border, as Brady has sought to advance its agenda by intervening in a lawsuit against Smith & Wesson in Toronto, Canada.

37.     The anti-Second Amendment Activists have not tried to hide their goals and objectives.  At a December 1, 2020 conference held at New York University, participants observed how consumer protection and false advertising theories were promising avenues for anti-gun initiatives, with one panelist, from the Attorney General's "Special Counsel for Firearms Safety Litigation" ("Firearms Counsel") of private law firms, specifically noting that theories such as these represented a "rich area" for future development.

38.     Harkening back to the coordinated litigation efforts of the public sector that led in part to the passage of the PLCAA, at the same NYU conference, Connecticut Attorney General William Tong commented on how state attorneys general were coordinating on pressing the gun control agenda.

39.     It is against this backdrop of coordinating with anti-Second Amendment Activists to search for new theories to litigate the firearms industry out of existence, that the Attorney General issued his Subpoena against Smith & Wesson here.  To this end, in addition to publicly

---

[7] *See, e.g.*, *Goldstein v. Earnest, et al.*, No. 37-2020-16638 (Cal. Super. Ct. – San Diego Cnty.); *Brady Ctr. to Prevent Gun Violence v. City of Nelson (GA), et al.*, No. 2:13-CV-104 (U.S.D.C. N.D. Ga.); *Brady Campaign to End Gun Violence v. Brownback, et al.*, No. 2:14-CV-02327 (U.S.D.C. D. Kan.); *Philips, et al. v. Lucky Gunner, et al.*, No. 1:14-CV-2822 (Col. – Arapahoe Cnty.); *Chiapperini, et. al v. Gander Mountain Co. Inc., et al.*, No. 5717/2014 (N.Y. Supreme Ct. – Monroe Cnty.).

[8] *See Goldstein v. Earnest, et al.*, No. 37-2020-16638 (Cal. Super. Ct. – San Diego County).

partnering with anti-Second Amendment Activists, the Attorney General has also hired FACT counsel, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as his own counsel specifically to pursue firearms manufacturers, further solidifying the anti-gun agenda as his own.

40.     The Attorney General's actions surrounding the issuance of the Subpoena and initiating the related investigation are forcing Smith & Wesson to expend substantial financial resources, and are threatening to cause irreparable damage with key stakeholders and necessary business partners and create reputational harm.

41.     The Attorney General's campaign to silence, intimidate, and deter Smith & Wesson and other Second Amendment advocates, gun manufacturers, and gun owners from exercising their constitutional rights, his consignment of the State's prosecutorial authority to non-governmental partisans, and the targeting of protected, disfavored speech, violate numerous provisions of the U.S. Constitution, including the First, Second, Fourth, Fifth, and Fourteenth Amendments.

42.     By circumventing the legislature and the courts and, where possible, invading the board room, the anti-Second Amendment Activists disguise their true motives and avoid exposing their agenda to the robust political debate surrounding firearms in the United States.  Their allies then use the issues that they create to falsely foster with shareholders, business partners, and other stakeholders a perception of unmitigated risk.  These coordinated activities, in which the Attorney General and State of New Jersey now are complicit, have caused, and continue to cause harm to Smith & Wesson.

## JURISDICTION AND VENUE

43.     Plaintiffs' claims alleging violations of the United States Constitution are brought under 42 U.S.C. § 1983, and therefore the Court has federal-question jurisdiction over them.  28

U.S.C. §1331.  The Court also has federal-question jurisdiction over Plaintiffs' claims alleging violations of the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901 *et seq.*

44.     Plaintiffs' claims alleging violations of New Jersey law share a common nucleus of operative facts with Plaintiffs' federal question claims, and therefore the Court has supplemental jurisdiction over them.  28 U.S.C. § 1367.

45.     There is an actual controversy in that the Attorney General of the State of New Jersey has served Smith & Wesson with an administrative Subpoena, and now has moved to enforce that Subpoena in New Jersey state court, seeking overbroad and voluminous information relating to Plaintiffs' opinions regarding the Second Amendment of the U.S. Constitution and related issues, as allegedly articulated in Smith & Wesson's marketing and business materials. The Attorney General also seeks a contempt ruling and sanctions against Smith & Wesson for failure to comply.  The Subpoena and the New Jersey Superior Court enforcement action violate Plaintiffs' First, Second, Fourth, Fifth, and Fourteenth Amendment rights under the U.S. Constitution, as well as the Second Amendment rights of gun buyers and bearers throughout the United States.  They also violate the Dormant Commerce Clause.

46.     The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.,* the All Writs Act, 28 U.S.C. § 1651(a), and the Court's inherent equitable powers.  The controversy between the parties is within the jurisdiction of this Court and involves the rights and liabilities of Plaintiffs and third parties under the Constitution and the laws of the United States and can be resolved through a judgment of this Court.

47.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402 because Defendants are domiciled in New Jersey, and because a substantial part of the events or omissions giving rise to this action occurred in this district.

48.     This Court has personal jurisdiction over the Defendants because they are domiciled in New Jersey, and both Defendants have taken action, and will take action in New Jersey that harms Plaintiffs.

## PARTIES

49.     Plaintiff Smith & Wesson Brands, Inc. is the parent corporation of Smith & Wesson Sales Company and Smith & Wesson, Inc.  Smith & Wesson Brands, Inc. is a Nevada corporation, headquartered in Springfield, Massachusetts, since 1852.  Smith & Wesson has, since its inception, invented and manufactured firearms that are noted for their innovative design, high quality, and reliability.

50.     Plaintiff Smith & Wesson Sales Company is a Delaware corporation, and is headquartered in Springfield, Massachusetts.

51.     Plaintiff Smith & Wesson Inc. is a Delaware corporation, and is headquartered in Springfield, Massachusetts.

52.     Defendant Gurbir Grewal is the New Jersey Attorney General and is responsible for all civil and criminal enforcement efforts at issue in this suit.  He is sued for declaratory and injunctive relief in his official capacity.  His address is Office of the Attorney General, Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, NJ 08625-0080.

53.     Defendant the Division of Consumer Affairs is a division of the New Jersey Office of the Attorney General.  It describes its mission as "protect[ing] the public from fraud, deceit, and misrepresentation in the sale of goods and services."

## FACTUAL ALLEGATIONS

**I.      Smith & Wesson's Business and Its Advocacy for Second Amendment Rights**

54.      Smith & Wesson is an iconic brand, a leader in firearms manufacture and design, and a leader in the firearms industry.  It is a strong advocate of Second Amendment rights, which means that the anti-Second Amendment Activists view the company as a voice that must be silenced.

55.      Throughout its history, Smith & Wesson has been committed to advocating for the responsible exercise of the Second Amendment right to bear arms, which includes advocating for the safe use of firearms.  Smith & Wesson's safety programs focus on a variety of initiatives, including protecting children from gun accidents, preventing straw purchases, and safely securing firearms in the home.  In addition, the user manuals for Smith & Wesson's firearms contain prominent safety warnings and encourage owners to seek formal training before using the product.

56.      Smith & Wesson supports gun safety and responsible gun ownership initiatives, both directly and indirectly, including the company's own #GUNSMARTS program, as well as Project ChildSafe, Don't Lie for the Other Guy$^{TM}$, and Operation Secure Store®, sponsored by the National Shooting Sports Foundation ("NSSF"), which is the trade association for the firearms industry and which provides some of the most effective programs in the nation for promoting firearm safety.

57.      Smith & Wesson offers gun usage and storage safety tips and other gun safety videos, including as part of its #GUNSMARTS program, and through its membership in and support of the NSSF.  These videos and other media can be readily found on the company's website and social media sites, on the NSSF's website and social media sites, and on YouTube and other internet outlets.  Smith & Wesson's comprehensive support of gun safety is part of its broader

16

advocacy for the Second Amendment, which recognizes the need for training and the safe and responsible handling of firearms.

58.     Smith & Wesson also is an industry leader in its outspoken advocacy for Second Amendment rights and its support for prominent Second Amendment advocacy groups.

59.     Smith & Wesson's public pronouncements on Second Amendment rights are encapsulated in its February 2019 report to its shareholders.  In that report, Smith & Wesson adopted its "Principles for Responsible Engagement" ("Principles").[9]  These Principles state expressly that, "[a]s a manufacturer of firearms for the lawful use by citizens," Smith & Wesson "recognizes its responsibility to its shareholders, its employees, and its customers to defend the Second Amendment."

60.     The Principles reject the blind pursuit by anti-Second Amendment Activists of limitations on the private right of firearms ownership, committing instead to "support only those regulatory proposals that are consistent with the Second Amendment and that deliver demonstrable societal benefits."

61.     The Principles articulate the company's position that the Supreme Court's 2008 ruling in *District of Columbia v. Heller*, "confirming the broad rights of citizens to possess firearms"[10] is "settled law," a position directly at odds with the Attorney General's opposition to concealed carry rights.

62.     Finally, the Principles expressly articulate Smith & Wesson's commitment to "engag[ing] in advocacy through education, communication, and public affairs efforts on behalf

---

[9] Shareholder Requested Report on Product Safety Measures, at A-1.

[10] *Id.*

of its shareholders, employees, and customers" who oppose "the imposition of onerous and unnecessary regulations adversely impacting citizens' Second Amendment rights."[11]

63.     Smith & Wesson also has experienced firsthand the harm to its business that would be caused by an abandonment of its defense of the Second Amendment.  Specifically, a settlement in 2000 with the Clinton administration, whereby the company accepted certain gun control measures, almost bankrupted the company after an almost immediate decline in sales, due to market reaction from firearm owners and purchasers.[12]  Anti-Second Amendment Activists are aware of Smith & Wesson's history and seek to use that history as a basis for threatened litigation by those activists.

64.     The Attorney General knows, or should know, that his attempt to curb Smith & Wesson's speech will cause Smith & Wesson customers to abandon the brand and cause the company significant economic damages, by decreasing the company's sales and causing the company to expend unnecessary resources in fighting and responding to the Attorney General's baseless "fraud" investigation.

## II.     The Administrative Subpoena

65.     At issue in this case is the Subpoena served on Smith & Wesson by the Attorney General, on October 13, 2020.

66.     Through the Subpoena, purportedly acting pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-3 and 56:8-4, the Attorney General commands Smith & Wesson to produce a vast collection of documents on a number of topics, most of which are, at bottom, *opinions* on either legal issues or matters of current public debate.  These statements of opinion

---

[11] *Id.*

[12] *Id.* at 13.

should not be subject to review by State officials for "accuracy," and cannot form the basis of any investigation sounding in "fraud."

67.    For example, the Subpoena treats as fraudulent, any alleged position that guns enhance safety.  To the extent Smith & Wesson has ever advocated for such a position, it is an opinion held by many people, many of whom are customers of Smith & Wesson's business.  The search "do guns make you safer" in Google® returns 248 million results.  Some of those returns reflect the position that guns do not make one safer, while others present the exact opposite position.

68.    The Subpoena also demands that Smith & Wesson defend what appears to be a legal position on the Second Amendment – to wit, the Subpoena demands the company's position on "[w]hether Smith & Wesson [f]irearms can be legally carried and concealed by any [c]onsumer, [i]ncluding by New Jersey [c]onsumers, while in New Jersey[.]"  This purported legal position cannot constitute a statement sounding in fraud.  Ex. 1 at 9.

69.    The Subpoena also demands that Smith & Wesson produce information related to, and explain its opinion as to "[w]hether the concealed carry of a [f]iream enhances one's lifestyle[.]"  *Id.* This is a non-quantifiable, taste-and-opinion-based statement that also cannot sound in "fraud."

70.    The Attorney General challenges any opinion that "it is safer to confront a perceived threat by drawing a [f]irearm rather than seeking to move away from and avoid the source of the perceived threat[.]"  *Id.*  Again, a simple online search readily reveals that opinions regarding the personal protection, personal defense, and personal safety aspects of gun ownership vary greatly in the public square.

71.     Another subject of investigation by the Attorney General in the Subpoena is "[w]hether having a Smith & Wesson Firearm or other Firearm makes a home safer." *Id.*  A survey of search results on this topic also reveals a difference of opinion in the public discourse.

72.     The same is true with respect to the inquiry in the Subpoena regarding "[w]hether novice, untrained [c]onsumers could successfully and effectively use a Smith & Wesson [f]irearm for personal or home defense." *Id.*  This is a political statement by the Attorney General regarding the use of firearms by private persons, in the guise of a question.  In any event, it ignores the prominent safety warnings contained in Smith & Wesson's user manuals, which encourage owners to seek training before using Smith & Wesson's products.

73.     Similarly focused on political views and opinion is the Attorney General's inquiry as to whether Smith & Wesson's firearms are more reliable, effective, or safe for use in personal or home defense or other activities.

74.     The remainder of the Subpoena constitutes an unconstitutional fishing expedition into virtually all of Smith & Wesson's purported advertisements and marketing materials, going back decades.  Moreover, as evidenced by the Attorney General's close coordination with anti-Second Amendment Activists, this fishing expedition is aimed at obtaining documents for use by those anti-Second Amendment Activists.  To wit, the Subpoena demands:

   a. "copies of all [a]dvertisements for [Smith & Wesson] [m]erchandise that are or were available or accessible in New Jersey [c]oncerning home safety, concealed carry, personal protection, personal defense, personal safety, or home defense benefits of a [f]iream[;] [and]

20

      b.   [a]ll documents [c]oncerning any test, study, analysis, or evaluation considered or undertaken . . . which relates to, addresses, evaluates, proves, disproves, or substantiates any [c]laim made in th[ose a]dvertisements[.]"  Ex. 1 at 9.

75.     The Attorney General warns Smith & Wesson in the Subpoena that "[f]ailure to comply with this Subpoena may render [Smith & Wesson] liable for contempt of Court and such other penalties as provided by law."  Ex. 1 at 2.

**III.    The Attorney General's Expressed Hostility to the Second Amendment and to the Courts' Constitutional Oversight of His Agenda**

76.     On January 16, 2018, the New Jersey Senate confirmed Defendant Grewal as Attorney General of the State of New Jersey.

77.     Since his confirmation, the Attorney General has been clear, through both his conduct and a series of inflammatory and biased statements, about his plan to use the power of his office to coerce firearms companies to adopt his policy preferences with respect to the Second Amendment.  To that end, he publicly boasted at a March 12, 2019 press conference with anti-Second Amendment Activists that he intended to "turn up the heat" on gun manufacturers.

78.     Despite cloaking his agenda in the rhetoric of "gun violence," the Attorney General's singular focus has been limited to interfering with constitutionally protected activity and to reduce gun ownership by law-abiding citizens.  For example, the Attorney General has been a fierce opponent of "open carry" and "concealed carry" policies, taking sides in the public gun debate by asserting that "[p]ublic carrying of firearms is dangerous to our residents and to law enforcement."

79.     Further, the Attorney General has used the vast resources of the State to bring meritless claims, for the purpose of using the burden and cost of a defense as leverage to force his opinions on others.

80. The Attorney General's hostility to opposing views extends even to the courts.  He unabashedly stated that "the evidence is clear that when more people carry guns in public, public confrontations get more dangerous, not only for the public, but also for our law enforcement officers," and that the "[c]ourts have no basis to overrule these careful public safety determinations made by states[.]"

81. Under the Attorney General's view of the world, Smith & Wesson should have no recourse to the courts to challenge his "public safety determinations."  The Attorney General's view necessarily means that the Subpoena represents, in his mind, not an investigatory tool but rather his attempt to eliminate the debate around the issue of "public safety" and unilaterally impose his political views.

82. The Attorney General's statements and actions demonstrate that his goal is to employ his prosecutorial authority to impose his own views regarding a contentious political issue, notwithstanding any constitutional or other legal safeguards.

IV. **The Attorney General's Alliance and Coordination with anti-Second Amendment Organizations**

A. **The Attorney General Signs on to the anti-Second Amendment Activists' Agenda and Transfers His Prosecutorial Authority to Law Firms for the Purpose of Going After Gun Manufacturers.**

83. The Attorney General has partnered with anti-Second Amendment Activists, such as Giffords and Brady, as well as Do Not Stand Idly By, which are explicit in their desire to restrict firearms ownership and carry rights, and to dictate to the firearms industry what types of firearms may be manufactured and how they may be sold.

84. In May 2018, the co-founders of Giffords appeared with New Jersey Governor Phil Murphy to announce an "unprecedented public-private effort on gun-safety litigation" in New

Jersey which would "combin[e] the *investigative and enforcement powers of the State* with the expertise of the nation's leading gun litigation coalition." (emphasis added).

85.     A Giffords press release explained that the "partners in [the] FACT litigation coalition w[ould] *work closely with New Jersey*" in this "unprecedented" campaign to "bring[] unparalleled legal resources to the . . . fight," and that "[l]everaging these resources *and Attorney General Grewal's leadership* will . . . enable . . . action against" what Giffords described as the "rogue elements" of the gun industry.  (emphasis added).

86.     In a telling "coincidence," only a couple of months earlier, in March 2018, the anti-Second Amendment Activists developed and issued the ICCR's Investor Statement on Gun Violence, and the Principles for a Responsible Civilian Firearms Industry, which were signed on to by various state pension fund officials, in November 2018.

87.     Just three short months after the May 2018 press conference, the Attorney General made good on his commitment to Giffords to use "the investigative and enforcement powers of the State" to advance the anti-gun agenda.  In August of 2018, the Attorney General issued a Request for Qualifications ("RFQ") for "Special Counsel for Firearms Safety Litigation," or "Firearms Counsel."  The RFQ sought qualifications from law firms with, "at a minimum," "[s]ubstantial experience in litigation pertaining to reducing or seeking damages for the impacts of firearm violence or similar *public safety impact litigation* claims[.]"[13]  The effect is that only law firms that already support the anti-Second Amendment Activists' lawfare campaign against the firearms industry need apply.

---

[13] Office of the Attorney General, State of New Jersey, Request for Qualifications for Special Counsel for Firearms Safety Litigation, Aug. 16, 2018, at 3, *available at* https://www.nj.gov/oag/law/pdf/rfqs/Firearms-Safey-Litigation.pdf (emphasis added).

88.     Per the RFQ, the Attorney General made it clear that he would delegate the immense prosecutorial power of the State to his Firearms Counsel:

> The firm(s) selected as [Firearms] Counsel will be required to handle all aspects of providing representation to the Attorney General in his role as Chief Law Enforcement Officer, the New Jersey State Police, the New Jersey Division of Criminal Justice, the Commissioner of Health as the State official responsible for public health, or other State officials or agencies impacted by gun safety issues in litigation seeking to remedy and reduce gun violence impacts in the State of New Jersey.[14]

89.     The RFQ further states that "[i]f legal action is approved by the Attorney General, the firm(s) may be retained to prepare, commence, and manage litigation *on behalf of the Attorney General*, the New Jersey State Police, the New Jersey Division of Criminal Justice, the Commissioner of Health or other State officials or agencies[.]"[15]

90.     Although the RFQ claims that this work would be performed under the supervision and control of the Attorney General, that generalized language is contradicted by specific provisions of the RFQ.  Notably, the scope of the Firearms Counsel's role and authority to use the prosecutorial power of the State under the RFQ appears to be almost unfettered.  The RFQ provides that "[p]reparation may include significant pre-filing evaluative and investigative work" and that "[l]itigation will include: drafting pleadings, motions, briefs and all other papers to be filed in court; *conducting and responding to discovery*; attending all pre-trial, trial and post-trial court appearances; [and] conducting settlement negotiations and handling appeals."[16]

91.     In addition to handing over the keys to the prosecutorial powers of the State, the RFQ also provides that Firearms Counsel will be compensated on a contingency basis.  Firearms

---

[14] *Id*.

[15] *Id.* (emphasis added).

[16] *Id*. at 4 (emphasis added).

Counsel receives compensation only if they prosecute cases, and even then, only in proportion to the amount recovered – thus effectively imposing a bounty system for private law firms executing State prosecutions against other private parties.

92.    The Attorney General's incentivization of private entities to execute State prosecutions runs afoul of the bedrock principle of the neutral and impartial administration of justice to which the Attorney General, like all attorneys-general, must adhere, effectively creating "bounty hunters" at the disposal of the Attorney General's office.  No New Jersey law provides any meaningful limitations on this abuse of power or, alternatively, grants the targets of such efforts any due process protection.

**B.     The Attorney General Retains Counsel Representing Anti-Second Amendment Activists as his Firearms Safety Counsel.**

93.    Delivering on the State's promise to "combin[e] the investigative and enforcement powers of the State with the expertise of the nation's leading gun litigation coalition," the Attorney General has appointed to his Firearms Safety Counsel a law firm which is a member of FACT. That law firm plainly proclaims that it aims "to help promote gun control."

94.    In addition, the FACT law firm serving as New Jersey's Firearms Counsel has committed to "unprecedented cooperation" with other FACT law firms in pursuing the gun control agenda.  One of those other FACT law firms is counsel of record in another case recently filed against Smith & Wesson, in which the Plaintiffs assert claims ringing similar in tone to the information requested by the Attorney General in the Subpoena.[17]

95.    Importantly, the Attorney General's Firearms Counsel is not simply engaged in direct litigation against firearms manufacturers.  Emails unearthed from public records requests

---

[17] *See Goldstein v. Earnest, et al.*, No. 37-2020-16638 (Cal. Super. Ct. – San Diego County).

reveal that at least one of the firms serving as Firearms Counsel has been participating, along with representatives from Giffords (the same entities that the Attorney General has partnered with), in proactive calls and meetings with various state Attorneys General in an attempt to advocate for their new "theory" regarding "false firearms marketing."  This is an obvious attempt to foment additional litigation against gun manufacturers at the state level.

96.     Unsurprisingly, a now-employee of Giffords previewed part of this "theory" – the same theory pursued by the Attorney General in the Subpoena – in an article published by the Center for American Progress, claiming that gun manufacturers have "created a false narrative that people are always at risk of violent attack[.]"

97.     Further, the anti-Second Amendment activists have made no secret of their intended aims with regard to their "impact litigation" strategy.  In a March 2, 2021 article in the New York Times regarding this very lawsuit (which accurately described the Subpoena as "a Trojan horse"), the chief counsel for Giffords made clear that such subpoenas were intended to harm firearms manufacturers, stating that "[t]he gun industry is afraid of nothing more than the ability of the public to see behind the scenes and to see their internal documents and to have their executives sit down and face the music[.]"[18]

98.     The anti-Second Amendment activists have now found a willing collaborator in the Attorney General on their "fraud" theory.  Indeed, it is the gravamen of both the Subpoena and the complaint in the state court proceeding.

99.     And the collaboration goes both ways.  As reported on a New Jersey news website, according to a retention agreement obtained through a public records request, in September

---

[18] Andrew Ross Sorkin, "The Most Important Gun Lawsuit You've Never Heard Of."  New York Times (DealBook), Mar. 2, 2021, https://www.nytimes.com/2021/03/02/business/dealbook/gun-control-lawsuit-new-jersey.html.

2019, the state of New Jersey hired a prominent New York-based firm "to support litigation and an investigation 'Regarding Gun Manufacturers' Deceptive or Misleading Advertising,'" which has now filed litigation in New Jersey state court premised on the same "fraud" theories invented and shaped by the anti-Second Amendment activists, and now, the Attorney General.[19]

100.     By retaining the aforementioned firm and hiring at least one FACT law firm as Firearms Safety Counsel, the Attorney General has knowingly ceded his investigatory and prosecutorial responsibility to law firms that publicly support an agenda hostile to gun manufacturers.  In short, the Attorney General is placing his Firearms Safety Counsel in a position where they can use the machinery of the state to press their stated gun control objectives in favor of their clients Giffords and Brady.  That situation presents an unacceptable risk that information could be used to advance the litigation objectives of the anti-Second Amendment activists that the FACT law firms represent, inadvertently or otherwise.

101.     In so doing, the Attorney General has created an unacceptable risk, if not the desired result, that the immense investigatory and prosecutorial powers of the State will be used to infringe on Smith & Wesson's constitutionally protected rights and target its protected speech, all within the context of an investigation that improperly seeks volumes of information relating to Smith & Wesson's opinion and its positions on matters of public debate.

---

[19] "N.J. asks judge to force gun manufacturer Smith & Wesson to hand over documents on how it markets firearms."  NJ.com, Feb. 23, 2021, https://www.nj.com/news/2021/02/nj-asks-judge-to-force-gun-manufacturer-smith-wesson-to-hand-over-documents-on-how-it-markets-firearms.html.

## V.   The Attorney General Implements an Arbitrary and Irrational Program, the Sole Purpose of Which is to Damage Smith & Wesson, the Firearms Industry, and Its Supporters.

102.   The Attorney General also has implemented an irrational, "name and shame" program that serves no purpose beyond harming Smith & Wesson and advancing the efforts of the anti-Second Amendment Activists.

103.   At a March 12, 2019 press conference with Governor Murphy and anti-Second Amendment Activists, the Attorney General announced that he had "signed on" with the anti-firearms agenda of Do Not Stand Idly By, a group whose self-professed method is to "identify the players with the most power to make a difference [and] work creatively, persistently, and flexibly to get them to respond[.]"

104.   In signing on to this agenda, the Attorney General announced what he referred as the "next step" in his campaign against the firearms industry, which is "to show the link between specific companies and guns recovered from crime scenes in New Jersey."   The purported objective of this "next step" is to "compel" gun manufacturers to work with the State, in an effort to reduce gun violence, by "*naming and shaming* gun manufacturers and holding them accountable for [the] illegal guns that flood [New Jersey] streets." (emphasis added).

105.   But the "name and shame" policy's inherently flawed methodology produces no actionable information and contributes nothing to its purported ultimate objective of compelling gun manufacturers to work with the State.   Upon information and belief, the Attorney General knows this to be the case.

### A.   The "Name and Shame" Policy Does Not Serve its Stated Purposes.

106.   The cornerstone of the "name and shame" initiative lies in the Attorney General issuing monthly "NJGUNStat" reports that identify the number and location of firearms

28

"recovered" statewide, the caliber of these firearms, and—*sometimes*—the manufacturer.  The reports are so flawed that the only purpose for publishing them, is to improperly label manufacturers as bad actors – a result that reflects the Attorney General's lack of prosecutorial neutrality.

107.    The Attorney General claims that the reports are designed to compel manufacturers to work with the State to stop weapons from ending up in the hands of dangerous criminals, with the inference that firearms manufacturers will not work with the State otherwise.  This is a false premise.

108.    Smith & Wesson works to develop and implement programs to promote compliance with firearms laws, the legal sale of firearms, and firearms safety at the federal, state, and local levels.  As part of these efforts, the company collaborates with federal, state, and local agencies, including prosecutors and law enforcement entities.  In fact, Smith & Wesson is required by law to respond within 24 hours to requests to help trace firearms used in crimes.  In short, the Attorney General has never raised any concern with Smith & Wesson regarding its cooperation with his office or with other government agencies in New Jersey, and there is no legitimate question that can be raised regarding Smith & Wesson's commitment to cooperate with prosecutors and the law enforcement community.

109.    Nor do the reports shed any light on the Attorney General's claimed connection between guns found at crime scenes and possible manufacturer culpability.  Completely absent from the reports is any information regarding who possessed the firearm or how it was obtained, making it impossible to determine if a manufacturer had theoretical culpability, if any, in the appearance of a firearm at a crime scene.  That is a critically important omission because the available data, in fact, shows that manufacturers have no such culpability because, for example,

the overwhelming number of "crime guns" are obtained illegally.  The Attorney General either knows this to be the case or should know it to be the case.

110.    Even the definition of "crime gun" demonstrates that the reports, at best, are designed to target manufacturers.  "Crime guns recovered," as defined by the Attorney General, include firearms having nothing to do with crimes, such as abandoned or discarded guns, and guns lawfully used in self-defense.  Moreover, because New Jersey treats even the lawful transport of a firearm pursuant to the Federal Firearms Owners Protection Act ("FOPA"), 18 U.S.C. § 926A, as a chargeable criminal offense, a firearm merely in the possession of a lawful owner who has committed no crime other than transporting her firearm through New Jersey is considered a "crime gun."

111.    The State of New Jersey even admits that the data in its reports are flawed, and yet makes no attempts to resolve those known flaws.  A tiny print disclaimer states that "[t]his chart [Weapons Breakdown by Manufacturer] reflects the information provided to the New Jersey State Police through NJTrace, a statewide program that relies on local police departments to input data on guns used in the commission of a crime. This chart does not rely on any reports from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). *The information is preliminary and subject to further analysis*."[20]  No such further analysis ever appears in subsequent reports.

112.    It would be a simple matter for the Governor or the Attorney General to resolve these deficiencies.  They could mandate reporting of brands in all cases of recovered guns along with such critical information needed to serve the Attorney General's claimed end.  After all, both

---

[20]    *See* September 2020 NJ GUNStat Report, *available at* https://www.nj.gov/oag/njsp/njgunstat/pdf/Sept-2020-GUNSTAT-Report.pdf (emphasis added).

the brand name of a firearm and its serial number are stamped on all firearms.  No public evidence

exists that the Attorney General has even made the attempt to have this information collected.

113.    The flawed data do serve one purpose – in the Attorney General's words, to "turn

up the heat" on manufacturers where there is no basis for prosecutorial action.  Not coincidentally,

the Attorney General's reports place Smith & Wesson prominently at the "top" of a list of "bad"

gun manufacturers who need to be "h[e]ld . . . accountable."  The Attorney General's naming of

Smith & Wesson as a bad actor, for nothing more than engaging in the entirely lawful activity of

manufacturing and selling firearms, necessarily means he already has judged the issue, abandoned

any semblance of prosecutorial neutrality, and replaced it with his own bias and political beliefs.

Indeed, if there is anything "false and deceptive," it is the Attorney General falsely associating

Smith & Wesson with the criminal acts of unrelated third parties.

114.    In short, the nature and structure of the reports, combined with a demonstrated

hostility to lawful and constitutionally protected firearms manufacture, make it difficult to reach

any conclusion other than that the reports have little to do with public safety and everything to do

with an attempt to harm firearms companies, such as the manufacturer at the top of the Attorney

General's list, Smith & Wesson.

**VI.    The Subpoena Violates Constitutional Rights and Is Causing Harm to Smith & Wesson and Its Customers.**

115.    The harm to Smith & Wesson from the Attorney General's abuse of his

prosecutorial authority, in particular by issuing the Subpoena and initiating an investigatory

process against Smith & Wesson that goes hand-in-glove with the Subpoena, is real and

immediate, even without any attempt to enforce the Subpoena in court.

116.   For any business to survive, it must rely on relationships with a host of key stakeholders and critical business partners, including those in banking, insurance, transportation, product distribution and retail sales, among many others.

117.   Anti-Second Amendment Activists have worked in a persistent and coordinated fashion to create an image of threatened reputational and litigation risk to Smith & Wesson that would harm these relationships and impede or cut off these services, unless Smith & Wesson changes its political views and legal business practices.

118.   For example, the ICCR, working through its affiliates, has been the driving force in getting shareholder proposals on the ballot at Smith & Wesson's annual meeting of stockholders, alleging that the failure to voluntarily adopt the gun control agenda will cause debilitating financial and reputational risk (or in the anti-Second Amendment Activists' words, cost Smith & Wesson its "social license to operate").

119.   The ICCR's board room efforts then are "proven" by the ICCR's allies through their admittedly "creative" litigation, which is designed for this purpose (its "impact"), where the nominal parties are merely tools of the anti-Second Amendment Activists.

120.   In this strategic and planned manner, the anti-Second Amendment Activists have engaged in a self-fulfilling prophecy, creating the very concerns they seek to use as a lever, all in an effort to circumvent the Second Amendment protections of Smith & Wesson and private citizens.  The perceived risk and public approbation resulting from these attacks on the firearms industry and Smith & Wesson are having their desired impact of depriving the industry of the support of services critical to its day-to-day operation and threatening its long-term survival.

121.   One need only be a casual observer of news headlines to know that a myriad of industries, from investment houses, banks, and insurers, to retail vendors all have expressed

concerns regarding these alleged risks, created and propagated by anti-Second Amendment Activists.  The result has been that they either have ceased providing necessary business services critical to firearms manufacturers' ordinary course business operations or have conditioned the provision of these services in ways that create added burdens.

122.    It is only through this lens of coordinated action that the Attorney General's facially invalid Subpoena makes sense.  By issuing the Subpoena to Smith & Wesson, backed by the full prosecutorial authority of his office, as well as the near-limitless resources of the State of New Jersey, his anti-Second Amendment Activist partners, and his Firearms Counsel, the Attorney General is merely making good on the promise announced at the May 2018 press conference with the co-founders of Giffords and the Governor of New Jersey to "combine the investigative and enforcement powers of the State with the expertise of the nation's leading gun litigation coalition" and "turn up the heat" on firearms manufacturers.

123.    Beyond the improper litigation tactics and abuse of prosecutorial authority is the facially invalid Subpoena itself, which forces Smith & Wesson to divert financial and personnel resources from its ordinary course operations and expend those resources to preserve its First Amendment-protected speech and Second Amendment-protected activity.  These expenditures are, and will continue to be, substantial.

124.    The harm does not end there.  The very statute on which the Attorney General has predicated his Subpoena, the New Jersey Consumer Fraud Act, expressly confers a private right of action.  Thus, again, by providing a litigation roadmap to private litigants, like the anti-Second Amendment Activists to whom he has pledged his support, the Attorney General is making good on his threat to harm firearms manufacturers, including Smith & Wesson.

125.    Forcing Smith & Wesson to expend its limited resources, and divert the time and attention of its board of directors, senior executives, and other personnel from running its business, in order to fight the spurious Subpoena, threatens the precise reputational and financial risks fabricated by the Attorney General's anti-Second Amendment Activist partners and causes Smith & Wesson real and immediate harm.  The facial invalidity of the Subpoena compels a singular conclusion that this harm to Smith & Wesson's business is not merely an incidental effect, but rather the Subpoena's singular purpose.

## VII.    The Attorney General Retaliates Against Smith & Wesson for Challenging the Violation of Constitutional Rights before this Court.

126.    Following the filing of the Initial Complaint, the Attorney General sought, and obtained, an extension of time to January 22, 2021 to respond to the Initial Complaint.  ECF No. 11.  The Attorney General's Office then contacted counsel for Smith & Wesson requesting an additional extension of the time to respond.  Smith & Wesson agreed to the request and the parties entered a stipulated order, approved by this Court, establishing a briefing schedule.  ECF No. 13. Pursuant to that schedule, the Attorney General's response was due on February 22, 2021, on which date he later filed a motion to dismiss.  ECF No. 14.

127.    On February 12, 2021, the Attorney General filed in New Jersey Superior Court a complaint (the "AG Complaint") alleging that Smith & Wesson's failure to comply with the Attorney General's Subpoena, *which under New Jersey law is not self-executing*, was a violation of New Jersey law.

128.    The AG Complaint essentially admits, as Smith & Wesson has alleged, that the Attorney General is pursuing not an investigation but attacking disfavored opinions on matters such as self-defense and safety regarding firearms.  Paragraph 9 of the AG Complaint states that the Attorney General's "preliminary investigation suggests that certain of Smith & Wesson's

firearms advertisements and marketing . . . may misrepresent the impact owning a firearm has on personal safety and/or safety in the home."  Ex. 2 ¶ 9.

129.    The AG Complaint proceeds to make representations regarding the allegations in Smith & Wesson's Initial Complaint.  Some of these representations are demonstrably false and misleading.  For example, the Attorney General states that Smith & Wesson claims "that the issuance of the Subpoena investigating potentially misleading or deceptive advertising . . . violates the U.S. Constitution."  Ex. 2 ¶ 14. Nowhere does the Initial Complaint allege that the mere issuance of a subpoena violates the U.S. Constitution.  Similarly, the AG Complaint falsely claims that Smith & Wesson argues that "as a firearms manufacturer" its advertising is "constitutionally protected opinion immune from investigation" for violations of law.  *Id.*  No such claim appears anywhere in the Initial Complaint.

130.    According to the Attorney General, draconian relief is required for Smith & Wesson's assertion of its constitutional rights in this Court (a shopped forum according to the Attorney General).  The Attorney General asks the New Jersey Court to find Smith & Wesson in contempt because Smith & Wesson objected to the Subpoena and initiated this action, rather than provide the requested documents.  Further, the Attorney General has sought to do so even though the Subpoena at issue is not self-executing.  The Attorney General also seeks an order restraining all protected speech and sales by Smith & Wesson "until it fully responds to the Subpoena."  Ex. 3 at 2.

131.    The Attorney General asks the New Jersey Superior Court to hear the case in "summary manner," essentially sidestepping this Court's adjudication of the constitutional issues presented by Smith & Wesson.  Toward that end, the Attorney General has proceeded by an "Order

to Show Cause."  Nowhere in his memorandum in support of such an order does the Attorney General indicate why such extraordinary relief is necessary.

132.    On the face of the Subpoena and the Attorney General's state court submissions, the investigation supposedly arises from vague statements about safety and a purported failure by Smith & Wesson to notify the New Jersey public that gun permits are required.  The Attorney General fails to identify what has changed since the "preliminary investigation" or what new and significant harm has made this so urgent a matter that the Superior Court should act with such expedition that the deliberations of this Court should be preempted.

133.    The Attorney General's failure to identify specifically what has changed is unsurprising.  That is because the only change is Smith & Wesson's efforts to protect its constitutional rights and challenge the Attorney General's authority by filing the Initial Complaint.

134.    But the Attorney General need not expressly admit that the state court action is motivated by Smith & Wesson's lawsuit.  His own state court filings betray him, as the AG Complaint ties the requested extraordinary relief directly to Smith & Wesson's exercise of its constitutional right to petition this Court.  It specifically finds fault with Smith & Wesson's objections to the Subpoena (repeatedly mischaracterized as a refusal to respond) served on the Attorney General.  The Attorney General then states that "irrespective of the merits" of the matter before this Court, Smith & Wesson must comply with the Subpoena.  Ex. 4 at 2.  The AG Complaint also expressly faults Smith & Wesson for filing an action with this Court rather than "mov[ing] to quash the [S]ubpoena."  Ex. 2 ¶ 13.

135.    The Attorney General's actions seek to present Smith & Wesson with a Hobson's Choice – either relinquish its constitutional rights or suffer immediate damage from the forced cessation of its business.

136.    The State Court has ordered Smith & Wesson to provide responsive papers on or before March 11, 2021 and has set March 18, 2021 as the hearing date on the Attorney General's motion to enforce the Subpoena.

## VIII.   The Subpoena and the Attorney General's Conduct Violate Smith & Wesson's Rights.

137.    The Attorney General's public statements, conduct, and actions leading up to, and in issuing the Subpoena and initiating the related investigation, and his retaliatory conduct via the initiation of the state court proceeding, combined with the attendant threat of related criminal and civil sanctions, unlawfully punish Smith & Wesson for constitutionally protected speech.

138.    The Attorney General's demonstrated prejudice against firearms manufacturers makes it clear that the Subpoena, related investigation, and state court enforcement action are the latest attempts to suppress Smith & Wesson's speech and Second Amendment advocacy efforts; to retaliate against and harass Smith & Wesson for its speech and its lawful business as a gun manufacturer, seller, and distributor; and to infringe upon the Second Amendment rights of both Smith & Wesson and the residents, not only of New Jersey, but of all fifty states in the United States of America, who are the beneficiaries of Smith & Wesson's products and advocacy.

139.    Additionally, because the Attorney General's public statements, conduct, and actions in issuing the Subpoena and initiating the related investigation implicate nationwide political statements made by Smith & Wesson, they have a nationwide impact on the company. Smith & Wesson will be subject to varying and arbitrary standards for what constitutes "fraud" in a given jurisdiction.  Protected speech is protected speech under the Constitution; labeling it as "fraud" because one disagrees with it does not strip away that protection.  Nor is there any compelling interest for the State of New Jersey to do so.

140.    Specifically, Smith & Wesson will have to tailor its political and commercial conduct out of concern that the aforementioned varying and arbitrary standards for what constitutes "fraud" in New Jersey, as defined by the Attorney General, will result in prosecution and harassment by the Attorney General, and others who share his political views of Smith & Wesson's business, Second Amendment advocacy, and protected speech.  In regulating nonactionable national political and commercial speech, the Attorney General is regulating interstate commerce, which the State of New Jersey cannot do under the Dormant Commerce Clause.

141.    In part because they are attempts to regulate protected speech, and not reasonably related to any valid investigation of fraud, the Attorney General's actions in issuing the Subpoena and initiating the related investigation deprive Smith & Wesson of constitutionally protected interests—including time, financial expenditures, and other resources—without due process of law.

142.    Additionally, the Attorney General's public statements, conduct, and actions in issuing the Subpoena and initiating the related investigation assist the anti-Second Amendment Activists' goal of creating the risk of debilitating financial and reputational harm for Smith & Wesson, and forcing Smith & Wesson to expend significant financial resources in defending against legal proceedings at the expense of ordinary course business operations.

143.    The Attorney General's demonstrated prejudice deprives Smith & Wesson of its substantive due process right to an unbiased prosecutor.  The Attorney General's political agenda, and the means and mechanisms he has put into place to drive that political agenda, are clearly motivating his actions in issuing the Subpoena and initiating the related investigation, neither of which are aimed at legitimate prosecutorial objectives, or prosecuting unlawful activity.

144.    The due process requirement of a neutral prosecution bars the Attorney General from injecting his personal interests – in this case, his partisan, political views regarding the Second Amendment – into any government enforcement effort.  When viewed in the light of the Attorney General's prior inflammatory statements regarding gun manufacturers and his views on Second Amendment rights, as well as his improper motive to undermine Second Amendment rights, it is clear that the Subpoena and investigation are designed to harm Smith & Wesson, both financially and in the court of public opinion.

145.    Finally, the AG Complaint and the requested Order to Show Cause establish that the Attorney General is retaliating against Smith & Wesson for asserting its rights in this Court. The Attorney General's actions and statements demonstrate that he is driven by a hostility to Smith & Wesson's assertion of its rights.  The Attorney General's filing seeks to instruct Smith & Wesson on the course of action to follow, demand that Smith & Wesson drop this proceeding, and force Smith & Wesson to comply with the Subpoena, in the Attorney General's own words, "irrespective of the merits" of the case before this Court.  To ensure that Smith & Wesson is dissuaded of any thought of continuing its defense, the Attorney General seeks draconian penalties – including a complete shutdown of Smith & Wesson's business activities and protected speech in New Jersey – which are disproportionate to any identified (and nonexistent) harm.

146.    The Attorney General's ends-driven, biased prosecution of Smith & Wesson, the result of which is pre-ordained, and his retaliation for challenging that prosecution, only serves to project impropriety and undermine public confidence in his investigation and his office.  The principle of a neutral prosecutor, a bedrock of our system of justice, is designed precisely to avoid such harms.

## CLAIMS FOR RELIEF

### Count I – Violation of Smith & Wesson's First and Fourteenth Amendment Rights
### (Retaliation – First Amendment Right to Petition)

147.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 146 of this Amended Complaint as if fully set forth herein.

148.    The First Amendment protects the right "to petition the Government for a redress of grievances." This Petition Clause applies to the states through the Fourteenth Amendment.

149.    By filing the instant lawsuit in this Court to vindicate its rights, Smith & Wesson engaged in constitutionally protected conduct.

150.    The Attorney General engaged in retaliatory action in response to Smith & Wesson filing its Complaint by moving to enforce the Subpoena in New Jersey and seeking the remedy of a total shutdown of Smith & Wesson's sales and protected speech. This draconian step would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights.

151.    A causal link existed between Smith & Wesson's constitutionally protected conduct and the Attorney General's retaliatory action, because the Attorney General seeks to punish Smith & Wesson by seeking, in a summary manner, the harshest of sanctions available under the New Jersey Consumer Fraud Act, as a response to Smith & Wesson seeking to assert its constitutional rights in this Court.

### Count II – Violation of Smith & Wesson's First and Fourteenth Amendment Rights
### (Retaliation – First Amendment Right to Freedom of Speech)

152.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 151 of this Amended Complaint as if fully set forth herein.

153.    The First Amendment protects the right to freedom of speech. Through the Fourteenth Amendment, this right is applicable to the states, which cannot abridge it.

154. By expressing certain views on the Second Amendment and related subjects, Smith & Wesson engaged in constitutionally protected conduct.

155. The Attorney General engaged in retaliatory action in response to Smith & Wesson expressing its views by initiating a campaign of intimidation against the company, launching an investigation, issuing the Subpoena, and filing an enforcement action in New Jersey state court, in which he seeks the remedy of a total shutdown of Smith & Wesson's sales and protected speech. These steps would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights.

156. A causal link existed between Smith & Wesson's constitutionally protected conduct and the Attorney General's retaliatory action, because the Attorney General's statements reveal that he has specifically targeted Smith & Wesson, and because he seeks to punish Smith & Wesson by seeking, in a summary manner, the harshest of sanctions available under the New Jersey Consumer Fraud Act, as a response to Smith & Wesson expressing its political and policy views.

**Count III – Violation of Smith & Wesson's First and Fourteenth Amendment Rights (Unlawful Viewpoint Discrimination and Restriction of Political Speech)**

157. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158. The focus of the Attorney General's Subpoena is on one side of a political policy debate regarding opinions and legal issues, and the Subpoena was issued in an effort to silence, intimidate, and deter Smith & Wesson and others possessing a particular viewpoint from participating in that debate. The Subpoena itself violates, and any effort to enforce the Subpoena would further violate, the rights provided to Smith & Wesson by the First Amendment of the United States Constitution, made applicable to the State of New Jersey by the Fourteenth Amendment.

159.     The Attorney General's Subpoena is an impermissible viewpoint-based restriction on protected speech, and it burdens Smith & Wesson's political speech.  The Attorney General issued the Subpoena based on his disagreement with Smith & Wesson's opinions and advocacy on behalf of Second Amendment issues and based on Smith & Wesson's status as a manufacturer, distributor, and seller of firearms.

160.     Even if the Subpoena had not been issued for that illegal purpose, it would still violate the First Amendment because it burdens Smith & Wesson's political speech without being substantially related to any compelling governmental interest.  The Subpoena cannot survive strict scrutiny review.

**Count IV – Violation of Smith & Wesson's First and Fourteenth Amendment Rights**
**(Compelled Speech)**

161.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.     The First Amendment protects the right to freedom of speech.  Through the Fourteenth Amendment, this right is applicable to the states, which cannot abridge it.

163.     Forced speech that requires the private speaker to embrace a particular government-favored message is *per s*e unconstitutional.

164.     The Attorney General's investigation, Subpoena, and enforcement action in state court all seek to punish Smith & Wesson for purportedly not disclosing in marketing and advertising that permits or licenses are required in New Jersey to own and carry a firearm.  To the extent that the Attorney General seeks to have Smith & Wesson agree with those political and public policy issues, it constitutes compelled speech.

42

165.     There is no compelling reason to compel Smith & Wesson's speech in this regard, nor is the relief sought by the Attorney General narrowly tailored to achieve the Attorney General's objective, as citizens are presumed to have knowledge of relevant laws.

166.     Additionally, in the commercial speech context, compelled disclosures are *only* permissible if they present purely factual and uncontroversial information about the terms under which services will be available.

167.     Gun control laws generally and New Jersey's concealed carry laws specifically are anything but an "uncontroversial" topic.

168.     There is no substantial interest on the part of the State of New Jersey to compel speech in this manner.  Nor does the relief sought by the Attorney General in state court advance any such interest, if any exists.

169.     An affirmative requirement that Smith & Wesson be compelled to disclose a permit or license requirement would be more extensive than necessary to serve any interest articulated by the Attorney General.

**Count V – Violation of Smith & Wesson's First and Fourteenth Amendment Rights**
**(Prior Restraint)**

170.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 169 of this Complaint as if fully set forth herein.

171.     The First Amendment protects the right to freedom of speech.  Through the Fourteenth Amendment, this right is applicable to the states, which cannot abridge it.

172.     Through his state court enforcement action, the Attorney General seeks a total ban on Smith & Wesson's speech in the State of New Jersey.

173.     Such a ban would constitute a prior restraint of speech, which is subject to a heavy presumption against constitutional validity.

174.     There is no compelling reason to enact a prior restraint on all of Smith & Wesson's speech in this regard, nor is ban sought by the Attorney General narrowly tailored to achieve the Attorney General's objective, if such a valid objective exists.

### Count VI – Violation of Smith & Wesson's First and Fourteenth Amendment Rights
### (Unlawful Restriction of Protected Commercial Speech)

175.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 174 of this Complaint as if fully set forth herein.

176.     Defendants' Subpoena was issued in an effort to silence, intimidate, and deter Smith & Wesson's ability to speak in the commercial marketplace.  The Subpoena itself contravenes, and any effort to enforce the Subpoena would further contravene, the rights provided to Smith & Wesson by the First Amendment of the United States Constitution, made applicable to the State of New Jersey by the Fourteenth Amendment.

177.     The Attorney General's Subpoena is an impermissible restriction on Smith & Wesson's commercial speech, and it burdens Smith & Wesson's commercial speech.

178.     Defendants cannot survive the heightened scrutiny review attendant to Smith & Wesson's commercial speech because Smith & Wesson's speech pertains to lawful commercial transactions and, being grounded in opinion, cannot be misleading.

179.     There is no substantial interest on the part of the State of New Jersey to regulate speech in this manner.  Nor does the relief sought by the Attorney General in state court advance any such interest, if any exists.

180.     Regulation of Smith & Wesson's speech would be more extensive than necessary to serve any interest articulated by the Attorney General, if such a valid objective exists.

44

**Count VII – Violation of Smith & Wesson's Second and Fourteenth Amendment Rights**

181.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

182.     The Subpoena violates Smith & Wesson's rights under the Second Amendment of the United States Constitution, as made applicable to the State of New Jersey by the Fourteenth Amendment.

183.     Specifically, (1) the Subpoena inhibits Smith & Wesson's ability to engage in the lawful manufacture, distribution, and sale of firearms to consumers; and (2) issuance of the Subpoena was motivated by an intent to infringe upon Smith & Wesson's Second Amendment rights and chill its exercise of those rights.

**Count VIII – Violation of Citizens' Second and Fourteenth Amendment Rights**

184.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 183 of this Complaint as if fully set forth herein.

185.     The Subpoena violates citizens' rights to bear arms under the Second Amendment, as made applicable to the State by the Fourteenth Amendment, by interfering with Smith & Wesson's ability to manufacture, distribute, and sell firearms, which by extension impedes and places an undue burden on citizens' ability to exercise their right to own and bear arms.

186.     Smith & Wesson has standing to bring this constitutional claim on behalf of third parties because it is an interested party.  Because the Subpoena was issued to Smith & Wesson, citizens have no means to seek judicial recourse as to the Subpoena and its effects.

187.     The Subpoena and related investigation are motivated by the Attorney General's desire to prevent New Jersey residents from exercising their Second Amendment rights, and to chill citizens' exercise of those rights, by harassing and intimidating Plaintiffs.

**Count IX – Violation of Equal Protection Rights**
**Fourteenth Amendment to the U.S. Constitution**

188.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 187 of this Complaint as if fully set forth herein.

189.     The Subpoena and related investigation violate the Fourteenth Amendment's Equal Protection Clause because Smith & Wesson is being treated differently than similarly situated entities.  More specifically, non-firearm manufacturer businesses that sell consumer products are not being targeted by these types of sweeping and overreaching administrative subpoenas and coordinated campaigns to inhibit and prohibit their lawful business activities or to chill the desires of their customers to purchase their products.

190.     Defendants have selectively targeted Smith & Wesson for improper reasons, because the Attorney General's ideological beliefs and political agenda, as evidenced by his ongoing campaign against lawful firearm ownership and proponents of the Second Amendment, lies squarely at odds with Smith & Wesson's own political viewpoints.

**Count X – Violation of Due Process Rights,**
**Fifth and Fourteenth Amendments to the U.S. Constitution**

191.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 190 of this Complaint as if fully set forth herein.

192.     The Subpoena and related investigation violate Smith & Wesson's substantive due process rights to a neutral, disinterested prosecutor under the due process clause of the Fifth Amendment to the United States Constitution, as made applicable to states by the Fourteenth Amendment.

193.    The Attorney General has made his opinions clearly known through public statements, his actions and policies, and his propounding of the "NJGUNSTATS" reports, which are fundamentally and methodologically flawed as set forth above.

194.    The proceedings are further tainted by the Attorney General's hiring of "Firearms Counsel" as well as the existence of the contingency fee arrangement.  The Subpoena is merely the tip of a spear aimed at Smith & Wesson by a coalition of the State of New Jersey, law firms, and third-party groups, all aimed at "taking matters into their own hands" to bring down Smith & Wesson and other firearms manufacturers.

195.    Moreover, the Attorney General's lack of impartiality is further demonstrated, standing alone, by his issuance of the Subpoena under the New Jersey Consumer Fraud Act, in that the opinions and political viewpoints targeted by the Subpoena cannot constitute fraud.

196.    Rather, the Attorney General's statements and conduct, as set forth above, demonstrate that the Subpoena is not about "fraud", and that he has targeted Smith & Wesson based on a bias against gun manufacturers.  The Attorney General, who is clearly biased with regard to Second Amendment issues, is prosecuting Smith & Wesson for its views on those issues.

**Count XI – Violation of Smith & Wesson's Fourth and Fourteenth Amendment Rights**

197.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 196 of this Complaint as if fully set forth herein.

198.    The Attorney General's Subpoena contravenes the rights provided to Smith & Wesson by the Fourth Amendment's proscription of unreasonable searches and seizures, made applicable to the states by the Fourteenth Amendment.

199.    The Subpoena is an unreasonable search and seizure because it is vastly overbroad, seeks information related to opinion or the basis of a legal position, demands information about

lawful conduct that is protected under the First, Second, and Fourteenth Amendments, is not reasonably related to any legitimate investigative purpose, and is overly burdensome.

### Count XII – Preemption, Protection of Lawful Commerce in Arms Act

200.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    The Subpoena and related investigation are preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA").

202.    The PLCAA requires a court to dismiss any "civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, *resulting from the criminal or unlawful misuse of a [firearm]* by the person or a third part[y,]" 15 U.S.C. § 7902(5)(A) (emphasis added).

203.    The Attorney General's decision to conduct this investigation and issue this Subpoena was motivated by, and "result[s] from", the "criminal [and] unlawful misuse of [firearms] by . . . third part[ies]" throughout the State of New Jersey and elsewhere.

204.    Although the PLCAA's preemption/dismissal provision does not apply to "an[y] action in which a manufacturer or seller of a [firearm] knowingly violated a state or federal statute applicable to the sale or marketing of the product, [where] the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. § 7903(5)(A)(iii), Smith & Wesson has not "knowingly violated" the New Jersey Consumer Protection Act, and—even if it did—any violation would not "[be] a proximate cause of the harm for which relief is sought."

**Count XIII – Violation of the Dormant Commerce Clause**

205.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.     The Subpoena and related investigation violate the Dormant Commerce Clause.

207.     Article I, Section 8 of the United States Constitution grants Congress the exclusive authority to regulate interstate commerce and thus prohibits the states from imposing an undue burden on interstate commerce and from regulating conduct occurring wholly beyond their borders.

208.     Smith & Wesson's advertising and marketing campaigns are not specifically focused on the State of New Jersey, but rather a broader market throughout the United States.

209.     By seeking to regulate Smith & Wesson's advertisements in New Jersey, the Attorney General in reality seeks to regulate speech and business conduct that occurs almost entirely outside New Jersey.  The Attorney General's actions necessarily and unduly burden Smith & Wesson's ability to advertise and speak throughout the United States.

210.     Because the State and the Attorney General seek to regulate and burden out-of-state speech, or attendant lawful commerce through the Subpoena, the State improperly encroaches on Congress's exclusive authority to regulate interstate commerce and violates the Dormant Commerce Clause.

**Count XIV – Injunctive Relief Prohibiting Defendants from Enforcing the Subpoena.**

211.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 210 of this Complaint as if fully set forth herein.

212.     This Court has the authority to provide injunctive relief in order to ensure that public officers and officials act within the bounds of their lawful powers.

213.    Smith & Wesson seeks an injunction as to Defendants preventing them from enforcing the Subpoena.

214.    Smith & Wesson has a substantial likelihood of success on the merits.

215.    Smith & Wesson will suffer irreparable injury if an injunction is not granted.

216.    An injunction will not substantially injure other interested parties, in that there can be no injury to Defendants for not being able to prosecute or investigate Smith & Wesson for lawful activity, nor is there any harm to Defendants arising from a brief delay to await a ruling on the merits of this matter.

217.    The public interest would be furthered by the injunction because constitutional rights are at stake, and because the public has an interest in preserving the principle of prosecutorial neutrality.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

218.    Enjoin any proceedings in the state courts of New Jersey to enforce the Subpoena;

219.    Enjoin Defendants from enforcing the Subpoena;

220.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate Smith & Wesson's rights under the First, Second, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

221.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate New Jersey citizens' rights under the Second Amendment to the United States Constitution;

222.   Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation are preempted by the Protection of Lawful Commerce in Arms Act;

223.   Issue a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Subpoena and related investigation violate the Dormant Commerce Clause and the Supremacy Clause of the United States Constitution;

224.   Award Plaintiffs such costs and reasonable attorney's fees to which it might be entitled by law; and

225.   Award such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  March 10, 2021

 *s/ Christopher M. Strongosky*
Christopher M. Strongosky
Amanda Laufer Camelotto
**DLA PIPER LLP (US)**
51 John F. Kennedy Parkway
Suite 120
Short Hills, New Jersey 07078-2704
Tel: 973-520-2550
christopher.strongosky@dlapiper.com
amanda.camelotto@dlapiper.com

Joseph A. Turzi (admitted *pro hac vice* )
Edward S. Scheideman (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
Tel:  (202) 799-4000
joe.turzi@dlapiper.com
edward.scheideman@dlapiper.com

*Attorneys for Plaintiffs*
*Smith & Wesson Brands, Inc.*
*Smith & Wesson Sales Company*
*Smith & Wesson Inc.*

51

# Exhibit 1

**REGISTERED AGENT**
**SOLUTIONS INC**

**Registered Agent Solutions, Inc.**
*Corporate Mailing Address*
1701 Directors Blvd.
Suite 300
Austin, TX 78744

Phone: (888) 705-RASi (7274)

# SERVICE OF PROCESS RECEIPT

10/14/2020

Tina Rettura
**SMITH & WESSON SALES COMPANY**
Legal Department
2100 Roosevelt Avenue
Springfield, MA 01104 USA

> **NOTICE OF CONFIDENTIALITY**
> This notice and the information it contains are
> intended to be a confidential communication only to
> the individual and/or entity to whom it is addressed.
> If you have received this notice in error, immediately
> call our SOP Department at (888) 705-7274.

**RE:  SMITH & WESSON SALES COMPANY**

This receipt is to inform you that Registered Agent Solutions, Inc. has received a Service of Process on behalf of the
above-referenced entity as your registered agent and is hereby forwarding the attached document(s) for your immediate
review.  A summary of the service is shown below; however, it is important that you review the attached document(s) in
their entirety for complete and detailed information.
For additional information and instruction, contact the document issuer:  DEPUTY ATTORNEY GENERAL

**SERVICE INFORMATION**

| | |
|---|---|
| Service Date: | 10/14/2020 |
| Service Time: | 8:00AM EDT |
| Service Method: | ATTORNEY GENERAL REP. |

**RASi REFERENCE INFORMATION**

| | |
|---|---|
| Service No.: | 0151940 |
| RASi Office: | New Jersey |
| Rec. Int. Id.: | JLW |

**CASE INFORMATION**

| | |
|---|---|
| Case Number: | N/A |
| File Date: | 10/13/2020 |
| Jurisdiction: | NEW JERSEY DIVISION OF CONSUMER AFFAIRS |
| Case Title: | RE: DOCUMENTS REGARDING ADVERTISEMENTS FOR MERCHANDISE |

**ANSWER / APPEARANCE INFORMATION**

11/13/2020         *(Be sure to review the document(s)*
                   *for any required response dates)*

**AGENCY / PLAINTIFF INFORMATION**

| | |
|---|---|
| Firm/Issuing Agent: | DEPUTY ATTORNEY GENERAL |
| Attorney/Contact: | CHANEL VAN DYKE |
| Location: | New Jersey |
| Telephone No.: | N/A |

**DOCUMENT(S) RECEIVED & ATTACHED**

Subpoena
Affidavit / Certification

**ADDITIONAL NOTES**

**Questions or Comments...** Should you have any questions or need additional assistance, please contact the SOP Department at (888) 705-7274.

You have been notified of this Service of Process by Insta-SOP Delivery, a secure email transmission.  The transmitted documents have also been uploaded to your Corpliance account.  RASi
offers additional methods of notification including Telephone Notification and FedEx Delivery.  If you would like to update your account's notification preferences, please log into your Corpliance
account at www.rasi.com.

*Thank you for your continued business!*

**GURBIR S. GREWAL**
**ATTORNEY GENERAL OF NEW JERSEY**
**Division of Law**
**124 Halsey Street - 5th Floor**
**P.O. Box 45029**
**Newark, New Jersey 07101**
**Attorney for New Jersey Division of Consumer Affairs**



**By:    Chanel Van Dyke**
**Deputy Attorney General**
**Chanel.VanDyke@law.njoag.gov**

**ADMINISTRATIVE ACTION**
**SUBPOENA DUCES TECUM**

**THE STATE OF NEW JERSEY to:**        **Smith & Wesson Sales Co., Inc.**
**A/K/A American Outdoor Brands Sales Co.**
**A/K/A Smith & Wesson Corp.**
**2100 Roosevelt Avenue**
**Springfield, Massachusetts 01104**

**c/o    Registered Agent Solutions, Inc.**
**208 West State Street**
**Trenton, NJ 08608**

YOU ARE HEREBY COMMANDED to produce to the New Jersey Division of Consumer

Affairs, Office of Consumer Protection ("Division") through Chanel Van Dyke, Deputy Attorney

General, at 124 Halsey Street, 5th Floor, Newark, NJ, 07101, on or before **November 13, 2020**, at

10:00 A.M., the following:

The Documents in the attached Schedule A; and

Your completed Certification of Compliance.

You may produce the Documents and information identified in the attached Schedule A on

or before the return date in electronic form, in a format compliant with Exhibit A, to Chanel Van

Dyke,    Deputy    Attorney    General,    who    may    be    contacted    by    email    at

1

Chanel.VanDyke@law.njoag.gov. In the alternative, You may produce the Documents and information identified in the attached Schedule A on or before the return date at the address listed above by Certified Mail, Return Receipt Requested, addressed to the attention of Chanel Van Dyke, Deputy Attorney General.  You may, at Your option and expense, provide certified, true copies in lieu of the original Documents identified in the attached Schedule by completing and returning the Certification attached hereto.

Failure to comply with this Subpoena may render You liable for contempt of Court and such other penalties as provided by law.  This Subpoena is issued pursuant to the authority of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226, specifically N.J.S.A. 56:8-3 and 56:8-4.

Date:   10/13/20

   /s/ Chanel Van Dyke
Chanel Van Dyke
Deputy Attorney General

2

**<u>PROOF OF SERVICE</u>**

I, _____, being of full age, certify that on _____,

2020, at approximately, _____, I served the within Subpoena on

_____ at _____, by exhibiting the

Subpoena to _____ and leaving a true copy thereof with said individual.

I certify that the foregoing statements made by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

Dated: _____, 2020                    _____

1

## CERTIFICATION OF COMPLIANCE

I, _____, certify as follows:

1. I am employed by Smith & Wesson Sales Co., Inc. in the position of
   _____;

2. Smith & Wesson Sales Co., Inc.'s productions and responses to the Subpoena of the Attorney General of the State of New Jersey, dated October 13, 2020 (the "Subpoena") were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete, and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4. Smith & Wesson Sales Co., Inc.'s production and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the Subpoena have been withheld from Smith & Wesson Sales Co., Inc.'s production and responses, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the Subpoena;

7. The Documents contained in Smith & Wesson Sales Co., Inc.'s productions and responses to the Subpoena are authentic, genuine, and what they purport to be;

8. Attached is a true and accurate record of all Persons who prepared and assembled any productions and responses to the Subpoena, all Persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all Persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such Person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:_____

_____
Name (signature)


_____
Name (print)


_____
Title or Position

## INSTRUCTIONS AND DEFINITIONS

### A.   INSTRUCTIONS

1.    The Subpoena requests that follow are continuing in nature, and thus, You have a continuing obligation to timely serve supplemental responses if You locate or obtain additional, more complete, or new information or Documents after Your response is due.

2.    This Subpoena is directed to Smith & Wesson, as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, divisions, subsidiaries, affiliates, successors, assigns, or any other Person(s) acting or purporting to act on its behalf.

3.    Unless otherwise specifically stated, the period of time encompassed by this Subpoena shall be from **October 13, 2010**, up to and Including the date of Your response to the Subpoena.

4.    No Subpoena request(s) should be construed to limit the scope of any other Subpoena request(s), or of any Definition set forth below.  No subpart of any Subpoena request should be construed to limit the scope of any other subpart of such Subpoena request.

5.    Unless otherwise specifically stated, capitalized terms are defined as set forth in the Definitions below.

6.    You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate, or otherwise diminish Your aforementioned preservation obligations.  Nor shall You act, in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under law.  No agreement purporting to modify, limit, or otherwise vary Your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating, or otherwise diminishing such aforementioned preservation obligations, nor shall You act in reliance upon any such agreement, unless a Deputy Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

7.    The Subpoena calls for all responsive Documents or information in Your possession, custody, or control.  This Includes Documents or information possessed or held by any of Your officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, divisions, affiliates, subsidiaries, successors, assigns, or any Persons from whom You could request Documents or information.  If Documents or information responsive to a request in this Subpoena are in Your control, but not in Your possession or custody, You shall promptly Identify the Person with possession or custody.

8.      If there are no Documents responsive to any particular Subpoena request, You shall so certify in writing in the Certification of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

9.      When a Subpoena request requires both privileged and non-privileged Documents, the non-privileged Documents must be produced to the fullest extent possible without thereby disclosing the privileged Documents.   When a response Includes Documents that have been redacted or otherwise altered on the basis of privilege, any redaction or alteration must be clearly visible on the Document.

10.     If a Subpoena request requires the production of Documents the form and/or content of which has changed over the relevant period, You must identify the period of time during which each such Document was used and/or otherwise was in effect.

11.     Unless otherwise specifically indicated, each and every Document produced shall be Bates-stamped or Bates-labeled or otherwise consecutively numbered, without disrupting or altering the form, sequence, organization, or other order or layout in which such Documents were maintained before production, and the Person making such production shall Identify the corresponding Subpoena request number(s) to which each Document or group of Documents responds.

12.     Electronically Stored Information should be produced in the format specified in the attached Exhibit A.

13.     Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization, or other order or layout in which it was maintained before production, Including production of any Document or other material indicating filing or other organization. Such production shall Include any file folder, file jacket, cover, or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Likewise, all Documents that are physically attached to each other in Your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

14.     For each Document withheld from production on the ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, You shall insert one or more placeholder page(s) in the production bearing the same Bates number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

15.     If one or more Documents or any portions thereof requested herein are withheld under a claim of privilege or otherwise, identify each Document or portion thereof as to which the objection is made, together with the following information:

        a.      The Bates-stamp, Bates-label, or other consecutive numbering of the Document or portion thereof as to which the objection is made;

4

b.    Each author or maker of the Document;

c.    Each addressee or recipient of the Document or Person to whom its contents were disclosed or explained;

d.    The date thereof;

e.    The title or description of the general nature of the subject matter of the Document and the number of pages;

f.    The present location of the Document;

g.    Each Person who has possession, custody, or control of the Document;

h.    The legal ground for withholding or redacting the Document; and

i.    If the legal ground is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

16.    In the event that any Document which would have been responsive to this Subpoena was formerly in Your possession, custody, or control but is no longer available, no longer exists, or has been destroyed or discarded, Identify that Document and also Include:

a.    A detailed description of the nature of such Document and its contents;

b.    The Identity of the Person(s) who prepared such Document and its contents;

c.    The Identity of the Person(s) who have seen or had possession of such Document;

d.    The date(s) on which such Document was prepared, transmitted, or received;

e.    The date(s) on which such Document became unavailable;

f.    The reason why such Document is unavailable, Including whether it was misplaced, destroyed, discarded, or transferred;

g.    For each such Document destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and/or performing such destruction or transfer; and

h.    The Identity of all Persons with knowledge of any portion of the contents of the Document.

18.     A copy of the Certification of Compliance provided herewith shall be completed and executed by all natural Persons supervising or participating in compliance with this Subpoena, and You shall submit such executed Certification(s) of Compliance with Your response to this Subpoena.

19.     In a schedule attached to the Certification of Compliance provided herewith, You shall Identify the natural Person(s) who prepared or assembled any productions or responses to this Subpoena.  You shall further Identify the natural Person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred.  You shall further Identify all other natural Person(s) able competently to testify:  (a) that such productions and responses are complete and correct to the best of such Person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be.

20.     You shall produce a copy of all written or otherwise recorded instructions prepared by You concerning the steps taken to respond to this Subpoena.  For any unrecorded instructions given, You shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

21.     No agreement purporting to modify, limit, or otherwise vary this Subpoena shall be valid or binding, and You shall not act in reliance upon any such agreement, unless a Deputy Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

## B.   **DEFINITIONS**

1.     "Advertisement" shall be defined in accordance with N.J.S.A. 56:8-1(a) and/or N.J.A.C. 13:45A-9.1, and Includes the Smith & Wesson Website, mailings, brochures, catalogs, periodicals, activity on Social Media, sponsored content, promotional materials, podcast content, and activity on the internet.  This definition applies to other forms of the word "Advertisement," Including "Advertise(s)" and "Advertising."

2.     "All" means each and every.

3.     "Any" includes "all" and vice versa.

4.     "Claim(s)" means All statements, representations, implications, messages, or suggestions made by Any Advertisement, commercial, endorsement, or other Communication.

5.     "Communication(s)" means any conversation, discussion, letter, email, text message, Social Media message or post, memorandum, meeting, note, picture, post, blog, or any other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means, and shall Include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.  Except where otherwise stated, a request for "Communications" means a request for All such Communications.

6.     "Compensation" means a payment in monies, digital currency, or other items for a provision of Firearms, or other goods, services, or Merchandise.

7.      "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing, or constituting.

8.      "Consumer(s)" refers to any Person who is offered Merchandise for Sale.

9.      "Custodian" means any Person that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled a Document.

10.     "Document(s)" Includes All writings, word processing documents, records saved as a .pdf, spreadsheets, charts, presentations, graphics/drawings, images, emails and any attachments, instant messages, text messages, phone records, websites, audio files, and any other Electronically Stored Information.  Documents Include originals and non-identical duplicates.  If a printout of an electronic record is a non-identical copy of the electronic version (for example, because the printout has a signature, handwritten notation, other mark, or attachment not included in the computer Document), both the electronic version in which the Document was created and the non-identical copy Document must be produced.

11.     "Electronically Stored Information" means any Document or information stored or maintained in electronic format.

12.     "Firearm(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(f).

13.     "Handgun(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(k).

14.     "Identify," "Identity," or "Identification" as applied to a Person, means to give, to the extent known, the Person's: (a) full legal name, any aliases, or d/b/a, former, or other names; (b) any parent, subsidiary, officers, employees, or agents thereof; (c) present or last known mailing and physical address(es), email address(es), and any telephone number(s); and (d) when referring to a natural Person, the present or last known place of employment.

15.     "Include" and "Including" shall be construed as broadly as possible and shall mean "without limitation."

16.     "Merchandise" shall be defined in accordance with N.J.S.A. 56:8-1(c) and/or N.J.A.C. 13:45A-9.1, and shall Include Firearms.

17.     "New Jersey" refers to the State of New Jersey.

18.     "New Jersey Consumer(s)" refers to Consumers who reside in New Jersey, maintain a New Jersey IP address, and/or maintain a New Jersey shipping address.

19.     "Person(s)" shall be defined in accordance with N.J.S.A. 56:8-1(d).

20.     "Policies" shall Include any procedures, practices, and/or established courses of action, whether written or oral.

21.     "Retail Dealer(s)" shall be defined in accordance with N.J.S.A. 2C:39-1(l).

22.     "Sale(s)" shall be defined in accordance with N.J.S.A. 56:8-1(e).

23.     "Smith & Wesson" means Smith & Wesson Sales Co., Inc., a/k/a American Outdoor Brands Sales Co., a/k/a Smith & Wesson Corp. and any of their predecessors, successors, assigns, present or former parents, subsidiaries, or affiliates, whether direct or indirect; and all owners, directors, officers, shareholders, founders, partners, managers, employees, agents, servants, contractors, consultants, representatives, and attorneys of the foregoing, or any other Persons associated with or acting on behalf of the foregoing, or acting on behalf of any predecessors, successors, assigns, parents, subsidiaries, or affiliates of the foregoing.

24.     "Smith & Wesson Website" means the websites located at https://www.smith-wesson.com/ and https://www.aob.com/, as well as any other website owned or controlled by Smith & Wesson through which it Advertises Merchandise.

25.     "Social Media" means any websites and applications that enable users to create and store content or to participate in social networking, Including Facebook, Instagram, Snapchat, TikTok, Twitter, Pinterest, and YouTube.

26.     "You" and "Your" mean Smith & Wesson.

27.     The use of the singular form of any word used herein shall include the plural and vice versa.  The use of any tense of any verb includes all other tenses of the verb.

28.     As used herein, the conjunctions "and" and "or" shall be interpreted conjunctively and shall not be interpreted disjunctively to exclude any information or Documents otherwise within the scope of this Subpoena.  References to the singular include the plural and references to the plural include the singular.

## SCHEDULE A
## DOCUMENT REQUESTS

1.  True, accurate, and complete copies of all Advertisements for Your Merchandise that are or were available or accessible in New Jersey Concerning home safety, concealed carry, personal protection, personal defense, personal safety, or home defense benefits of a Firearm, including a Smith & Wesson Firearm.

2.  True, accurate, and complete copies of all versions and drafts of each Advertisement produced in response to Request No. 1 above.

3.  All Documents Concerning any test, study, analysis, or evaluation considered or undertaken, whether by You, on Your behalf, or by a third party, which relates to, addresses, evaluates, proves, disproves, or substantiates any Claim made in the Advertisements produced in response to Request Nos. 1 or 2, Including Documents Concerning safety, risks, or performance of the Firearms depicted in such Advertisements.

4.  All Documents Concerning the following topics:

    a.  Whether Smith & Wesson Firearms can be legally carried and concealed by any Consumer, Including by New Jersey Consumers, while in New Jersey;

    b.  Whether the concealed carry of a Firearm enhances one's lifestyle;

    c.  Whether it is safer to confront a perceived threat by drawing a Firearm rather than seeking to move away from and avoid the source of the perceived threat;

    d.  Whether having a Smith & Wesson Firearm or other Firearm makes a home safer;

    e.  Whether Smith & Wesson Firearms are designed to be more safe, reliable, accurate, or effective than Firearms made by other Firearm manufacturers for use in personal or home defense or other activities; and

    f.  Whether novice, untrained Consumers could successfully and effectively use a Smith & Wesson Firearm for personal or home defense.

5.  All Documents, Including Policies, reports, and findings, Concerning any efforts by You to determine whether Your Advertisement of Merchandise complies with New Jersey law. If the Documents have changed over time, identify the time period during which each Document produced was used by or on behalf of You.

6.  All Documents Concerning the public or personal health, safety, or other risks of: (a) keeping a Firearm in the home, (b) carrying a Firearm in public in New Jersey or elsewhere; or (c) drawing a Firearm in response to a perceived threat. Such Documents Include any studies, reports, news articles, surveys, or Communications, whether created by You, on Your behalf, or by a third party, Including Documents Concerning best practices for mitigating any such risks.

7.    True and correct copies of Your organizational charts for each division (and each department therein) which were responsible for the creation, development, or approval of the Advertisements produced in response to Request Nos. 1 or 2, or the Advertising, marketing, promotion, or Sale of any Firearm depicted in such Advertisements.

8.    All Documents, Including contracts, agreements, and Communications between You and any Advertising agency or any other Person employed or retained to assist You, or which did assist You, in creating, developing, approving, maintaining, marketing, or distributing any of the Advertisements produced in response to Request Nos. 1 or 2, Concerning such Advertisements, Including all Compensation provided by You for any such services.

9.    All Documents Concerning All models of Firearms manufactured by You that were sold to New Jersey Consumers, and the total Compensation received by You for the Sale of Firearms manufactured by You that were sold to New Jersey Consumers.

10.   All Documents, Including contracts and agreements, Concerning any arrangements with any Person, Including Retail Dealers, to sell Your Firearms or other Merchandise in New Jersey.

11.   All Documents reflecting contracts, agreements, or arrangements with any Person, Including Retail Dealers, to use Your Trademark, Advertise Your Merchandise, or otherwise make statements about Your Merchandise or Firearms to Consumers, Including New Jersey Consumers.

12.   All Documents Concerning:

    a.    any agreement or authorization provided by Smith & Wesson to permit New Jersey Retail Dealers to include the Smith & Wesson logo or trademark, Smith & Wesson Advertisements, or links to the Smith & Wesson Website on their websites or in other Advertising or Communications;

    b.    any coordination, assistance, training, or approval provided by Smith & Wesson to Persons in New Jersey, Including Retail Dealers, Concerning the Advertisement, marketing, promotion, and/or Sale of Smith & Wesson Firearms;

    d.    any training or promotional materials (Including product displays and customer events) provided by Smith & Wesson to Persons in New Jersey, Including Retail Dealers, Concerning the Advertisement, marketing, and/or Sale of Smith & Wesson Firearms.

13.   Documents Concerning Smith & Wesson's sponsorship, presence, or participation in any Firearm shows, exhibitions, or competitions held in New Jersey.

14.   All contracts and agreements between You and any third parties Concerning the development, approval, and/or broadcast in whole or in part in New Jersey of the Advertisements produced in response to Request Nos. 1 or 2, Including all Compensation provided by You for any such services.

15. Documents Concerning any Communications by You or on Your behalf with any television network, cable television, digital media, Social Media, radio, or other commercial platform relating to the Advertisements available to or accessible by New Jersey Consumers which relate to the Advertisements produced in response to Request Nos. 1 or 2, Including drafts of such Documents.

16. Documents Concerning marketing strategies related to the Advertisements produced in response to Request Nos. 1 or 2, Including any efforts to distribute or display the Advertisements on the internet, any algorithms used for the Advertisements' distribution or dissemination, and any research used to Identify and/or target the Persons or demographics that the Advertisements would reach.

17. Documents Concerning any integrated marketing strategy using different Advertising venues to reach intended audiences and market Your Firearms in the United States, Including New Jersey.

# Exhibit 2

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:    Chanel Van Dyke (165022015)
       Deputy Attorney General
       (973) 648-7819
       Chanel.VanDyke@law.njoag.gov

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
ESSEX COUNTY
DOCKET NO. _____

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, and KAITLIN A. CARUSO, Acting Director of the New Jersey Division of Consumer Affairs, <br><br> Plaintiffs, <br><br> v. <br><br> SMITH & WESSON SALES CO., INC., a/k/a AMERICAN OUTDOOR BRANDS SALES CO., a/k/a SMITH & WESSON CORP., <br><br> Defendant. | Civil Action <br><br> **VERIFIED COMPLAINT** |

Plaintiffs Gurbir S. Grewal, Attorney General of the State of New Jersey ("Attorney General"), and Kaitlin A. Caruso, Acting Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs"), by way of this Verified Complaint state:

## PRELIMINARY STATEMENT

1.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226 ("CFA"), provides the Attorney General with broad authority to investigate possible deceptive practices in the advertisement, offering for sale, and sale of merchandise. To effectuate that authority, the CFA,

specifically N.J.S.A. 56:8-3 to -4, authorizes the Attorney General to issue subpoenas to any person
to determine whether the CFA and related statutes and regulations have, in fact, been violated. In
the event a person fails to respond to such subpoena, the CFA, specifically N.J.S.A. 56:8-6,
authorizes the Attorney General to obtain from the Superior Court an Order, among other things,
directing the person to respond to the subpoena and restraining the person from engaging in the
advertisement, offering for sale, and sale of merchandise until a response has been provided.

2.      On October 13, 2020, the Division issued an Administrative Subpoena Duces
Tecum ("Subpoena") to Smith & Wesson Sales Co., Inc., a/k/a American Outdoor Brands Sales
Co., a/k/a Smith & Wesson Corp. ("Smith & Wesson" or "Defendant") requesting documents
regarding Smith & Wesson's advertising and marketing of firearms. To date, Defendant has
refused to produce any documents in response to the Subpoena. Pursuant to N.J.S.A. 56:8-8 and
R. 4:67-1(a), Plaintiffs are entitled to summary relief requiring Defendant to appear and show
cause why it should not be held in contempt and why it should not be required to immediately
produce all documents requested in the Subpoena.

## JURISDICTION AND PARTIES

3.      The Attorney General is charged with the responsibility of enforcing the CFA, and
the Director is charged with the responsibility of administering the CFA on behalf of the Attorney
General. The Attorney General and the Director have offices located at 124 Halsey Street, Newark,
New Jersey.

4.      This action is brought by Plaintiffs pursuant to their authority under the CFA,
specifically N.J.S.A. 56:8-4 and 56:8-6, and the New Jersey Rules Governing Civil Practice,
specifically R. 1:9-6(b) and R. 4:67-1. Venue is proper in Essex County, pursuant to R. 4:3-2,
because it is a county in which Plaintiffs reside.

2

5.      Defendant Smith & Wesson is a for-profit corporation established in Delaware that registered to do business in New Jersey on March 5, 2000.  Smith & Wesson maintains a principal place of business at 2100 Roosevelt Avenue, Springfield, Massachusetts 01104.

6.      Smith & Wesson's registered agent in New Jersey is Registered Agent Solutions, Inc., which maintains a mailing address at 208 West State Street, Trenton, New Jersey 08608.

## GENERAL ALLEGATIONS

7.      The Attorney General is charged with protecting consumers from commercial practices that violate the CFA, including advertising practices that mislead or fail to disclose material facts about merchandise, including firearms.

8.      The Division commenced an investigation of Smith & Wesson to determine whether certain of its advertising and marketing practices violated the CFA and the Advertising Regulations or Hazardous Products Regulations promulgated thereunder.

9.      The preliminary investigation suggests that certain of Smith & Wesson's firearms advertisements and marketing available to New Jersey consumers may misrepresent the impact owning a firearm has on personal safety and/or safety in the home. In addition, certain of Smith & Wesson's advertisements to New Jersey consumers depict and market the concealed carry of firearms while omitting the material fact that, in New Jersey, concealed carry of a firearm requires a permit.

10.     On October 14, 2020, the Division served the Subpoena on Smith & Wesson's registered agent in New Jersey.  Among other things, the Subpoena sought copies of certain Smith & Wesson's advertisements and documents substantiating the safety-related claims depicted therein.

11.     The Subpoena set a November 13, 2020 deadline for Smith & Wesson to respond.

3

12.    On November 3, 2020, Smith & Wesson requested a thirty-day extension to respond to the Subpoena.  When asked for an explanation regarding why such an extension was necessary, an Assistant General Counsel for Smith & Wesson described the request as "modest" and responded that "we are just not in a position yet to provide any meaningful clarity."  The Division agreed to extend the return date to December 14, 2020.

13.    In a letter dated December 14, 2020, Smith & Wesson stated that it was refusing to produce any documents in response to the Subpoena.  It did not propose any modifications to the Subpoena's scope or otherwise engage in a good-faith dialogue; nor did it move to quash the Subpoena.

14.    Rather than filing a motion to quash the filing of the Attorney General and Director's Subpoena in this Court, on December 15, 2020, Smith & Wesson filed suit in the United States District Court for the District of New Jersey against the Attorney General and the Division, Smith & Wesson Brands. Inc. v. Grewal, 20-cv-19047 (D.N.J.).  In that action, Smith & Wesson alleges that the issuance of the Subpoena investigating potentially misleading or deceptive advertising impacting New Jersey consumers violates the U.S. Constitution.  Among other things, Smith & Wesson claims that as a firearms manufacturer, the representations and depictions it made in its advertising constitute constitutionally protected opinion immune from investigation for violation of CFA and other state laws.  Through its preemptive action, Smith & Wesson not only has engaged in forum shopping, but seeks to avoid any investigation into the lawfulness of its conduct under New Jersey law.

15.    To date, Smith & Wesson has failed to produce any documents in response to the Subpoena.

4

## COUNT I

### VIOLATION OF THE CFA BY DEFENDANT
### (FAILURE TO COMPLY WITH THE SUBPOENA)

16.     Plaintiffs repeat and reallege paragraphs 1 through 15 as if more fully set forth herein.

17.     The CFA prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . .

> [N.J.S.A. 56:8-2.]

18.     Under the CFA, the Attorney General has broad investigatory authority to investigate potential violations.  Among other things, the CFA provides that:

> When it shall appear to the Attorney General that a person has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful by this act, or when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in or is about to engage in, any such practice, he may . . .

> (c) Examine any merchandise or sample thereof, record, book, document, account or paper as he may deem necessary . . . .

> [N.J.S.A. 56:8-3.]

19.     In this regard, the CFA authorizes the Attorney General to issue subpoenas to any person:

> To accomplish the objectives and to carry out the duties prescribed by this act, the Attorney General . . . may issue subpoenas to any person, administer an oath or affirmation to any person, conduct hearings in aid of any investigation or inquiry, promulgate such rules and regulations, and prescribe such forms as may be necessary, which shall have the force of law.

5

[N.J.S.A. 56:8-4.]

20.     The CFA addresses the failure or refusal of a person to obey a subpoena issued by

the Attorney General and provides:

> If any person shall fail or refuse to file any statement or report, or
> obey any subpoena issued by the Attorney General, the Attorney
> General may apply to the Superior Court and obtain an order:
>
> (a)     Adjudging such person in contempt of court;
>
> (b)     Granting injunctive relief without notice restraining the sale
> or advertisement of any merchandise by such persons;
>
> (c)     Vacating, annulling, or suspending the corporate charter of
> a corporation created by or under the laws of this State or
> revoking or suspending the certificate of authority to do
> business in this State of a foreign corporation or revoking or
> suspending any other licenses, permits or certificates issued
> pursuant to law to such person which are used to further the
> allegedly unlawful practice; and
>
> (d)     Granting such other relief as may be required; until the
> person files the statement or report, or obeys the subpoena.

[N.J.S.A. 56:8-6.]

21.     Defendant is a "person" within the meaning of the CFA, specifically N.J.S.A. 56:8-

1(d).

22.     At all relevant times, Defendant has been engaged in the advertisement, offering

for sale, and sale of firearms, which comprise merchandise within the meaning of the CFA,

specifically N.J.S.A. 56:8-1(c).

23.     The Subpoena was issued pursuant to the Attorney General's authority under the

CFA, specifically N.J.S.A. 56:8-3 and 56:8-4.

24.     Defendant has violated the CFA by failing to produce the documents requested in

the Subpoena.

6

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that

the Court enter an Order:

(a)   Adjudging Defendant in contempt of Court for failing or refusing to obey the Subpoena;

(b)   Restraining Defendant from engaging in the advertisement, offering for sale, or sale of any merchandise until it fully responds to the Subpoena;

(c)   Directing Defendant to respond fully to the Subpoena within ten (10) days;

(d)   Enjoining the destruction of any documents specifically requested in the Subpoena;

(e)   Directing that this matter be heard in a summary manner pursuant to the provisions of N.J.S.A. 56:8-8 and R. 4:67-1(a);

(f)   Directing the assessment of costs and fees, including attorneys' fees, against the Defendant for the use of the State of New Jersey, as authorized by N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

(g)   Granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Chanel Van Dyke_

Chanel Van Dyke
Deputy Attorney General

Dated: February __, 2021
Newark, New Jersey

7

## RULE 4:5-1 CERTIFICATION

I certify to the best of my information and belief, the matter in controversy in this action involving the aforementioned potential violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226, is the subject of an action pending in the United States District Court for the District of New Jersey, Smith & Wesson Brands, Inc. v. Grewal, 20-cv-19047.

I further certify that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I certify that there is no other party who should be joined in this action at this time.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By:  Chanel Van Dyke

Chanel Van Dyke
Deputy Attorney General

Dated: February 12, 2021
Newark, New Jersey

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Chanel Van Dyke
Deputy Attorney General

Dated: February 12, 2021
        Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Chanel Van Dyke, Deputy Attorney General, is hereby designated as trial counsel on behalf of the Plaintiffs.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Chanel Van Dyke
Deputy Attorney General

Dated: February 12, 2021
        Newark, New Jersey

9

## VERIFICATION

I, Aziza Salikhova, of full age, hereby certify as follows:

1.      I am an Investigator with the New Jersey Division of Consumer Affairs ("Division"), Office of Consumer Protection.

2.      I have read the foregoing Verified Complaint and on my own personal knowledge and review of documents in possession of the Division, I know that the facts set forth herein are true and they are incorporated in this certification by reference, except for those alleged upon information and belief.

3.      I certify that the above statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Aziza Salikhova

Dated: February 11, 2021
       Newark, New Jersey

10

# Exhibit 3

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:     Chanel Van Dyke (165022015)
        Deputy Attorney General
        (973) 648-7819
        Chanel.VanDyke@law.njoag.gov

|  |  |
|---|---|
|  | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION,<br>ESSEX COUNTY<br>DOCKET NO. _C-25-21_____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, and KAITLIN A. CARUSO, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>                                    Plaintiffs,<br><br>              v.<br><br>SMITH & WESSON SALES CO., INC., a/k/a AMERICAN OUTDOOR BRANDS SALES CO., a/k/a SMITH & WESSON CORP.,<br>                                    Defendant. | Civil Action<br><br><br>**ORDER TO SHOW CAUSE**<br>**<u>SUMMARY ACTION</u>** |

THIS MATTER being brought before the Court by Chanel Van Dyke, Deputy Attorney General, for plaintiffs Gurbir S. Grewal, Attorney General of the State of New Jersey, and Kaitlin A. Caruso, Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs"), seeking relief by way of summary action pursuant R. 4:67-1(a), based upon facts set forth in the Verified Complaint, Brief and supporting Certification filed herewith; and the Court

having determined that this matter may be commenced by Order to Show Cause as a summary proceeding pursuant to N.J.S.A. 56:8-8, and for good cause shown:

**It is on this _22d__ day of _February___, 2021 ORDERED** that defendant Smith & Wesson Sales Co., Inc. ("Smith & Wesson" or "Defendant") appear and show cause before the Superior Court of New Jersey, Essex County, Chancery Division, General Equity Part, at 212 Washington Street, Newark, New Jersey 07102, subject to the Order of the Honorable Glenn A. Grant, J.A.D. dated November 17, 2020, at **2_** o'clock in the afternoon_ or as soon thereafter as counsel can be heard, on the **18th_**day of **_March_,** 2021, why judgment should not be entered:

A.   Adjudging the Defendant to be held in contempt of Court for failing or refusing to obey the Administrative Subpoena Duces Tecum ("Subpoena") issued on October 13, 2020;

B.   Restraining the Defendant from engaging in the advertisement or sale of any merchandise until it fully responds to the Subpoena;

C.   Directing the Defendant to respond fully to the Subpoena within ten (10) days;

D.   Enjoining the destruction of any documents specifically requested in the Subpoena;

E.   Directing that this matter be heard in a summary manner pursuant to the provisions of N.J.S.A. 56:8-8 and R. 4:67-1(a);

F.   Directing the assessment of costs and fees, including attorneys' fees, against the Defendant for the use of the State of New Jersey, as authorized by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

G.   Granting such other relief as the interests of justice may require.

**And it is further ORDERED that:**

1.     A copy of this Order to Show Cause, Verified Complaint, Brief, and supporting Certification submitted in support of this application be served upon the Defendant personally (or by other means ) within  **5**__ days of the date hereof, in accordance with R. 4:4-3 and R. 4:4-4, this being original process.

2.     Plaintiffs must file with the Court the proof of service of the pleadings on the Defendant no later than three (3) days before the return date.

3.     Defendant shall file and serve a written Answer, an Affidavit, or Brief where necessary or a motion returnable on the return date to this Order to Show Cause and the relief requested in the Verified Complaint and proof of service by **March 11**_, 2021.  The Answer, Affidavit, or Brief as the case may be, must be filed with the Clerk of the Superior Court in the county listed above, and a copy of the papers must be sent directly to the Chambers of Judge _**Alper**___.

4.     Plaintiffs must file and serve any written reply to Defendant's Order to Show Cause opposition by **March 16** , 2021.  The reply papers must be filed with the Clerk of the Superior Court in the county listed above, and a copy of the reply papers must be sent directly to the Chambers of Judge **Alper**__.

5.     If the Defendant does not file and serve opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiffs file a proof of service and a proposed form of Order at least three (3) days prior to the return date.

6.      If Plaintiffs have not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3) days before the return date.

7.      Defendant takes notice that Plaintiffs have filed a lawsuit against them in the Superior Court of New Jersey.  The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit.  If you dispute the Verified Complaint, you, or your attorney, must file a written Answer to the Verified Complaint and proof of service within thirty-five (35) days from the date of service of this Order to Show Cause; not counting the day you received it.

These documents must be filed with the Clerk of the Superior Court in the county listed above.  A directory of these offices is available with the Civil Division Management Office in the county list above and online at: http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.  Include a $____ ___ filing fee payable to the "Treasurer State of New Jersey."  You must also send a copy of your Answer to the Plaintiffs' attorney whose name and address appear above.  A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default.  Please note:  Opposition to the Order to Show Cause is not an Answer, and you must file both.  Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter a default against you for the relief Plaintiffs demand.

8.      If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).  If you do not have an attorney and are both eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.  A directory with contact information for local Legal Services Offices and Lawyer Referral

4

Services is available in the Civil Division Management Office in the county listed above and online at http://judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

9.      The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than __**2**__ days before the return date.

/s/ Jodi Lee Alper

HON.        JODI        LEE        ALPER
_____, J.S.C.

5

# Exhibit 4

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
ESSEX COUNTY
DOCKET NO. _____

GURBIR S. GREWAL, Attorney General of the State
of New Jersey, and KAITLIN A. CARUSO, Acting
Director of the New Jersey Division of Consumer
Affairs,

Plaintiffs,

v.

SMITH & WESSON SALES CO., INC., a/k/a
AMERICAN OUTDOOR BRANDS SALES CO.,
a/k/a SMITH & WESSON CORP.,

Defendant.

Civil Action

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF ORDER TO SHOW CAUSE

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs
(973) 648-7819
Chanel.VanDyke@law.njoag.gov

Chanel Van Dyke (165022015)
Deputy Attorney General
Of Counsel and On the Brief

## PRELIMINARY STATEMENT

The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226 ("CFA"), provides the Attorney General with broad authority to investigate deceptive practices in the advertisement, offering for sale, and sale of merchandise. Accordingly, the CFA, specifically N.J.S.A. 56:8-3 to -4, authorizes the Attorney General to issue subpoenas to any person to determine whether the CFA has been violated. In the event a person fails to obey such subpoena, the CFA, specifically 56:8-6, authorizes the Attorney General to obtain from the Superior Court an Order, among other things, directing the person to respond to the subpoena and restraining the person from engaging in the advertisement, offering for sale, and sale of merchandise until a response has been provided.

Firearm manufacturers are not uniquely exempt from the CFA's general prohibition on any person employing any unconscionable commercial practice, deception, fraud, or other unlawful practice in connection with the sale or advertisement of any merchandise. Like sellers of other merchandise, firearm manufacturers cannot deceive consumers with impunity. And the Attorney General of New Jersey ("Attorney General") and the New Jersey Division of Consumer Affairs ("Division") are authorized to investigate potential violations of the law by firearm manufacturers just as they are authorized to investigate potential violations by other manufacturers—to determine, for instance, whether and to what extent a manufacturer's advertisements contain false or misleading statements about a product's benefits and safety, whether the manufacturer possesses information belying its public claims, and whether the manufacturer's advertisements omit material information.

Defendant Smith & Wesson Sales Co., Inc., a/k/a American Outdoor Brands Sales Co., a/k/a Smith & Wesson Corp. ("Smith & Wesson" or "Defendant") claims that it is above the law— that it can deceive consumers and potential consumers of its products without consequence and that the company need not answer to those charged with enforcing the law. Smith & Wesson is

clearly wrong, and its outright refusal to comply with an administrative subpoena lawfully issued by the Attorney General and the Division demands the Court's prompt intervention.

On October 13, 2020, the Division issued an Administrative Subpoena Duces Tecum ("Subpoena") to Smith & Wesson requesting documents regarding Smith & Wesson's advertising and marketing of firearms. Thereafter, Smith & Wesson requested a one-month extension of the deadline to respond to the subpoena only to later state that it did not intend to comply with the subpoena. Instead, Smith & Wesson filed an action in the United States District Court for the District of New Jersey claiming that the Division's mere issuance of the subpoena violates the U.S. Constitution. Irrespective of the merits of that action—and the action is meritless—its filing does not obviate Smith & Wesson's obligation to timely comply with the subpoena in accordance with New Jersey law.

Because Smith & Wesson has refused to produce a single document in response to the Subpoena to date, Plaintiffs Gurbir S. Grewal, Attorney General, and Kaitlin A. Caruso, Acting Director of the Division (collectively, "Plaintiffs"), request entry of an Order to Show Cause that, among other things, directs Defendant's complete responses to the document requests within the Subpoena pursuant to N.J.S.A. 56:8-6 and R. 4:67-1(a).

## STATEMENT OF FACTS

Smith & Wesson is a Delaware corporation registered to do business in New Jersey. (Certification of Chanel Van Dyke, dated February 12, 2021 ("Van Dyke Cert.") ¶4, Exh. A.) Smith & Wesson manufactures, advertises, and sells firearms, among other merchandise. (Id. ¶5.) The Division commenced an investigation of Smith & Wesson to determine whether certain of its advertising and marketing practices violated the CFA and the Advertising Regulations or Hazardous Products Regulations promulgated thereunder. (Id. ¶3.) The Division's preliminary investigation suggests that certain of Smith & Wesson's firearms advertisements and marketing

2

available to New Jersey consumers may misrepresent the impact owning a firearm has on personal safety and/or safety in the home. (Id. ¶6.) In addition, certain of Smith & Wesson's advertisements to New Jersey consumers depict and market the concealed carry of firearms while omitting the material fact that, in New Jersey, concealed carry of a firearm requires a permit. (Ibid.)

On October 14, 2020, the Division served a Subpoena on Smith & Wesson's registered agent in New Jersey. (Id. ¶7, Exh. B.) Among other things, the Subpoena sought copies of certain Smith & Wesson advertisements and documents substantiating the safety-related claims depicted therein. (Id. ¶8, Exh. B.) The Subpoena set a November 13, 2020 deadline for Smith & Wesson to respond. (Id. ¶ 7, Exh. B.)

On November 3, 2020, Smith & Wesson requested a thirty-day extension to respond to the Subpoena. (Id. ¶9, Exh. C.) When asked for an explanation regarding why such an extension was necessary, an Assistant General Counsel for Smith & Wesson described the request as "modest" and responded that "we are just not in a position yet to provide any meaningful clarity." (Id. ¶10, Exh. C.) Based on this explanation, the Division agreed to extend the return date to December 14, 2020. (Id. ¶11, Exh. C.)

In a letter dated December 14, 2020, Smith & Wesson stated that it was refusing to produce any documents in response to the Subpoena. (Id. ¶12, Exh. D.) It did not propose any modifications to the Subpoena's scope or otherwise engage in a good-faith dialogue; nor did it move to quash the Subpoena. (Ibid.) Instead, on December 15, 2020, Smith & Wesson filed suit in the United States District Court for the District of New Jersey against the Attorney General and the Division, Smith & Wesson Brands, Inc. v. Grewal, 20-cv-19047 (D.N.J.). (Id. ¶13, Exh. E.) In that action, Smith & Wesson alleges that the issuance of the Subpoena investigating potentially misleading or deceptive advertising available to New Jersey consumers violates the U.S.

3

Constitution. (Ibid.) Among other things, Smith & Wesson claims that as a firearms manufacturer, the representations and depictions it makes in its advertising constitute constitutionally protected opinion immune from investigation for violation of CFA and other state laws. (Ibid.) Through its preemptive action, Smith & Wesson not only has engaged in forum shopping, but seeks to avoid any investigation into the lawfulness of its conduct under New Jersey law.

To date, Smith & Wesson has failed to produce any documents in response to the Subpoena. (Id. ¶14.)

## ARGUMENT

### SMITH & WESSON UNLAWFULLY FAILED TO COMPLY WITH A VALID SUBPOENA ISSUED BY THE ATTORNEY GENERAL AND AUTHORIZED BY THE CFA

The CFA focuses on commercial deception in consumer transactions and provides, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

[N.J.S.A. 56:8-2.]

The CFA defines "person" to include "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate . . . ." N.J.S.A. 56:8-1(d). The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). Pursuant to these comprehensive

4

definitions, Smith & Wesson is a "person" and firearms are "merchandise" for purposes of the CFA.

Notably, "the Legislature passed the [CFA] 'to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer.'" Cox v. Sears Roebuck & Co., 138 N.J. 2, 14 (1994) (quoting legislative history). And the CFA "evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 264 (1997); see also Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985); Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 376-77 (1977). In fact, the CFA "is designed to protect the public even when a merchant acts in good faith." Cox, 138 N.J. at 16 (citation omitted).

To carry out these legislative aims, the CFA provides the Attorney General with broad investigatory authority. The Legislature, through the CFA, "intended to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public." Kugler v. Romain, 58 N.J. 522, 537 (1971). Specifically, the legislative sponsors of the CFA acknowledged the necessity that the Attorney General be able to effectively investigate potential consumer fraud:

> The purpose of the bill is to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer. The authority conferred will provide effective machinery to investigate and prohibit deceptive and fraudulent advertising and selling practices which have caused extensive damage to the public.
>
> [Sponsor's Statement to Senate Bill No. 199, April 11, 1960 (emphasis added).]

Accordingly, the Supreme Court has recognized that the CFA, specifically N.J.S.A. 56:8-3 to -4, provides the Attorney General with "broad powers to investigate" and "subpoena records." Weinberg v. Sprint Corp., 173 N.J. 233, 247-48 (2002) (citing Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 472-473 (1988)).

Under N.J.S.A. 56:8-3,

> When it shall appear to the Attorney General that a person has
> engaged in, is engaging in, or is about to engage in any practice
> declared to be unlawful by this act, or when he believes it to be in
> the public interest that an investigation should be made to ascertain
> whether a person in fact has engaged in, is engaging in or is about
> to engage in, any such practice, he may:
>
> . . . .
>
> (c) Examine any merchandise or sample thereof, record, book,
> document, account or paper as he may deem necessary . . . .

Further, N.J.S.A. 56:8-4 states:

> To accomplish the objectives and to carry out the duties prescribed
> by this act, the Attorney General, in addition to other powers
> conferred upon him by this act, may issue subpoenas to any person,
> . . . which shall have the force of law.

If a person (as defined in N.J.S.A. 56:8-1(d)) fails to obey a subpoena issued pursuant to

the CFA, the Attorney General is empowered to enforce the subpoena through the filing of a

Superior Court action. N.J.S.A. 56:8-6. By way of relief, the Attorney General may apply for an

order:

> (a)   Adjudging such person in contempt of court;
>
> (b)   Granting injunctive relief without notice restraining the sale
>       or advertisement of any merchandise by such persons;
>
> (c)   Vacating, annulling, or suspending the corporate charter of
>       a corporation created by or under the laws of this State or
>       revoking or suspending the certificate of authority to do
>       business in this State of a foreign corporation or revoking or
>       suspending any other licenses, permits or certificates issued
>       pursuant to law to such person which are used to further the
>       allegedly unlawful practice; and
>
> (d)   Granting such other relief as may be required; until the
>       person files the statement or report, or obeys the subpoena.
>
> [Ibid.]

6

Pursuant to this broad grant of authority to investigate potential violations of the CFA, the Division commenced an investigation to determine whether Smith & Wesson's advertising and marketing practices violate the CFA and related regulations. (Van Dyke Cert. ¶3.)  As part of that investigation, the Division served the Subpoena on Smith & Wesson.  (Id. ¶7, Exh. B.)  After initially requesting and receiving an extension, Smith & Wesson stated it was refusing to comply with the Subpoena altogether.  (Id. ¶¶9-12, Exhs. C, D.)  Among other things, Smith & Wesson disputed the merits of any potential future claims still under investigation, asserting, for example, that any deceptive statements in its advertising are constitutionally protected opinions not actionable under the CFA.  (Id. ¶12, Exh. D.)  Defendant further argued, without any factual basis, that the Attorney General and the Division are improperly targeting it because it sells firearms, rather than conducting a valid CFA investigation.  (Ibid.)  The next day, December 15, 2020, Defendant filed its preemptive federal court action, largely parroting the same meritless claims as those in its letter.  (Id. ¶13, Exh. E.)  To date, Defendant has failed to produce any documents in response to the Subpoena.  (Id. ¶14.)

Contrary to Smith & Wesson's claims, the Subpoena is directly related to the Division's ongoing investigation of whether Smith & Wesson employed deceptive or misleading advertising in violation of the CFA.  In short, it is not the product Smith & Wesson sells, but the representations and omissions in its marketing and advertising that are the subject of the investigation.  Smith & Wesson advertises, offers for sale, and sells firearms to New Jersey consumers.  As described, *supra*, certain of Smith & Wesson's advertising may contain misrepresentations or otherwise deceive consumers regarding the impact owning a firearm has on personal safety and/or safety in the home, in violation of the CFA and the Advertising Regulations.  See N.J.S.A. 56:8-2; N.J.A.C. 13:45A-9.2(a)(2), (a)(5).  In addition, certain of its advertisements may also mislead New Jersey

consumers by marketing firearms for use in a manner that is not permissible under New Jersey law without disclosing that fact to New Jersey consumers in violation of the CFA, the Hazardous Products Regulations, and the Advertising Regulations. See N.J.S.A. 56:8-2; N.J.A.C. 13:45A-4.1(b); N.J.A.C. 13:45A-9.2(a)(2), (a)(5). The Subpoena therefore seeks, among other things, documents relating to certain of Smith & Wesson's firearms advertisements and marketing available to New Jersey consumers, including documents regarding the safety-related claims Smith & Wesson made in such advertisements and the advertisements' compliance with and disclosures in accordance with New Jersey law. These documents are essential for the Division's investigation of whether Smith & Wesson's advertising and marketing is misleading or deceptive in violation of the CFA.

For these reasons, neither Smith & Wesson's frivolous objections nor its pending federal action provides a valid basis for the company's refusal to comply with the Subpoena. The investigation of potentially misleading or deceptive advertising falls squarely within the ambit of the Attorney General's authority under the CFA. Smith & Wesson's mere assertion of these claims does not render it immune from investigation under state law. Cf. Exxon Mobil Corp. v. Schneiderman, 316 F. Supp. 3d 679, 686, 695-96 (S.D.N.Y. 2018) (observing that state court required Exxon to produce documents in response to state attorney general's subpoena notwithstanding its filing of federal lawsuit challenging the validity of the subpoena and investigation); Exxon Mobil Corp. v. Attorney Gen., 94 N.E.3d 786, 801-02 (Mass. 2018) (affirming trial court's denial of a motion to stay subpoena enforcement proceedings where a complaint had been filed in federal court because, among other things, the state court was better equipped to apply the state consumer protection statute). Were the rule otherwise, any respondent could avoid compliance with a valid subpoena merely by asserting baseless objections or filing

claims in a federal forum. This Court should not permit Smith & Wesson to so easily evade investigation of its marketing and advertising practices. Accordingly, Plaintiffs are entitled to relief under N.J.S.A. 56:8-6, including an Order directing Defendant to respond to the Subpoena.

## CONCLUSION

For the foregoing reasons, the Attorney General and the Division respectfully request that the Court grant their application and issue an Order: (1) directing that this matter be heard in a summary manner pursuant to N.J.S.A. 56:8-8 and R. 4:67-1(a); (2) adjudging Smith & Wesson in contempt of court for failing to comply with the Subpoena; (3) directing Smith & Wesson to fully comply with the Subpoena in ten days; (4) enjoining the destruction of any documents or information requested by the Subpoena; (5) directing the assessment of costs and fees, including attorneys' fees, against Smith & Wesson; and (6) granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General

Dated: February 12, 2021
Newark, New Jersey

9