EXHIBIT 10

```
                                SUPERIOR COURT OF NEW JERSEY
                                CHANCERY DIV: GENERAL EQ. PART
                                ESSEX COUNTY
                                DOCKET NO.: C-25-21
                                A.D. # _____
```

| | |
|---|---|
| GURBIR S. GREWAL, the New) | |
| Jersey Attorney General, ) | |
| KAITLIN CARUSO, acting   ) | |
| director of New Jersey   ) | |
| Division of Consumer      ) | TRANSCRIPT |
| Affairs,                   ) | OF |
|                            ) | ORDER TO SHOW CAUSE |
|            Plaintiff,      ) | |
|                            ) | |
|            vs.              ) | |
|                            ) | |
| SMITH & WESSON SALES       ) | |
| COMPANY, INC.,             ) | |
|                            ) | |
|            Defendant.      ) | |

```
                         Place: Essex County
                                Wilentz Justice Complex
                                (Heard via Zoom)

                         Date: May 27, 2021


BEFORE:

     HONORABLE JODI LEE ALPER, P.J.Ch.

TRANSCRIPT ORDERED BY:

     AMANDA LAUFER CAMELOTTO, ESQ.,
     (DLA Piper, LLP)

APPEARANCES:

     MAYUR SAXENA, ESQ.
     (Assistant Attorney General)
     Attorney for Plaintiffs

     COURTNEY SALESKI, ESQ.
     (DLA Piper, LLP)
     Attorney for Defendant

                         Transcriber:  Sharon Conover
                         PHOENIX TRANSCRIPTION
                         796 Macopin Road
                         West Milford, NJ 07480
                         (862) 248-0670

                         Audio Recorded
                         Recording Opr: Angela Hart
```

I N D E X

ORDER TO SHOW CAUSE:

ARGUMENTS:

BY:  Mr. Saxena.................................4, 32

BY:  Ms. Saleski.............................18, 48

THE COURT:

Decision...............................to be rendered

1          (Hearing commenced at 10:11 a.m.)

2          THE COURT:  Good morning.  This is the matter

3     of <u>Gurbir Grewal, the Attorney General of the State of</u>

4     <u>New Jersey, and Kaitlin Caruso, acting director of the</u>

5     <u>New Jersey Division of Consumer Affairs versus Smith &</u>

6     <u>Wesson</u>.  The matter is filed under docket number C-25-

7     21.  I'm Judge Jodi Lee Alper.  I sit in the Essex

8     County Chancery Division.  Today is May 27th, 2021.

9     And it is 10:12 a.m.  May I please have appearances of

10    counsel starting with plaintiff's counsel.  Please

11    spell your last names.

12          MR. SAXENA:  Good morning, Your Honor.

13    Assistant Attorney General Mayur Saxena, that's S like

14    Sam, A-X like x-ray E-N like Nancy A, for plaintiffs

15    and movants.

16          THE COURT:  Thank you.  Good morning Mr.

17    Saxena.  And now may I please have appearance of

18    counsel for the defendant.

19          MS. SALESKI:  Good morning, Your Honor.  This

20    is Courtney Saleski, S-A-L-E-S-K-I on behalf of Smith &

21    Wesson.  I believe some of my colleagues are on as well

22    also on behalf of Smith & Wesson.  I will ask if they

23    will identify themselves as well if they can Your

24    Honor.

25          THE COURT:  Well they can, they don't have

1    to.  You'll be the only one arguing.  But certainly if

2    you wish to have their appearances noted, we can do

3    that.

4        MS. SALESKI:  That's not necessary then, Your

5    Honor.  It will only be me arguing, thank you.

6        THE COURT:  Very good, thank you then.  And

7    welcome everybody.  The matter comes before the Court

8    on an Order to Show Cause which was filed on behalf of

9    the Attorney General essentially to enforce a subpoena

10   which was filed pursuant to the New Jersey Division of

11   Consumer Affairs, the Consumer Fraud Act, and a cross

12   motion to dismiss or quash, or stay the subpoena.

13        I will hear first from the Attorney General

14   please on your enforcement action and then I will hear

15   from the defendant on your cross claim or counterclaim

16   and then I will give Mr. Saxena another opportunity to

17   speak.

18        MR. SAXENA:  Thank you, Your Honor.  May it

19   please the Court, I'll start with a brief introduction

20   before turning to the three points I would like to

21   address today.  The key facts in this subpoena

22   enforcement proceeding are undisputed.  The New Jersey

23   Division of Consumer Affairs and the Attorney General

24   served a subpoena on Smith & Wesson in October 2020.

25   The State served that subpoena pursuant to it's broad

1    authority to investigate whether Smith & Wesson is

2    engaging in deceptive advertising in violation of the

3    New Jersey Consumer Fraud Act.

4         The subpoena seeks production of documents

5    and has standard document requests that are routinely

6    used in the State's deceptive advertising

7    investigations.  For example, the first document

8    request seeks copies of Smith & Wesson's

9    advertisements.  And subsequent requests seek documents

10   in Smith & Wesson's possession that substantiate or

11   disprove factual claims made in those advertisements.

12        Smith & Wesson has failed to obey the

13   subpoena, has not produced any documents to date, and

14   has made no effort to meet and confer with the State to

15   discuss it's objections.  Instead, the very next day

16   after sending the State a letter objecting to the

17   subpoena Smith & Wesson challenged the subpoena in

18   federal court.

19        Based on these facts which cannot be

20   meaningful disputed, the State seeks and order

21   directing Smith & Wesson to comply with the subpoena.

22        I would like to express three points to

23   explain why the subpoena should be enforced, and why

24   Smith & Wesson Constitutional objections lack merit.

25   First, the plain language of the subpoena shows that

1    the State seeks documents directly relevant to it's

2    deceptive advertising investigation under the CFA.  And

3    this fact alone defeats Smith & Wesson's main

4    objections under the First and Fourth Amendments.

5            Second, nearly all of Smith & Wesson's

6    Constitutional objections are premature and cannot be

7    adjudicated at this early subpoena enforcement stage.

8    And Smith & Wesson's narrow fall-back objection that

9    the mere production of documents will itself violate

10   constitutional privacy rights has no application here.

11           And third, there is no reason to stay these

12   proceedings, Your Honor, in this Court which is the

13   natural forum for subpoena enforcement as expressly

14   designated by the Consumer Fraud Act.  And especially

15   not for Smith & Wesson's preemptive strike suit in

16   federal court.

17           To begin, it's important to be clear about

18   what exactly the State's subpoena seeks to investigate.

19   Smith & Wesson argues that the subpoena is improperly

20   aimed at investigating it's "advocacy of opinions that

21   firearms are a useful or a good choice for self-

22   defense."  But that is just not the subpoena the State

23   served.  Simply reading the subpoena document requests

24   reveals that the State is not concerned with Smith &

25   Wesson's advocacy or it's opinions.  But rather, with

1   whether the company's factual claims in its advertising

2   are misleading.  The actual subpoena served by the

3   State is much more limited than the strawman Smith &

4   Wesson attacks as an unconstitutional overreach.

5        More specifically, the State's subpoena is

6   directly targeted to investigate two potential CFA

7   violations.  The first is that Smith & Wesson's

8   advertising may violate the CFA and it's regulations by

9   marketing firearms to consumers for the purpose of

10  concealed carry without making disclosures required by

11  regulations.  Namely, a cleaner and conspicuous

12  disclosure that concealed carry of a firearm is

13  unlawful without a permit in New Jersey.

14       The key requests seeking documents relevant

15  to that potential violation are requests one and two

16  which seek copies of the advertisements and request 4A

17  and B, which seek documents concerning specific types

18  of claims that might be made in advertisements

19  marketing firearms for concealed carry.

20       The second potential violation being

21  investigated is that the company's advertisement may

22  mislead consumers regarding the safety, effectiveness,

23  or benefits of owning a Smith & Wesson firearm.  The

24  key requests here are once again requests one and two,

25  which enable us to review the advertisements and assess

1    the factual claims made therein.  And requests three,

2    four, and six, which seek studies, risk assessments and

3    other documents in Smith & Wesson's possession that

4    support or disprove the factual claims made in the

5    advertisements.  These include claims about safety,

6    effectiveness, or benefits of Smith & Wesson firearms

7    for self-defense, home-defense, or even just when

8    compared to other firearms.

9         In short, the subpoena investigates deceptive

10   advertising by requesting copies of advertising, and

11   then by requesting documents in Smith & Wesson's

12   possession that may evidence deception.  This is a

13   tried and true model that the Division has routinely

14   used to investigate deceptive advertising in many

15   different contexts, including advertising of airbags,

16   opioids, medical devices and also firearms, all of

17   which are equally subject to the Consumer Fraud Act.

18        Just this week Judge Paganelli granted

19   summary judgment to the State in a litigation springing

20   from similar subpoena holding that certain

21   advertisements for large-capacity ammunition magazines

22   violated the CFA and its regulations.  That's Grewal v.

23   22 Mods for All Incorporated, Your Honor.

24        The fact that the State's subpoena does in

25   fact seek to investigate deceptive advertising is fatal

1    to Smith & Wesson's main Constitutional defenses.

2    Smith & Wesson's entire argument hinges on establishing

3    that the subpoena does not seek to investigate

4    deceptive advertising, and instead was issued solely

5    for the improper purpose of punishing the company.

6         For example, Smith & Wesson argues that the

7    State is engaging in viewpoint discrimination, but the

8    First Amendment doesn't prohibit a subpoena directed at

9    deceptive advertising  which  is not a protected

10   viewpoint.  Investigating fraud is not viewpoint

11   discrimination against fraudsters.

12        Smith & Wesson also argues that the State's

13   investigation is an unlawful search and seizure, but

14   the Fourth Amendment permits an administrative subpoena

15   on mere suspicion that the law has been violated.  And

16   it requires only that the subpoena document request be

17   reasonably directed at a legitimate purpose and that

18   standard is easily met.

19        Smith & Wesson bases several additional

20   constitutional objections on it's argument that the

21   State issued the subpoena and now seeks to enforce it

22   based on an improper and retaliatory motive.  But of

23   course there's zero plausible allegations of this as

24   detailed at pages 24 and 25 of our opposition brief,

25   and certainly no allegations that would overcome the

1    strong presumption of regularity that a prosecutor has

2    legitimate grounds for the action that he takes.

3         But importantly, even assuming that Smith &

4    Wesson's assertions are true, they still fail to meet

5    the extremely high standard here, which requires

6    showing that the investigation has objectively no

7    independent law enforcement justification and was

8    brought even though the Attorney General knew this and

9    knew there was no violation of law.

10        The standard is high because as the Supreme

11   Court said in <u>Hartman v. Moore</u>, "a party can inflict a

12   public officer with disruption and expense by alleging

13   nothing ore in practical terms, than actually with a

14   retaliatory animus, a subjective condition too easy to

15   claim and too hard to defend against."  That's what

16   Smith & Wesson has tried unsuccessfully to do here,

17   Your Honor.

18        Moving to my second point, Smith & Wesson's

19   remaining Constitutional defenses are premature and

20   cannot be adjudicated at this early stage.  Smith &

21   Wesson argues that courts routinely adjudicate

22   Constitutional objections before requiring the

23   production of documents, but that's not correct.  They

24   actually had it backwards.  Adjudicating Constitutional

25   issues before requiring compliance with the subpoena is

1      a narrow exception and not the rule.

2              Because we're still at the subpoena

3      enforcement stage, all Smith & Wesson needs to do right

4      now is produce responsive documents.  After the

5      Division receives that documents it may file an action

6      to the CFA or it may conclude that no violation has

7      occurred.  So any Constitutional defense that is

8      premised on the State actually applying the CFA to

9      Smith & Wesson is necessarily premature and cannot be

10     adjudicated until a specific claim is actually brought.

11     Nearly all of Smith & Wesson's challenges are as

12     applied Constitutional challenges, but no law has

13     actually been applied to any advertisement yet.

14             For example, Smith & Wesson argues that the

15     subpoena seeks to investigate only non-actionable

16     opinion or puffery, but that argument is entirely

17     hypothetical at this point, because we don't yet know

18     what advertisements will be at issue, let alone which

19     specific statements might violate the CFA.  There is no

20     basis at this stage to conclude that Smith & Wesson's

21     advertising contains no factual claims or only opinion

22     or puffery.  And we certainly can't be expected to take

23     their word for it.  This is especially the case when

24     the City of Gary, Indiana asserted that deceptive

25     advertisement claim against Smith & Wesson based on

1    factual representations about produce safety and claim

2    survived a motion to dismiss for failure to state a

3    claim.

4              As to the Fourth Amendment, similarly Smith &

5    Wesson insists that the State not only show that the

6    subpoena is reasonably related to a legitimate purpose

7    which we've done, but also must proffer exactly what

8    "specific affirmative statements will support the

9    State's hypothetical CFA claims in the future."  And we

10   have to do this without the benefit of any discovery.

11   So initially the CFA doesn't even require affirmative

12   statements to prove a violation, because it embraces

13   knowing omissions and unconscionable commercial

14   practices.

15             But in any case what Smith & Wesson demands

16   is futile, because the State can't intelligently assess

17   without the benefit of document production what our

18   claims will ultimately be, or whether  we're even going

19   to bring claims at all.

20             You know, finally Smith & Wesson argues that

21   the disclosure requirements of the regulations

22   underlying the CFA unlawfully compel speech when

23   they're applied to firearms advertisements.  Again,

24   this is premature, Your Honor.  Smith & Wesson first

25   has to produce the advertisements, and then only if the

1    regulations are applied can it challenge the

2    application.  But in any case, even on the merits, the

3    government compels speech all the time, like the

4    Surgeon General's warning on cigarettes or disclaimers

5    that terms or conditions may apply in certain states.

6         So the authorities that Smith & Wesson relies

7    on actually recognize these well-established exceptions

8    for uncontroversial informational disclosures to

9    consumers about the products that they're buying, like

10   the disclosures that are required under the

11   regulations, consumers like to know that the product

12   they are buying is unlawful to possess absent certain

13   circumstances.

14        So given that most of their arguments are

15   premature at this stage, in it's reply brief Smith &

16   Wesson has turned to a fallback argument, which asserts

17   that the mere production of documents itself will

18   infringe on the Company's First Amendment Rights.  And

19   they rely heavily on NAACP versus Alabama, and two

20   other McCarthy era cases.  All of which address a

21   narrow issue that is just not present here, whether to

22   enforce a subpoena seeking membership lists for the

23   purpose of revealing the identity of suspected

24   communists or other alleged subversive actors.

25        In that unique situation, certain courts have

1        struck down subpoenas before requiring production of

2        documents.  But they've done so where the identifying

3        information sought was (a) not relevant to the

4        investigation; and (b) the disclosure would itself have

5        a chilling effect and thus infringe on associational

6        privacy under the First Amendment.

7                Those are the facts in NAACP, in Gibson and

8        also in Sweezy the main cases that Smith & Wesson

9        relies on.  The remaining cases have similar privacy

10       issues at stake.  And importantly, these are the only

11       cases cited by Smith & Wesson where a Court actually

12       quashes a subpoena before requiring document production

13       based on Constitutional objections.

14               But the State subpoena here just doesn't seek

15       that type of information.  It doesn't seek membership

16       lists or private or sensitive information from

17       individuals so it can't threaten infringement of Smith

18       & Wesson's privacy interest at all.  Smith & Wesson

19       certainly can't assert those types of interests in its

20       advertising which is already public, or in you know

21       studies or analyses relating to claims made in its

22       advertising.

23               One final note on this before I move to the

24       third point on stay, Your Honor, Smith & Wesson has

25       raised additional objections in its opening brief,

1   including under the Second Amendment and the due

2   process and equal protection clauses, but it abandoned

3   those and did not address it in their reply brief, and

4   made no rebuttal of the arguments in the State's

5   opposition brief.  So we would simply stand on those

6   arguments and we respectfully submit that Smith &

7   Wesson can't raise new arguments for the first time at

8   this hearing.

9        Then for my third point, Your Honor, I will

10  address why a stay is not warranted here.  Our

11  opposition brief details why application of the First

12  Filed Rule is not appropriate here.  That's because

13  there are important special equities involved.  Those

14  include the State's strong interest in protecting

15  consumers from potential ongoing fraud or deceptive

16  advertising, which the legislature made a priority when

17  it enacted the CFA, one of the strongest Consumer

18  Protection Laws in the country.

19       They also include the State's ability to

20  obtain prompt relief when a party disobeys one of it's

21  (indiscernible).  Consumer protection investigations

22  under the CFA would mean very little if the State's

23  subpoenas cannot be effectively enforced.

24       And the special equities include Smith &

25  Wesson's attempt at jurisdiction shopping here,

1       especially because their preemptive strike suit in

2       federal court was filed without even an attempt to meet

3       and confer with the State over any objections.  And the

4       filing of the suit precluded the State from being the

5       first to file a subpoena enforcement action in this

6       court.

7               The State is the natural plaintiff here and

8       this Court is the natural forum.  In fact, it's

9       designated as such under the CFA at 56:8-6 which

10      requires that any motion to enforce the subpoena has to

11      be filed with the Superior Court.  So for these reasons

12      granting a stay would be unjust.  And frankly, it would

13      not harm Smith & Wesson at all if this proceeding moves

14      forward.

15              I'll add one more thing on the stay, Your

16      Honor, before wrapping up.  One of the purposes of the

17      First Filed Rule is to avoid needless use of judicial

18      resources.  But if this Court were to accept Smith &

19      Wesson's arguments and to stay the action it would

20      create a perverse incentive for any party who receives

21      a subpoena from the State, to follow Smith & Wesson's

22      lead.  Instead of meeting and conferring, and

23      attempting to resolve disputes, and then only if

24      necessary moving to quash in this Court, everyone would

25      race to federal court like Smith & Wesson did here with

1   a preemptive strike suit to trigger the First Filed

2   Rule.  If that were the law it would discourage meet

3   and confer, which frankly, might have avoided this

4   litigation since Smith & Wesson appears to have badly

5   misunderstood what the State's subpoena seeks to

6   investigate.  And it would create duplicative

7   litigation and delay any subpoena enforcement until the

8   ultimate resolution of whatever federal action was

9   filed.

10        Smith and Wesson concedes here that the

11  federal proceeding could take months if not years to

12  resolve, especially since they've withdrawn their

13  request in the federal action for expedited relief.  So

14  inflexible application of the First Filed Rule would

15  basically disregard all of these special equities and

16  it would vitiate the Attorney General's ability to

17  properly enforce subpoena.

18        We recommend to the Court that our Supreme

19  Court's decision in Sensient Colors on this as well as

20  the Massachusetts Supreme Court decision in the Exxon

21  case both of which declined to stay actions in favor of

22  similar preemptive strike suits.

23        So for those reasons, Your Honor the Division

24  and the Attorney General respectfully the Court denies

25  Smith & Wesson's motion to stay and motion to quash and

1    enforce the State's subpoena.  I'm happy to answer any

2    questions that you have.

3             THE COURT:  Thank you, Mr. Saxena.  I have no

4    questions at the moment.  But I will reserve my right

5    to ask them on your reply argument.  I'll hear now

6    please from counsel for Smith & Weston -- Wesson I'm

7    sorry, Ms. Saleski.

8             MS. SALESKI:  Good morning, again Your Honor.

9    May it please the Court, from our view this is

10   procedurally a simple case.  This Court should stay the

11   matter pending the outcome of the First Filed Federal

12   matter, as it's articulated in cases like the New

13   Jersey Supreme Court case <u>Sensient</u>.

14            This subpoena and the related federal action

15   and this enforcement action present important issues

16   regarding among other this First Amendment speech, and

17   in this case disfavored political speech.  But Your

18   Honor doesn't need to and shouldn't decide the

19   Constitutional and Federal issues right now.  And that

20   is because the proper course here is to stay, which I

21   would like to address first.

22            But even if the Court decided not to stay,

23   the Court must dismiss the complaint and quash the

24   subpoena because the AG has failed to meet his burden

25   to show that the subpoena is reasonably related to a

1    legitimate purpose and the subpoena cannot pass

2    Constitutional scrutiny.  I would like to address that

3    second if that's okay with the Court.

4           Starting the stay, the Court should follow

5    the First Filed Rule here.  The proper course under

6    comity principles is not to exercise jurisdiction, but

7    to adhere to the general rule that the Court which

8    first acquires jurisdiction has precedence in the

9    absence of special equities.  The AG does not dispute

10   that in briefing or here before the Court that the

11   First Filed Rule requirements are met.  Instead the AG

12   tries to demonstrate two compelling special equities

13   that he argues militates against the stay.

14          But he fails to show that such equities here

15   and thus cannot overcome the First Filed Rule.  It's

16   worth noting the circumstances hereto especially

17   because this argument we're hearing about how a meet

18   and confer would've been effective under these

19   circumstances.  That is the federal action was filed

20   two months before this one.  The AG is actively

21   participating in that action.  The AG has offered no

22   reason for the delay in filing this action.  There's a

23   tolling agreement in place with respect to the AG's

24   potential CFA claims.  And he sought and was granted

25   extensions in both courts.

1        There's just no need to proceed today at the

2    speed which the AG requests under these circumstances

3    and we know that from the AG's own conduct.  This is

4    the first time that the AG has argued that prompt

5    relief is a special equity.  It's not.  But under the

6    circumstances if the AG needed prompted relief, he

7    should not have waited two months to file this action.

8    With regards to his special equity arguments that he

9    has in fact raised, first there's forum shopping.

10        The AG argues that this was forum shopping,

11    but cites absolutely no analogous case to support that

12    accusation.  That's because there is no analogous case.

13    Forum shopping generally is when you file an

14    inappropriate forum or one with little to no contacts

15    to avoid a less favorable jurisdiction.  An example is

16    the Supreme Court -- the New Jersey Supreme Court case

17    of Heavner which was cited in a case we cited

18    Performance Motor Cars, that's a good example because

19    in that case the plaintiffs filed in New Jersey to try

20    to get the benefit of New Jersey Products Liability

21    Law.  But they were North Carolina residents.  They

22    bought their car in North Carolina.  They had a car

23    accident in North Carolina.  And that was all the facts

24    that formed the basis of their actions.  They just

25    wanted to get to New Jersey to use New Jersey's

1    Products Liability Law.  That's forum shopping.

2              Filing in Federal Court in New Jersey, a

3    federal action wasn't forum shopping.  It was a filing

4    of a well-founded complaint raising constitutional and

5    federal statutory issues in an appropriate court.  For

6    similar reasons this was not a First Strike maneuver.

7    It was an appropriate time supporting by the cases that

8    we cite in our brief like Louisiana Debating and Teleco

9    Communications to bring a pre-enforcement

10   Constitutional Challenge to Federal Court.

11             No action by the AG was imminent.  As we know

12   they didn't file two more months after Smith & Wesson

13   filed.  And there was no bad faith here.  In fact, the

14   AG doesn't even make a showing, or attempt to make a

15   showing that this was somehow bad faith.  As the New

16   Jersey Supreme Court noted in Sensient the first strike

17   maneuver is about bad faith.

18             The second special equity that the AG tries

19   to establish is a compelling a state interest.  But the

20   AG's argument that there is a compelling state interest

21   in rooting out consumer fraud doesn't add to the

22   equities analysis.  As the cases he cites and the

23   Courts recognize the special equity requires a showing

24   that the proceeding in another jurisdiction would

25   contravene that policy.  The AG doesn't even argue that

1    the resolution of the federal claims in federal court

2    before proceeding in this court would undermine the

3    policy of consumer protection in New Jersey.  And

4    that's because it wouldn't.

5            Smith & Wesson has entered into a tolling

6    agreement under the AG, such that if the subpoena and

7    the investigation survive federal and constitutional

8    scrutiny no prejudice will result from the delay.  The

9    Court's comity inquiry is an inquiry about weighing the

10   interests of the parties and the interests of the

11   judiciary.  It would be a waste of resources to have

12   these cases go forward at the same time.  And there

13   would be no harm to any interest of the AG in allowing

14   resolution of the federal case to proceed first.  Under

15   those circumstances, a stay is appropriate here for

16   comity reasons.

17            Even if the Court were not to stay, if the

18   Court determined that it was not appropriate under the

19   First Filed Rule, then it's our position that the Court

20   must dismiss the complaint or quash the subpoena.

21   That's because the AG has not met his burden to show

22   that the subpoena is reasonably related to a legitimate

23   purpose and cannot -- that subpoena cannot otherwise

24   survive Constitutional scrutiny.

25            First, Smith & Wesson has raised multiple

1    constitutional challenge -- challenges to the subpoena

2    any one of which would invalidate the subpoena.

3    There's absolutely no merit to the idea that you can

4    compel disclosure without resolving the First Amendment

5    and other claims first.

6             In the argument for the first time, we hear

7    the AG saying that only McCarthy era cases approach

8    Constitutional issues and subpoena context this way.

9    That's simply not the case.  For example, a case cited

10   by the AG which is EEOC versus U PENN, Third Circuit,

11   recognized that it was appropriate to address the First

12   Amendment issues in the subpoena enforcement action.

13   Other cases do the same.

14            In fact, the Supreme Court has specifically

15   recognized that the power of compulsory process must be

16   carefully circumscribed when the investigative process

17   tends to impinge upon such highly sensitive areas as

18   freedom of speech.  That's Sweezy.

19            The first -- so there are many examples of

20   cases invalidating subpoenas on First Amendment and

21   other Constitutional grounds.  Another one that's not

22   from McCarthy era is Local 1814 International

23   Longshoremen Association that we cited in our brief.

24            Similar to that case here, we have the AG's

25   viewpoint discrimination in issuing this subpoena

1   requires the subpoena to be invalidated.  Viewpoint

2   discrimination requires a showing that the government

3   -- of the government targeting speech when the specific

4   motivating ideology or the opinion, or perspective of

5   the speaker is the rationale for the restrictions on

6   speech.  In other words, the test for viewpoint

7   discrimination is whether the government has singled

8   out a subset of messages for disfavor based on those

9   views expressed.

10          Smith & Wesson is part if a disfavored

11   industry and is being attacked for engaging in

12   disfavored speech.  The Attorney General has singled

13   out those views for disfavor and has now named them

14   fraud.  It is a commonsense that we wouldn't even be

15   here if Smith & Wesson was on the other side of the

16   AG's disfavored political speech.  And that is

17   resulting in speech that the AG disfavors being

18   chilled.

19          The AG has allied himself with Anti-Second

20   Amendment Activists.  He's hired lawyers to coordinate

21   with those activists.  Those are the same groups that

22   have been shopping around as marketing fraud period of

23   AG's is a way to get documents to build cases.  There

24   are public reports that have revealed that the goal of

25   these approaches is to obtain documents to use what

1    they call impact litigation to attack firearms'

2    manufacturers, not to prosecute any fraud.

3         The AG has told the public that he's turning

4    up the heat on gun manufacturers.  The AG has touted a

5    naming and shaming program that unfairly tries to link

6    firearms manufacturers with third party criminal

7    activity.  Not only are these public implications of

8    viewpoint discrimination.  The viewpoint discrimination

9    is evident in the very subpoena and the arguments made

10   by the AG's briefing.

11        The Attorney General now seeks to curb Smith

12   & Wesson's speech by labeling it's opinions as fraud in

13   an attempt to chill Smith & Wesson's speech going

14   forward.  For example, enhancement of one's lifestyle

15   through firearms ownership is something that AG says he

16   is investigating as potential fraud.  A statement like

17   that cannot be fraud.  If this were an issue on the

18   other side of the political spectrum, like for example

19   if the AG said he wanted to investigate a women's

20   clinic regarding statements that abortion enhanced

21   one's lifestyle, I don't think we would be here having

22   this debate at all.

23        This is also so clearly opinion.  And in our

24   case, today it's disfavored opinion.  And that's why

25   it's so important to scrupulously police viewpoint

1    discrimination.  Right now, it's my client's industry

2    that is disfavored and whose political speech is being

3    targeted.  But some day soon it could be another.  And

4    this subpoena is viewpoint discrimination based on

5    disfavored speech making it unconstitutional and

6    unenforceable.

7           In addition, the AG has failed to show the

8    subpoena is reasonably related to a legitimate purpose.

9    It's not enough to just say that he wants to

10   investigate fraud, especially in the context of

11   constitutional issues.  Each request seeks documents

12   regarding protected First Amendment opinions about

13   Second Amendment issues that cannot form the basis of

14   fraud.  And therefore, the subpoena cannot meet the

15   standard articulated in Greenblatt and the other cases

16   that he's cited and we've cited.

17          He has suggested that his requests fall into

18   two categories.  I will start with his second first,

19   that's how they appeared in the briefing.  His second

20   is the one he said was second today, that category was

21   repress regarding whether the company engaged in

22   deceptive advertising regarding products safety

23   benefits and effectiveness.  We should all start by

24   recognizing that we aren't talking about a typical

25   product safety issue here.  We're talking about

1      firearms.  That makes this case unique.  Firearms are a

2      unique product.  There is a lot of political discourse

3      around firearms and people have strong beliefs on both

4      sides.

5               They are also a unique product because they

6      can be dangerous and everyone knows that.  But firearms

7      are protected in a Constitutional way.  The Second

8      Amendment and the Supreme Court recognized and enshrine

9      a policy that Americans are entitled to bear firearms

10     for their safety and protection.  So advertisements

11     that state the same just cannot be fraudulent.

12              And the AG's subpoena in main asks for

13     documents that regards opinions like that that could

14     never form the basis of fraud actions.  For example,

15     the AG talked about whether concealed carry of a

16     firearm enhances one's lifestyle.  It's not really

17     clear what that even means.  But there's no conceivable

18     way that meets New Jersey's requirement that statements

19     constitute fraud must be a misrepresentation of fact

20     not an opinion on your puffery.

21              Then there's other things like whether

22     something is safer, like confronting a threat he wants

23     documents related to that.  Safer is an opinion in this

24     context and it's certainly situational.  It's not a

25     presently existing quantifiable provable fact capable

1     of exact knowledge at the time made.  That language

2     comes from the Cigna case.  And that's the standard.

3          Where the request involves safety, self-

4     defense, protection, in particular self-defense in the

5     home, like his request in 4D, E, and F in the subpoena,

6     Supreme Court precedent like Heller and the Second

7     Amendment itself has usurped that policy decision the

8     AG wants to make here.  He wants to say that people are

9     less safe or less protected with firearms.  But that's

10    not a decision for him because in Heller the Supreme

11    Court recognized that citizen has a right to carry arms

12    in defense of his property or person and to use them if

13    either were assailed with such force, numbers, or

14    violence as made it necessary for protection or safety

15    of either.

16         The Second Amendment speaks to security as

17    the reason for it's existence.  So statements speaking

18    to a Constitutionally enshrined policy decision and

19    rights cannot constitute fraud.  Heller recognized the

20    enshrinement of Constitutional Rights necessarily takes

21    certain policy choices off the table.

22         These things really cannot be proven false.

23    That's why the cases cited by the AG to support his

24    inquiry do not provide any support.  As we mentioned in

25    our brief, he cites things like Leon versus Rite Aid

1   <u>Corp</u> to say that he's allowed to investigate such

2   things.  But in that case he was talking about how Rite

3   Aid advertised merchandise at prices and said that they

4   were the lowest prices.  That's quantifiable, that's

5   provable.  That's not opinion.  Those types of cases

6   add nothing here for the Court's analysis and are just

7   not the same.

8          The second category, which today the AG

9   addresses the first, is the failure to disclose

10  products marketed are unlawful to possess without a

11  permit.  This is the only specific allegation that the

12  AG has relied on to try to justify the subpoena.  This

13  hazardous product regulation which the AG contends

14  requires advertisers to inform New Jersey Consumers of

15  the need for a permit, seems to only have ever been

16  applied in two cases as far as I can tell or been able

17  to tell before today.  One in a recent settlement by

18  the AG's office relating to illegal firearms called

19  Ghost Guns and the other in this case.  I am not sure

20  if it's in the next case that the AG just mentioned,

21  but that case also involved illegal firearms that could

22  not be legally sold here in New Jersey.

23          But we know from the briefing here that the

24  AG's theory is that if Smith & Wesson's advertisements

25  available to New Jersey residents did not include a

1    statement that concealed carry requires a permit in New

2    Jersey then the AG thinks this is fraud.  And we should

3    note despite that the regulation potentially could be

4    applicable to every other industry that somehow

5    requires permits and licensing, like driving cars, or

6    selling liquor, et cetera, there's no other example of

7    the AG using that regulation.

8            In fact, driving a car requires a license in

9    New Jersey.  And if you drive without a license that is

10   a criminal offense, so this would fit right into that

11   statute.  But the AG is not targeting any auto maker

12   whose ads are all clearly available to New Jersey

13   residents but don't include that fact.  We know why.

14   It's because the more -- this is more evidence of

15   viewpoint discrimination and it's because the AG wants

16   to turn up the heat on gun manufacturers.  But it is

17   also evidence of how the AG has not and cannot

18   articulate a legitimate purpose for the subpoena and

19   investigation because it's not targeting fraud and

20   false statements.  It's targeting opinions expressed in

21   national advertisements of a disfavored industry with

22   which he disagrees.

23           We've described also in detail in our

24   briefing why this regulation cannot be constitutionally

25   abide to Smith & Wesson because it unconstitutionally

1      compels speech.  So even were the Court to apply the

2      most lenient standard in evaluating this, that's the

3      Central Hudson case, it would still have to evaluate

4      whether the notice requirement was narrowly drawn and

5      not more extensive than necessary to serve New Jersey

6      interests.  But it's not.  There is a really simple way

7      the State could do this.  It could modify it's online

8      permit form for all firearms that includes even BB-

9      guns, you have to get a permit for -- you have to go

10     there and do your online permit form to include a

11     statement regarding concealed carry.  Under such

12     circumstances New Jersey cannot force Smith & Wesson to

13     carry the State's message and it cannot survive

14     Constitutional scrutiny.

15             Imagine the implications on both inter-state

16     commerce and speech if the AG's theory were permitted.

17     Every advertisement or promotional statement made by

18     Smith & Wesson, whether by a magazine advertisement,

19     broadcast commercial, tweet, or any other form of

20     advertisement that has the potential to reach the State

21     of New Jersey, which is to say every advertisement

22     would have to have New Jersey's legal disclaimers along

23     with any other applicable State laws.  This certainly

24     creates dormant commerce clause issues as we have

25     raised in the federal case and our motion to quash.  It

1    would be just entirely too burdensome to meet the

2    purposes.  And I will just note that we obviously have

3    not made any of those issues.  They're all incorporated

4    into our briefing.

5          This subpoena is a political attack on

6    disfavored speech.  This is not about protecting

7    consumers.  Even an unbiased journalist recognized that

8    in that New York Times article we cited for Your Honor,

9    calling the AG's arguments disingenuous and the

10   subpoena a Trojan horse.  This is about digging and

11   fishing to try to find something to use and it's about

12   chilling his favored political speech.

13          In the first instance, it's our request that

14   Your Honor stay in comity to the First Filed action.

15   But if the Court determines not to stay, because the AG

16   has not met his burden to show his subpoena has a

17   legitimate purpose and because the subpoena cannot pass

18   constitutional scrutiny, then it must dismiss and

19   quash.  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. SAXENA:  Your Honor, I'm happy to respond

22   if that's appropriate now.

23          THE COURT:  Yes, I'm just reviewing my notes

24   Mr. Saxena.  One moment.

25                (Pause in hearing)

1           THE COURT:  I will hear you Mr. Saxena.  At

2      the outset I would like to hear you on the argument of

3      Smith & Wesson that there is not basis for your

4      subpoena under the Consumer Fraud Act that the two

5      areas that have been asserted, or two areas of concern

6      that there are statements made by Smith & Wesson that

7      may have an impact on personal safety and/or safety at

8      home, and that certain ads depict and market the

9      concealed carry of firearms while omitting the material

10     fact that in New Jersey concealed carry of firearms

11     requires a permit.

12          So first I'll hear you on whether or not

13     those are the assertions upon which you're attaching

14     your subpoena, or the basis of the subpoena.  And then

15     I'll hear you on her argument that those do not

16     properly support your subpoena.

17          MR. SAXENA:  Sure, Your Honor.  So those --

18     those are the two broad you know bases that are

19     outlined in our papers.  And those are the two bases

20     that we are relying on, if I'm understanding correctly.

21          I can go through each of them and explain why

22     each provides a basis for the State to at least

23     investigate under the Consumer Fraud Act.

24          THE COURT:  I'll hear you on each of them and

25     then, Mr. Saxena, whatever else you want to add in

1    response to Ms. Saleski's argument.

2              MR. SAXENA:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              MR. SAXENA:  So just as a preliminary, as I

5    mentioned the Consumer Fraud Act is one of the most

6    protective consumer protection laws in the nation.  And

7    the legislature enacted it as such, and instructed that

8    it should be construed probably as a remedial statute.

9    As part of effectuating that policy and protecting the

10   consumers, the statute doesn't just punish fraud, it

11   punishes or makes unlawful unconscionable commercial

12   practices of a wide variety of conduct, and really

13   seeks to establish a standard of kind of good faith and

14   fair dealing in the market.

15             As another part of ensuring that there's

16   robust enforcement of the statute, the CFA sets up a

17   very broad authority for the Attorney General to

18   actually issue subpoenas for potential violations under

19   the act.  Under 56:8-3 the act says, "when it shall

20   appear to the Attorney General that a person has

21   engaged in, is engaging in, or is about to engage in

22   any practice declared to be unlawful by the act,  or

23   when it believes it to be in the public interest that

24   an investigation should be made to ascertain that, then

25   he may examine documents and use subpoenas to

1    effectuate that purpose.

2              So the authority is quite broad.  So the

3    question then is what is the potential violation that

4    could be an issue.  As to -- I'll start with the claim

5    about safety, benefits and effectiveness.  Again we're

6    at the subpoena enforcement stage so we're not in a

7    position to weigh out all of the elements of a claim

8    for Your Honor, nor would that be appropriate to

9    disclose all of our investigative thinking and work

10   product to --

11             THE COURT:  I'm not asking you to do that Mr.

12   Saxena.  I just simply want to hear what the anchor is

13   for the subpoena.  Certainly, there's got be some --

14             MR. SAXENA:  Sure.

15             THE COURT:  -- understanding by the AG of

16   some possible fraud that this broad subpoena power is

17   utilized for.  So that's what I want to hear.

18             MR. SAXENA:  I -- I think it will help to

19   give you an illustrative example, Your Honor.  That is

20   I would just say a hypothetical that is grounded in

21   reality right here.  You know, if let's say Smith &

22   Wesson marketed a firearm that -- and it said in an

23   advertisement that the firearm has a "self-defense

24   trigger".  And that trigger made that firearm

25   especially effective for purposes of self-defense, and

1    indeed more effective than the competition's firearms.

2    But in fact, you know the actual data in Smith &

3    Wesson's possession indicated that the so-called self-

4    defense trigger did not actually improve the odds of

5    successful use in self-defense and did not render it a

6    superior product when compared to competitor's

7    products.  That would be a violation of the CFA.  It

8    would be deceptive advertising.

9            Were that to be the case and should we

10    discover those facts that would be an all fours with

11    the Radell case about the football helmets that said

12    that they had new concussion preventative technology

13    when in fact they did not.  That was a misleading

14    statement and an advertisement.

15            So that's an example of a variety of

16    statements about products and about the uses of

17    products that Smith & Wesson may be making in it's

18    advertisements, that are misleading as to the safety,

19    effectiveness, or benefits of the products.  Those

20    would be statutory violation under the CFA, which

21    prohibits deceptive advertising, and generally

22    misleading statements.

23                THE COURT:  But that's not the case here --

24                MR. SAXENA:  As to the regulation --

25                THE COURT:  We don't have something like that

1    here, do we?

2              MR. SAXENA:  Well we do, Your Honor, again

3    without you know, without disclosing our thinking at

4    this stage, we are concerned about statements that

5    Smith & Wesson has made about it's products and their

6    efficacy as compared to other products and their

7    efficacy for purposes of use for self-defense, and for

8    other purposes.  This is not a -- as opposing counsel

9    describes, this is not a general inquiry into the

10   appropriateness of firearms for use in self-defense.

11             We obviously understand that firearms have

12   Constitutionally recognized uses for purposes of self-

13   defense.  It's an inquiry into the specific statements

14   made by Smith & Wesson in it's advertising about the

15   specific products that it is advertising.

16             THE COURT:  So what specific statements and

17   what specific products?

18             MR. SAXENA:  So again, that is what -- again

19   our view is it's not appropriate to disclose here,

20   because (a) it's our investigative thinking and our

21   strategy, and (b) we don't have all of the arguments

22   yet, Your Honor.  So I've given you an example that is

23   grounded in reality.  Smith & Wesson did in fact market

24   a firearm with a self-defense trigger.  That has been

25   the subject of prior litigation.

1          But our concerns are also broader than that.

2     And the Attorney General at this stage of the

3     proceeding under the broad authority under the Consumer

4     Fraud Act is entitled to look into these matters.

5          Separately, as to the regulatory violation,

6     you know, it is correct that we did identify one

7     advertisement in our papers.  Again, as an illustrative

8     example the bodyguard advertisement which marketed a

9     product, a firearm for purposes of concealed carry.

10    And you know, encouraged consumers, including New

11    Jersey Consumers to purchase the product and use it for

12    concealed carry saying that it was particularly

13    effective concealed carry.  And you know, in that

14    instance, again we have concerns that there might be a

15    violation of the regulation.  We haven't conclusively

16    determined that yet, nor have we conclusively

17    determined that there's a statutory violation.  But at

18    the very least, we're entitled to investigate it in

19    that the advertisement makes no disclosures about you

20    know, the fact that it is unlawful to -- not possess a

21    firearm, but conceal carry a firearm in New Jersey

22    without a permit that is difficult to obtain.

23         Consumers are entitled to this information to

24    get full transparency into what they're buying.  And so

25    yes, that -- you know, that is something that we're

1    investigating.  Again, we do not have access to the

2    full compliment of Smith & Wesson's advertising.  Some

3    of it is public.  Some of it is around, but certainly

4    not all of it.  And so we're entitled to review it to

5    kind of address these concerns, especially under the

6    broad authority that the CFA provides.

7          And that also, by the way Your Honor,

8    explains some of the requests that Ms. Saleski has

9    pointed out.  Do you have a copy of the subpoena in

10   front of you, Your Honor?

11         THE COURT:  I have the verified complaint.

12   Does that have the language in it?  Let me see.

13         MR. SAXENA:  It's also exhibit B to the

14   Vandyke certification that was submitted along with the

15   verified complaint.  I'm not sure if you have that.

16         THE COURT:  I have it in the electronic file

17   which I've got to pull up.  If you want to read

18   language to me, you can do that.

19         MR. SAXENA:  Yeah, I can start us off.  I was

20   just going to address the concern about some of these

21   requests don't have -- don't go to deceptive

22   advertising, or don't go to a potential CFA violation.

23   I just wanted to walk through some of the key requests.

24   And you know, honestly, I would've preferred to do this

25   at a meet and confer with counsel for Smith & Wesson.

1    This is the type of thing that we would've done.  But I

2    think it's useful if we do it here.

3            THE COURT:  Yes.

4            MR. SAXENA:  The first request, seeks true,

5    accurate, and complete copies of all advertisements for

6    your merchandise, here firearms, that are or were

7    available or accessible in New Jersey concerning and

8    then a variety of topics are listed there, including

9    you know, the benefits of Smith & Wesson firearm.

10           Again that advertisement -- that request

11   seeks the advertisements, right, so we can assess the

12   factual claims that are made by Smith & Wesson about

13   the advertisements.

14           The second request is similar, in that it

15   requests drafts of the advertisements.  The reason

16   being if there was language or particular

17   representations that were omitted in early drafts

18   because of concerns that they might be misleading, they

19   may be revealing as to whether Smith & Wesson has made

20   a knowing omission in violation of the CFA.

21           The third request is one that I discussed

22   already concerning tests, studies, and analyses that

23   bear on the factual claims made in the advertisements

24   that are at issue, if those studies illustrate things

25   that are contrary to the representations that are made

1     in the advertising, then that could be evidence that

2     the advertisements are misleading.

3          Request four is the one that Smith & Wesson

4     really focuses on and particularly 4B, out of all the

5     other requests I think they really had an issue with

6     this one.  Again, we could've clarified this in

7     discussions with them.  But this request was an attempt

8     to seek documents concerning topics that are related to

9     claims that are made in the advertising or types of

10    advertising that we're concerned about.

11         So 4A whether Smith & Wesson firearms can be

12    legally concealed and carried, that goes straight to

13    the regulatory violation, right.  We want to understand

14    both the advertisements and also what Smith & Wesson's

15    thinking was if any on making representations as to

16    whether these firearms can be legally concealed or

17    carried by New Jersey consumers.

18         4B is the lifestyle request and I grant that

19    it may be difficult to parse this one if you're not

20    familiar with the types of advertisements here.  But

21    Smith & Wesson certainly is and they should know that

22    firearms are increasingly being marketed as lifestyle

23    accessories.  Accessories that are not only, you know,

24    suitable for you know, extreme situations like home

25    defense, in the case of an invader, but something that

1    you can carry with you in a purse to Yoga class, or to

2    work, or to you know, a bar, you know which is conduct

3    that is illustrated in advertisements for firearms,

4    because they're being marketed as a lifestyle

5    accessory.  So marketing firearms as a lifestyle

6    accessory is directly related to the regulatory

7    violation because it goes to the concealed carry of

8    firearms, which is set forth in this request.  Granted

9    it could've been clearer.

10         The rest of the requests in four are

11   similarly, you know, Smith & Wesson is treating them

12   like allegations in a complaint.  It's treating them

13   like we are alleging that you know, Smith & Wesson's

14   advertisements assert that a firearm makes the home

15   safer and that somehow is a violation of the CFA.  But

16   that's not the intent here.  These are topics in a

17   subpoena and we seek to discovery, you know,

18   discoverable information about specific advertisements

19   and specific firearms making specific claims about

20   whether those products will make the consumer safer in

21   specific circumstances.

22         Again, we don't know what those circumstances

23   exactly are yet, because we're at this early stage in

24   the proceeding.  But that's where those requests are

25   intended to go.  You know, I'll just do requests five

1    and six and wrap this up, because a lot of the other

2    requests are kind of jurisdictional in nature, trying

3    to get a better understanding of the extent to which

4    Smith & Wesson is directing it's marketing into New

5    Jersey and marketing products in New Jersey.  We

6    certainly know that they do it.  But obviously, we

7    would want to get a better understanding of to what

8    extent.

9         Request five, you know, concerns Smith &

10   Wesson's policies about ensuring compliance with New

11   Jersey laws.  That goes directly to the regulatory

12   violation, because we just would like to understand as

13   a background fact whether Smith & Wesson has ever

14   considered this issue of complying with the regulation.

15   And request six, goes similarly like request three, to

16   basically documents in Smith & Wesson's possession like

17   risk assessments that might belie the claims that are

18   made, the factual claims that are made, you know, in

19   its advertising.

20        So I wanted to start there because I thought

21   that might be helpful in terms of bridging the gap

22   between how the parties are characterizing the

23   subpoena.  That at lest is our view and our intent

24   behind those requests.

25        I'll say as to, you know, a couple of more

1    points and then I will wrap up, Your Honor, we're not

2    saying, you know as -- the important question about

3    timing, you know, is this an appropriate time to

4    consider the Constitutional objections?  We're not

5    saying that only McCarthy era cases considered that

6    issue.  Smith & Wesson did cite more recent cases

7    involving anonymous individuals on the internet who

8    wished to stay anonymous but a subpoena or other

9    demands sought to identify them and make public their

10   identifying information.  But that clearly implicates

11   the same type of associational privacy interest that is

12   addressed in the McCarthy era cases.  And it's just not

13   present here.  And Local 1814 which Ms. Saleski

14   mentioned, is just directly in the lineage of McCarthy

15   era cases.  Although it's more recent, it involved a

16   membership list request for union members that had --

17   that wasn't relevant to the overall investigation and

18   had the risk of chilling conduct.

19            You know, as to the second amendment, you

20   know Ms. Saleski asserted that the DC versus Heller

21   case somehow kind of makes the -- takes the inquiry

22   here under the CFA off the table.  That's just simply

23   not the case.  I mean Heller did not involve deceptive

24   advertising.  It didn't discuss deceptive advertising.

25   In fact the decision expressly acknowledged that

1       reasonable regulation of the commercial sale of

2       firearms is constitutional and does not offend the

3       Second Amendment.  So <u>Heller</u> is just off point here.

4       The policy choice, by the way that they were talking

5       about taking off the table in that decision, was a

6       complete and total ban on the possession of handguns in

7       the District of Columbia.  That clearly is not what

8       we're dealing with here.

9               On the stay, Your Honor, I would just note --

10      I guess both parties have urged Your Honor to read

11      <u>Sensient Colors</u> if you haven't already, but I would

12      just say read the decision.  The Court declines to stay

13      the case there.  It cited the Third Circuit case <u>Moses</u>

14      <u>H. Cone</u> which similarly declined a stay because of a

15      preemptive first strike suit.

16              You know, counsel makes that argument that is

17      not forum shopping because there is not an issue of a

18      different geographic forum.  But you know, our argument

19      is not that they're trying to take it into a different

20      geographic forum, clearly, they're still in the

21      district of New Jersey.  It's just that there are now

22      two parallel proceedings and there's this tricky issue

23      about which is going to go.  And the federal

24      proceeding, because they have delays, their request for

25      expedited relief is now going to take months if not

1        years.  So it is forum shopping to the extent that they

2        will not have to deal with enforcement of the subpoena,

3        for, you know, extended period of time.  Whereas if

4        this Court makes a decision, you know the subpoena

5        might be enforced much sooner.

6               The tolling agreement that they mentioned and

7        the two month delay, so I got to say that argument

8        takes a certain amount of chutzpah because you know,

9        the ordinary course here is that we issue a subpoena

10       and a party comes to us to meet and confer, and at

11       least discuss the objections to the subpoena.  But

12       again, here, you know the day after telling us that

13       they are going to refuse to comply with the subpoena in

14       it's entirety, Smith & Wesson went to federal court and

15       commenced litigation.  So after that point there really

16       wasn't much to meet and confer about.  They kind of

17       missed that opportunity and made clear where they were

18       -- you know, where they were going with this.  We had

19       to deal with their requests in the federal forum for

20       emergent relief and understand how it was going to

21       impact this case.  So it did take us some time to do

22       that and then get around to actually filing this motion

23       to enforce.  But that's not the relevant time period.

24       We didn't sit on our rights.  We had one day -- they

25       gave us one day to file a motion to enforce in this

1    Court before they filed in federal court.  That's the

2    relevant time period here.

3            So again, I think because of that reason, a

4    stay would be particularly unjust.  They say that no

5    prejudice would arise from the delay because there's a

6    tolling agreement.  Now while we may ultimately be able

7    to bring claims down the road, let's say months or

8    years because of the tolling agreement, any ongoing

9    violations of law will continue to occur during that

10   time.  Of course, we don't know that those are

11   happening, but the subpoena was issued because there's

12   a suspicion that those were happening.

13           So clearly that will be a prejudice to New

14   Jersey consumers.  They also complain of a waste of

15   resources, but they can't really be heard to complaint

16   of that, Your Honor, because they are the ones that

17   filed, you know, their Constitutional claims as a

18   complaint in federal court, rather than moving to quash

19   in this Court, which they could've done without the

20   federal complaint.  And then there would be no

21   duplicative litigation.  So I think that's all I would

22   like to respond now unless you have any other

23   questions.

24           THE COURT:  No, thank you Mr. Saxena.  Ms.

25   Saleski, is there anything you want to add before we

1    disconnect?

2            MS. SALESKI:  Yes, Judge just a few things,

3    thank you.  So first on this day, on the timing that

4    argument just doesn't make any sense in light of the

5    time line in the federal action.  So we filed on

6    December 15th.  The AG asked for an extension of time

7    for 14 days to answer the complaint.  Then the parties

8    jointly submitted a briefing schedule on January 21st.

9    Nothing happens in the federal court then until the AG

10   files it's motion to dismiss on February 22nd.

11           In the meantime, on February 12th, that's

12   when the AG files it's state court action.  There was

13   actually no emergent or preliminary injunction or TRO

14   request at that time because it wasn't clear that we

15   were -- we needed expedited relief.  Then when the AG

16   filed in this Court, we were afraid for our client's

17   rights that they wouldn't get resolved, and that's when

18   the emergent relief was requested.

19           It's correct.  It was withdrawn because after

20   that we negotiated a briefing schedule that made sense

21   and made clear that nothing was going to happen in the

22   immediate days that followed.  So it's just really not

23   correct, or fair, or genuine to say that somehow that

24   timing there was what capped the filing.  Two months

25   was two months and we have to live with those facts.

1   Forum shopping, it's not forum shopping.  It's just

2   not.  I mean the thing that we just heard described as

3   forum shopping was that it may take months or years for

4   a decision so that's forum shopping.  That's not

5   correct.  It's just not forum shopping.

6           And also I'll note there's this decision

7   right now pending before the District Court, the

8   briefing is almost finish.  The AG just asked for

9   another extension in the District Court to file it's

10  reply.  But this is a motion to dismiss and it has a

11  Younger argument to it.  We think we have the better of

12  the arguments, because we always do.  But we do think

13  we have the better of the arguments, but if the Judge

14  were to grant the relief requested by the AG under

15  Younger grounds that case is over.

16          So it's really -- that we'll know in short

17  order once the AG gets the reply in and it will be

18  fully briefed and I think the Court has said no oral

19  argument on that.

20          This meet and confer issue, you know, going

21  through that subpoena, it strikes me as -- we're

22  talking about opinion issues, and then we're talking

23  about sort of subsets of opinion issues.  If we want

24  all of your advertisements that relate to home safety.

25  You know our position on that.  That's political speech

1      that is protected and can never be fraud.

2              So to ask for sort of the subset of that

3      then, which is like your drafts of those because we

4      want to know what you were thinking, also violates the

5      Constitution.  And under these circumstances where it's

6      clear that the AG is politically aligned, and we were

7      looking -- our client was looking at these document

8      requests and I don't know -- I don't know what this

9      idea is that this one -- that I'm going to come back to

10     in a second is rooted in reality because the AG has not

11     pointed that out to us.

12             But we were looking at these requests and

13     saying what are these, because they did not appear to

14     be rooted in reality for us.  That's when we discovered

15     that there's marketing fraud theory, that academics,

16     and people who were opposed to Second Amendment

17     protections have been shopping around to AG's.

18             So if we take the lifestyle one, the idea

19     that they want to get a sense of why we're thinking

20     that somebody should put a gun in their purse when

21     there's this permitting law that we say can't

22     Constitutionally be applied to us just doesn't ring

23     true from our end of it.  And I think that the

24     permitting law would not sort of ask the question, why

25     would somebody put that in their purse?

1        You know, it seems more in line with the idea

2   that there was this subpoena that was crafted to get at

3   this political discourse and it's all based in that.

4   So one example that I don't understand how it's rooted

5   in reality, but we can put that away, the one example

6   that the AG gave is self-defense trigger and more

7   effective than others.  There's only one request in

8   this whole page that you went through with the AAG that

9   would go to that, and that's 4E.  So like 95% of the

10  subpoena does not relate to that.  And it's not a

11  concrete this idea that it's rooted in reality, but I'm

12  not going to tell you where.  That's not an anchor.

13  And that's what —- that doesn't respond to what the

14  Court was asking for.

15       The repeated statements that somehow the AG

16  has broad authority, that's really not enough.  That's

17  not enough under the law.  It's not enough in cases

18  like Gibson.  Gibson is a supreme court case that

19  recognized that the Constitutionality is not co-

20  expensive with the authority granted by legislation and

21  that makes sense because it's not just about whether

22  you're authorized.  It doesn't compel the conclusion

23  that you're free to inquire into any and all demands.

24       So we would ask the Court again to stay.  We

25  would ask the Court if you're not going to stay to

1    please consider our request that this complaint be

2    dismissed or that the subpoena be quashed.

3            THE COURT:  Okay.  Thank you.  Thank you both

4    for your very thorough arguments and briefs.  I will be

5    considering your arguments.  And I will issue an

6    opinion either in writing or else, if I am going to

7    read it into the record,  I will notify you 24 hours at

8    least in advance.  So thank you both.  And good luck.

9            MS. SALESKI:  Thank you for your time, Your

10   Honor.

11           THE COURT:  You're welcome.

12           MR. SAXENA:  Thank you, Your Honor.

13           THE COURT:  You're welcome.

14             (Hearing concluded at 11:22 a.m.)

15                        *  *  *  *

16

17

18

19

20

21

22

23

24

25

53

1    <u>CERTIFICATION</u>

2       I, Sharon Conover, the assigned transcriber, do

3    hereby certify the foregoing transcript of proceedings

4    on CourtSmart, Index No. from <u>10:11:12</u> to <u>11:22:43</u>, is

5    prepared to the best of my ability and in full

6    compliance with the current Transcript Format for

7    Judicial Proceedings and is a true and accurate non-

8    compressed transcript of the proceedings, as recorded.

9

10

11
12    */s/ Sharon Conover*         AD/T 625
13      Sharon Conover           AOC Number
14
15
16    Phoenix Transcription LLC     05/30/21
17       Agency Name             Date
18